ACCEPTED
15-25-00116-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
8/18/2025 11:41 PM
CHRISTOPHER A. PRINE
CLERK

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
8/18/2025 11:41:55 PM
CHRISTOPHER A. PRINE
Clerk

No. 15-25-00116-CV

# IN THE FIFTEENTH COURT OF APPEALS

KEN PAXTON, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL FOR
THE STATE OF TEXAS, AND
THE OFFICE OF THE ATTORNEY GENERAL,

*Appellants,*

v.

DELIA GARZA, IN HER OFFICIAL CAPACITY AS TRAVIS COUNTY
ATTORNEY; JOSÉ P. GARZA, IN HIS OFFICIAL CAPACITY AS TRAVIS
COUNTY DISTRICT ATTORNEY; TRAVIS COUNTY; BRIAN M.
MIDDLETON, IN HIS OFFICIAL CAPACITY AS FORT BEND COUNTY
DISTRICT ATTORNEY (268TH JUDICIAL DISTRICT); HARRIS COUNTY
DISTRICT ATTORNEY SEAN TEARE; HARRIS COUNTY; EL PASO COUNTY
DISTRICT ATTORNEY JAMES MONTOYA; EL PASO COUNTY ATTORNEY
CHRISTINA SANCHEZ; EL PASO COUNTY; DALLAS COUNTY CRIMINAL
DISTRICT ATTORNEY JOHN CREUZOT; DALLAS COUNTY; BEXAR
COUNTY CRIMINAL DISTRICT ATTORNEY JOE GONZALES; BEXAR
COUNTY; AND SHAWN W. DICK, IN HIS OFFICIAL CAPACITY AS
WILLIAMSON COUNTY DISTRICT ATTORNEY (26TH JUDICIAL DISTRICT),

*Appellees.*

## BRIEF OF THE TRAVIS COUNTY, HARRIS COUNTY,
## EL PASO COUNTY, DALLAS COUNTY, BEXAR COUNTY,
## AND WILLIAMSON COUNTY APPELLEES

[Appellees' Attorneys Listed on Following Pages]

*Oral Argument Requested*

Leslie W. Dippel
State Bar No. 00796472
Leslie.Dippel@traviscountytx.gov
Todd A. Clark
State Bar No. 04298850
Todd.Clark@traviscountytx.gov
Cynthia W. Veidt
State Bar No. 24028092
Cynthia.Veidt@traviscountytx.gov
Travis County Attorneys
**DELIA GARZA**
**TRAVIS COUNTY ATTORNEY**
P.O. Box 1748
Austin, TX 78767
Tel.: (512) 854-9513
Fax: (512) 854-4808

*Counsel for Appellees Delia Garza, in her Official Capacity as Travis County Attorney, José P. Garza, in his Official Capacity as Travis County District Attorney, and Travis County*

Jonathan G.C. Fombonne
Deputy County Attorney & First
Assistant
State Bar No. 24102702
Jonathan.Fombonne@harriscountytx.gov
Tiffany S. Bingham
Managing Counsel
Affirmative & Special Litigation Division
State Bar No. 24012287
Tiffany.Bingham@harriscountytx.gov
Christopher Garza
Deputy Division Director
Affirmative & Special Litigation Division
State Bar No. 24078543
Christopher.Garza@harriscountytx.gov
Office of the Harris County Attorney
**CHRISTIAN D. MENEFEE**
**HARRIS COUNTY ATTORNEY**
1019 Congress Plaza, 15th Floor
Houston, TX 77002
Tel.: (713) 274-5101
Fax: (713) 755-8924

Alexandria Oberman
State Bar No. 24131555
aoberman@milchev.com
Michael J. Statin, *pro hac vice*
msatin@milchev.com
**MILLER & CHEVALIER CHARTERED**
900 16th Street, NW
Washington, DC 20006
Tel.: (202) 626-5800
Fax: (202) 626-5801

*Counsel for Appellees Criminal District Attorney John Creuzot; Dallas County; Criminal District Attorney Joe Gonzales; and Bexar County*

Bradley W. Snead
State Bar No. 24032706
snead@wrightclosebarger.com
Michael Adams-Hurta
State Bar No. 24097860
hurta@wrightclosebarger.com
**WRIGHT CLOSE & BARGER, LLP**
One Riverway, Suite 2200
Houston, Texas 77056
Tel.: (713) 572-4321
Fax: (713) 572-4320

*Counsel for Appellees District Attorney Sean Teare and Harris County*

Christina Sanchez
El Paso County Attorney
State Bar No. 24062984
Ch.sanchez@epcountytx.gov
Bernardo Rafael Cruz
Assistant County Attorney
State Bar No. 24109774
b.cruz@epcountytx.gov
**CHRISTINA SANCHEZ**
**EL PASO COUNTY ATTORNEY**
320 S. Campbell St., Suite 200
El Paso, TX 79901
Tel.: (915) 273-3247

*Counsel for Appellees El Paso County District Attorney James Montoya, El Paso County Attorney Christina Sanchez, and El Paso County*

C. Robert Heath
State Bar No. 09347500
bheath@bickerstaff.com
**BICKERSTAFF HEATH DELGADO ACOSTA**
1601 S. Mopac Expy., Suite 400
Austin, TX 78746
Tel.: (512) 404-7821

Randy T. Leavitt
State Bar No. 12098300
randy@randyleavitt.com
**LAW OFFICE OF RANDY T. LEAVITT**
1301 Rio Grande St.
Austin, TX 78701
Tel.: (512) 476-4475

*Attorneys for Appellee Shawn W. Dick in his Official Capacity as Williamson County District Attorney (26th Judicial District)*

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ...................................................................4

TABLE OF AUTHORITIES .............................................................6

STATEMENT OF THE CASE ........................................................ 13

ISSUES PRESENTED.................................................................... 14

INTRODUCTION.......................................................................... 15

STATEMENT OF FACTS............................................................... 17

SUMMARY OF THE ARGUMENT ................................................ 26

STANDARD OF REVIEW ............................................................. 28

ARGUMENT................................................................................. 29

I.    The trial court did not abuse its discretion in finding that Appellees established a probable right to the relief sought. ................... 30

    A.    The Attorney General lacks statutory authority to promulgate the Challenged Rules......................................... 30

        1.    The Legislature did not expressly grant the Attorney General power to promulgate the Challenged Rules. ....................................................... 32

        2.    The Attorney General does not have the "implied" power to promulgate the Challenged Rules. ..................................................................... 37

        3.    Statutory history confirms that Section 41.006 always focused on local prosecutors and their duties, not on the Attorney General's powers.................... 41

    B.    The Challenged Rules are invalid because they exceed the scope of Texas Government Code Section 41.006. ....................... 48

    C.    The Attorney General did not comply with the procedural requirements of the Texas Administrative Procedure Act.......... 52

        1.    The Challenged Rules were not adopted in substantial compliance with the reasoned justification requirement. ....................................... 53

        2.    The Challenged Rules were not adopted in substantial compliance with Section 2001.024. .................. 56

D. The Challenged Rules violate the Texas Constitution's separation of powers. ........................ 57

II. The trial court did not abuse its discretion by finding that Appellees established a probable, imminent, and irreparable injury. .................................................................. 64

A. The Attorney General has waived any challenge to the trial court's injury findings or conclusions. .................... 66

B. Nevertheless, the trial court did not abuse its discretion in holding that Appellees established this element. ........................... 66

III. The trial court did not abuse its discretion in preserving the status quo or otherwise weighing the equities. ......................... 70

A. The temporary injunction preserves the status quo. ................... 70

B. This Court should not reweigh the equities. ................................ 71

C. To the extent it is relevant, the Attorney General overestimates his own harm. ....................................... 73

D. The equities favor preserving the status quo. ............................. 76

IV. The temporary-injunction order is not overbroad. ................................. 78

PRAYER ................................................................................................ 79

CERTIFICATE OF COMPLIANCE ........................................................ 82

APPENDIX ............................................................................................ 83

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott v. Doe,*
691 S.W.3d 55 (Tex. App.—Austin 2024, pet. filed) ................................ 28, 72

*Am. Pearl Grp., L.L.C. v. Nat'l Payment Sys., L.L.C.,*
715 S.W.3d 383 (Tex. 2025) ................................................................. 46

*Armadillo Bail Bonds v. State,*
802 S.W.3d 237 (Tex. Crim. App. 1990) ............................................. 58

*Brown v. City of Houston,*
660 S.W.3d 749 (Tex. 2023) ............................................................... 42

*Brown v. Humble Oil & Refin. Co.,*
83 S.W.2d 935 (Tex. 1935) ................................................................. 63

*Burkholder v. Wilkins,*
504 S.W.3d 485 (Tex. App.—Corpus Christi–Edinburg 2016, no pet.) ..... 73

*Butnaru v. Ford Motor Co.,*
84 S.W.3d 198 (Tex. 2002) ........................................................... passim

*Cameron v. Terrell & Garrett, Inc.,*
618 S.W.2d 535 (Tex. 1981) ............................................................... 34

*Camp v. Shannon,*
348 S.W.2d 517 (Tex. 1961) ............................................................... 30

*Cities of Austin, Dallas, Ft. Worth & Hereford v. Sw. Bell Tel. Co.,*
92 S.W.3d 434 (Tex. 2002) ................................................................. 40

*City of El Paso v. Heinrich,*
284 S.W.3d 366 (Tex. 2009) ........................................................... 67, 74

*City of Houston v. James Const. Grp., LLC,*
No. 14-21-00322-CV, 2023 WL 3301739 & n.3
(Tex. App.—Houston [14th Dist.] May 8, 2023, no pet.) .......................... 52

*Combs v. Ent. Publ'ns, Inc.*,
292 S.W.3d 712 (Tex. App.—Austin 2009, no pet.) ................................ 72

*Comm'n of Tex. (PUC) v. City Pub. Serv. Bd. of S.A.*,
53 S.W.3d 310 (Tex. 2001) .......................................... 33, 37, 39

*Ctr. for Econ. Justice v. Am. Ins. Ass'n*,
39 S.W.3d 337 (Tex. App.—Austin 2001, no pet.) ................................ 28, 71

*Cupples Prods. Co., Div. of H.H. Robertson Co. v. Marshall*,
690 S.W.2d 623 (Tex. App.—Dallas 1985, no writ) .............................. 68

*Daniels v. Balcones Woods Club, Inc.*,
No. 03-02-00353-CV, 2002 WL 31426294 (Tex. App.—Austin Oct. 31, 2002, no pet.) .......................................................... 73

*El Paso Hosp. Dist. v. Tex. Health & Hum. Servs. Comm'n*,
247 S.W.3d 709 (Tex. 2008) ....................................... 52

*Fin. Comm'n of Tex. v. Norwood*,
418 S.W.3d 566 (Tex. 2013) ....................................... 58

*Gatlin v. GXG, Inc.*,
No. 05-93-01852-CV, 1994 WL 137233
(Tex. App.—Dallas Apr. 19, 1994, no writ) ...................................... 69

*Hartzell v. S.O.*,
672 S.W.3d 304 (Tex. 2023) ................................... 32, 39, 49

*Henry v. Cox*,
520 S.W.3d 28 (Tex. 2017) ......................................... 28

*Hill County v. Sheppard*,
142 Tex. 358, 178 S.W.2d 261 (1944) ................................ 61

*Hogan v. Zoanni*,
627 S.W.3d 163 (Tex. 2021) ......................................... 45, 46

*In re Bay Area Citizens Against Lawsuit Abuse*,
982 S.W.2d 371 (Tex. 1998) ......................................... 50

*In re Newton*,
146 S.W.3d 648 (Tex. 2004) ......................................... 71

*In re Off. of the Att'y Gen.*,
   No. 15-24-00091-CV, 2025 WL 2204075
   (Tex. App.—15th Dist. Aug. 4, 2025, orig. proceeding)............................59, 63

*In re Oncor Electric Delivery Co.*,
   630 S.W.3d 40 (Tex. 2021)........................................................................31, 41

*In re State*,
   711 S.W.3d 641 (Tex. 2024)............................................................................73

*In re Tex. House of Representatives*,
   702 S.W.3d 330 (Tex. 2024)......................................................................60, 61

*In re Turner*,
   627 S.W.3d 654 (Tex. 2021)......................................................................58, 61

*INEOS Grp. Ltd. v. Chevron Phillips Chem. Co.*,
   312 S.W.3d 843 (Tex. App.—Hous. [1st Dist.] 2009, no pet.) ....................30

*Loving v. United States*,
   517 U.S. 748 (1996) ........................................................................................60

*Main St. Legal Servs., Inc. v. Nat'l Sec. Council*,
   811 F.3d 542 (2d Cir. 2016)............................................................................35

*Martinez v. State*,
   323 S.W.3d 493 (Tex. Crim. App. 2010)........................................................58

*Martinez v. State*,
   503 S.W.3d 728 (Tex. App.—El Paso 2016, pet. ref'd)..................................58

*Md. Am. Gen. Ins. Co. v. Blackmon*,
   639 S.W.2d 455 (Tex. 1982) ...........................................................................68

*Meshell v. State*,
   739 S.W.2d 246 (Tex. Crim. App. 1987)............................................. 59, 61, 62

*Muth v. Voe*,
   691 S.W.3d 93 (Tex. App.—Austin 2024, pet. filed)......................................72

*Ojo v. Farmers Grp., Inc.*,
   356 S.W.3d 421 (Tex. 2011).............................................................................47

8

*Paxton v. Annunciation House, Inc.*, __ S.W.3d __, No. 24-0573, 2025 WL 15362224, at \*12 (Tex. May 30, 2025)........................................................ 50

*Perry v. Del Rio*,
67 S.W.3d 85 (Tex. 2001) ..................................................................59, 63

*Pruett v. Harris Cnty. Bail Bond Bd.*,
249 S.W.3d 447 (Tex. 2008) ...............................................31, 37, 38, 39

*R.R. Comm'n of Tex. v. Lone Star Gas Co.*,
844 S.W.2d 679 (Tex. 1992) .....................................................31, 39

*Rescue-National v. Planned Parenthood of*,
*Hous.*, 937 S.W.2d 60 (Tex. App.—Houston [14th Dist.] 1996) ................. 70

*Rodriguez v. Serv. Lloyds Ins. Co.*,
997 S.W.2d 248 (Tex. 1999) ..................................................................... 53

*Rose v. Doctors Hosp.*,
801 S.W.2d 841 (Tex. 1990) ..................................................................... 79

*S.C. v. M.B.*,
650 S.W.3d 428 (Tex. 2022) ..................................................................... 36

*Saldano v. State*,
70 S.W.3d 873 (Tex. Crim. App. 2002)..................................................... 64

*Smith v. Craddick*,
471 S.W.2d 375 (Tex. 1971)...................................................................... 78

*State v. City of San Marcos*,
714 S.W.3d 224 (Tex. App.—15th Dist. 2025, pet. filed)........................71, 78

*State v. Hollins*,
620 S.W.3d 400 (Tex. 2020)...................................................................... 67

*State v. Loe*,
692 S.W.3d 215 (Tex. 2024)...................................................................... 28

*State v. Stephens*,
663 S.W.3d 45 (Tex. Crim. App. 2021).............................................passim

*Sun Oil Co. v. Whitaker*,
424 S.W.2d 216 (Tex. 1968)...................................................................... 30

*Talisman Energy USA, Inc. v. Matrix Petrol., LLC,*
No. 04-15-00791-CV, 2016 WL 7379254, at
(Tex. App.—San Antonio Dec. 21, 2016, no pet.) ............................................ 66

*Tex. Alcoholic Beverage Comm'n v. Amusement & Music Operators of Tex., Inc.,*
997 S.W.2d 651 (Tex. App.—Austin 1999, pet. dism'd w.o.j.) ...................... 72

*Tex. Ass'n of Acupuncture & Oriental Med. v. Tex. Bd. of Chiropractic Exam'rs,*
524 S.W.3d 734 (Tex. App.—Austin 2017, no pet.) ....................................... 48

*Tex. Boll Weevil Eradication Found., Inc. v. Lewellen,*
952 S.W.2d 454 (Tex. 1997) .............................................................................. 63

*Tex. Health & Hum. Servs. v. Advocates for Patient Access, Inc.,*
399 S.W.3d 615 (Tex. App.—Austin 2013, no pet.) ....................................... 72

*Tex. St. Bd. of Exam'rs of Marriage & Fam. Therapists,*
511 S.W.3d 28 (Tex. 2017) ............................................................................... 48

*Unified Loans, Inc. v. Pettijohn,*
955 S.W.2d 649 (Tex. App.—Austin 1997, no writ) ...................................... 57

*United States v. Hernandez-Barajas,*
71 F.4th 1104 (8th Cir. 2023) .......................................................................... 35

*Washington v. Associated Builders & Contractors of S. Tex. Inc.,*
621 S.W.3d 305 (Tex. App.—San Antonio 2021, no pet.) ...................... 30, 79

*Webster v. Comm'n for Law. Discipline,*
704 S.W.3d 478 (Tex. 2024) ............................................................................. 59

*Whitman v. Am. Trucking Ass'ns,*
531 U.S. 457 (2001) ........................................................................................... 45

*Williams v. Tex. St. Bd. of Orthotics & Prosthetics,*
150 S.W.3d 563 (Tex. App.—Austin 2004, no pet.) ....................................... 31

**Statutes**

Tex. Bus. & Comm. Code §§ 17.464, 102.101, 114.0002,
303.004, 371.051, 848.151 ............................................................................... 34

Tex. Code Crim. Proc. art. 2.305 .......................................................................... 34

TEX. CODE CRIM. PROC. art. 2A.205 ....................................................... 63

TEX. CODE CRIM. PROC. art. 46B.460 ..................................................... 34

TEX. CODE CRIM. PROC. art. 58.052 ....................................................... 34

TEX. CODE CRIM. PROC. § 2.01 ................................................................ 23

TEX. CONST., art. II, § 1 ..................................................................... 58, 70

TEX. CONST., art. IV, § 22 ................................................................. 59, 63

TEX. CONST., art. V, § 21 .................................................................. 59, 64

TEX. CONST. of 1836, art. IV, § 5 ........................................................... 59

TEX. CONST. of 1866, art. IV, § 13 .......................................................... 59

TEX. CONST. of 1869, art. IV, § 23 .......................................................... 59

TEX. GOV'T CODE § 41.006 .......................................................... passim

TEX. GOV'T CODE §§ 402.0212–.036 ...................................................... 33

TEX. GOV'T CODE §§ 420.005–.108 ........................................................ 33

TEX. GOV'T CODE §§ 552.262–3031 ....................................................... 33

TEX. GOV'T CODE § 2107.002 ................................................................ 34

TEX. GOV'T CODE § 2001.001 ................................................................ 53

TEX. GOV'T CODE § 2001.024 ........................................................... 56, 57

TEX. GOV'T CODE § 2001.033 ........................................................... 54, 55

TEX. HEALTH & SAFETY CODE § 142.0104 ............................................. 48

TEX. INS. CODE § 848.151 ...................................................................... 34

TEX. LOC. GOV'T CODE § 87.011 ........................................................... 18

TEX. LOC. GOV'T CODE § 87.911 ........................................................... 50

TEX. NAT. RES. CODE § 11.071 .............................................................. 64

TEX. OCC. CODE § 1704.101 .................................................................. 38

TEX. TRANSP. CODE § 371.051(g) ........................................................ 34

TEX. UTIL. CODE § 35.002 .................................................................... 39

**Prior Statutes and Acts**

Act of May 17, 1985, 69th Leg., R.S., ch. 480, § 1, 1985 Tex. Gen. Laws 1720, 1919 (codified as TEX. GOV'T CODE § 41.006) ........................................... 47

TEX. CODE CRIM. PROC. at 181, sec. 3, art. 1 (1925) ..................................... 46

TEX. CODE CRIM. PROC. title. 1, arts. 28, 30, 40, 58 (1879) ............. 43, 44, 47

TEX. REV. CIV. STAT. at 2419, sec. 2 (1925) ........................................ 46, 47

TEX. REV. CIV. STAT. title 70, ch. 4, art. 4413 (1925) ................................ 46

Paschal's Digest Art. 201-02 (Act of 11 May 1846) ............................................ 43

**Rules**

Tex. R. App. P. 9.4 ................................................................................. 82

TEX. R. APP. P. 38.1(i) .......................................................................... 66

**Regulations**

1 TEX. ADMIN. CODE §§ 56.1–.8 .........................................................passim

50 Tex. Reg. 2173 (2025) (Adopted Rules) .........................................passim

**Other Authorities**

Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 152 (2012) ........................................35, 42, 46, 47

MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary (last updated Aug. 17, 2025) .............................35, 51

RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY (2d ed. 2001) .......... 35

Senate Judiciary Comm., Bill Analysis, Tex. S.B. 1228, 69th Leg., R.S. (1985) ................................................................. 47

# STATEMENT OF THE CASE

*Nature of the Case:*    Appeal from a temporary injunction enjoining enforcement of new regulations promulgated by the Attorney General (a member of the Executive Department) that impose sweeping and continuous reporting requirements upon county and district attorneys (members of the Judicial Department) presiding in a district or county with a population of 400,000 or more (the "Challenged Rules"). Appellees (certain counties, district attorneys, and county attorneys subject to the Challenged Rules) challenged them as invalid.

*Course of Proceedings:*    Appellees filed three lawsuits, which the trial court consolidated, and sought a temporary injunction. (CR339). Prior to the hearing, the parties stipulated to the Challenged Rules' first imminent reporting deadlines and to the admissibility of 23 exhibits, including 9 sets of comments on the proposed rules and 10 declarations by attorneys and administrators in Appellees' offices. (CR383–85). The trial court then held an evidentiary hearing where Appellees presented additional testimony by two live witnesses. (2RR35–160). The Attorney General presented no evidence.

*Trial Court's Disposition:*    The trial court granted a temporary injunction, finding that Appellees stated a valid cause of action, that they have a probable right to relief, and that they will suffer probable, imminent, and irreparable injury absent the temporary injunction. (CR392). The trial court held that Appellees are likely to prevail under four different legal theories, and the trial court found imminent and irreparable harm through (a) outlay of expenses and resources (diverting from core prosecutorial duties), and (b) forced disclosure of confidential information which interferes with Appellees' "ability to perform their constitutionally assigned duties and protect their communities from criminal activity." (CR392–93).

## ISSUES PRESENTED

A temporary injunction is an equitable tool meant to preserve the status quo while litigation is pending, the issuance of which is left to "the trial court's sound discretion." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). The Attorney General identified the question presented as generally whether the trial court abused its discretion in granting the temporary injunction below. For clarity, this case presents the following sub-issues:

1. Did Appellees establish a probable right to relief under at least one of the four legal theories accepted by the trial court, i.e., that—

   • the Attorney General lacked authority under Texas Government Code Section 41.006 or any other statute to promulgate the Challenged Rules;

   • the scope of the Challenged Rules exceeded the scope of Section 41.006;

   • the Attorney General failed to comply with the procedural requirements of the Texas Administrative Procedure Act; and/or

   • the Challenged Rules violate Texas Constitution's separation of powers?

2. In an issue not squarely raised by the Attorney General, did Appellees establish a probable, imminent, and irreparable injury? And did the Attorney General waive this point by failing to challenge the trial court's underlying factual findings here?

3. Did the trial court act within its sound discretion in preserving the status quo, given the probable success and injury established by Appellees and the equities that the trial court reasonably balanced?

4. Did the trial court act within its sound discretion in fashioning the scope of relief?

14

TO THE HONORABLE FIFTEENTH COURT OF APPEALS:

## INTRODUCTION

The Attorney General promulgated the Challenged Rules, which establish an unprecedented and burdensome executive-department regulatory "reporting" regime over select large-county prosecutors, to "rein" them in. Instead of citing any direct authority for rulemaking, however, the Attorney General latches onto a single word ("directs") to transform an innocuous statute into a fountain of unlimited rulemaking and regulatory power. That statute, Section 41.006 of the Texas Government Code, provides:

> At the times and in the form that the attorney general directs, the district and county attorneys shall report to the attorney general the information from their districts and counties that the attorney general desires relating to criminal matters and the interests of the state.

TEX. GOV'T CODE § 41.006.

The Attorney General seeks to enforce his Challenged Rules while their authority and legality is litigated—and force Appellees to ignore confidentiality laws while diverting staff and millions of dollars from their prosecutorial roles—based almost entirely on a cursory dictionary cherry-picking exercise. He offers no structural reading of the statute and no precedent. Unlike every other statute conferring rulemaking authority to the Attorney General, Section 41.006 does not say he "shall" or "may" adopt rules. But agencies must point to a clear and unmistakable legislative authorization before asserting power. They

15

cannot conjure new powers by stretching isolated words beyond recognition. Yet the Attorney General asks this Court to do just that—accept a construction so untethered from context that it would give him a blank check to regulate whenever expedient, even over other constitutional officers in different government departments. And he asks this at the temporary-injunction stage.

Even if Section 41.006 could be bent to imply some rulemaking power, the Challenged Rules far exceed any plausible statutory scope. They are independently invalid because they were promulgated without compliance with the Administrative Procedure Act and because they intrude on prosecutorial duties constitutionally assigned to district and county attorneys.

Equally telling is what the Attorney General does not do. He ignores the record evidence showing the Rules' substantial burdens, offers none of his own, and simply assures the Court the burdens are minor. He wholly disregards the standard of review at this interlocutory posture: abuse of discretion.

A temporary injunction is meant to preserve the status quo while litigation is pending. The procedural tool would be rendered a nullity if temporary injunctions were disallowed against government entities asserting wide swaths of power based on stilted statutory readings and an official's desire to exercise that power without heed to statutory and constitutional constraints. The order here, instead, is paradigmatic of the temporary-injunction process. The trial court did not abuse its discretion, and this Court should affirm.

## STATEMENT OF FACTS

Appellants—Attorney General Ken Paxton and the Office of the Attorney General (collectively, "the Attorney General")—promulgated administrative rules that impose sweeping and continuous reporting requirements upon district and county attorneys presiding in a county with a population of 400,000 or more (the "Challenged Rules"). In adopting the rules, the Attorney General claimed that the new regulations are "necessary to implement §41.006" of the Government Code. 50 Tex. Reg. 2173 (2025) (Adopted Rules). But Section 41.006 has nothing to implement, and the Challenged Rules would require Appellees—a coalition of certain counties, district attorneys, and county attorneys subject to the Challenged Rules[1]—to divert numerous staff and millions of dollars from prosecutorial functions to comply by identifying, reviewing, and maintaining massive amounts of data. (*See* 3RRP-4 to P-12; 3RRP-14 to P-23 (detailing compliance costs and efforts faced by various Appellees)).

Appellees sued, and the trial court issued a temporary injunction against the enforcement of the Challenged Rules.

---

[1] This brief is presented by all Appellees except for Fort Bend County District Attorney Brian M. Middleton. This brief refers to this group as "Appellees" for simplicity.

*The Challenged Rules*

The Challenged Rules require covered district and county attorneys to submit highly burdensome initial, quarterly, and annual "reports." 1 TEX. ADMIN. CODE § 56.1. Appellees must provide to the Attorney General numerous categories of information and documents, including "case file[s]" for particular categories of cases, "[a]ll correspondence" on particular topics or with particular entities regarding decisions whether to indict an individual or category of offenses, and the number of times certain prosecution events occurred. *Id.* § 56.3; *see also id.* §§ 56.4, 56.9(c). The Challenged Rules explicitly include protected "work product" and "otherwise privileged and confidential matters" as items to be provided. *Id.* § 56.2(1). They also purport to expand the meaning of "official misconduct" beyond the legislative definition. *Compare id.* § 56.8(1), *with* TEX. LOC. GOV'T CODE § 87.011(3).

The stated intent of the Challenged Rules is to, among other things, regulate local prosecutions by "ensur[ing] that county and district attorneys are … appropriately prosecuting crimes." 50 Tex. Reg. 2173. But, in a press release issued on the day the Challenged Rules were published, the Attorney General noted the rules target officials in major counties. The press release, admitted into evidence without objection, is titled, "Attorney General Ken Paxton Announces New Reporting Requirement to Rein in Rogue District Attorneys and Ensure the Prosecution of Violent Criminals," and states:

In many major counties, the people responsible for safeguarding millions of Texans have instead endangered lives by refusing to prosecute criminals and allowing violent offenders to terrorize law-abiding Texans. This rule will enable citizens to hold rogue DA's accountable.

(3RRP-13).[2]

The Attorney General originally proposed an initial rule on March 8, 2024, similar to the one here. The initial proposed rule received many public comments—mostly in opposition (and the record contains no comments in favor). The Attorney General withdrew that proposal on September 13, 2024, in favor of a new and similar proposed rule. The new proposal also received numerous comments in opposition. Many of those comments came from Appellees, detailing the extraordinary burden and cost associated with compliance and raising concerns about conflicting statutory and ethical obligations to safeguard sensitive and confidential information. (*See* 3RRP-4 to P-12).

In adopting the Challenged Rules, the Attorney General dismissed the public comments by moving forward without substantive modifications and without engaging with commenters' concerns about the rule's legality, cost, or feasibility. *See* 50 Tex. Reg. 2175–80.

---

[2] *Also available* at https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-announces-new-reporting-requirement-rein-rogue-district-attorneys-and (last visited August 15, 2025).

### The Lawsuit

Faced with the Attorney General's attempt to "rein" them in through the Challenged Rules, Appellees filed separate suits seeking injunctive relief and declaratory relief that the Challenged Rules are invalid or *ultra vires*. The trial court consolidated the separate lawsuits (CR339) and set a hearing on Appellees' temporary-injunction applications for June 16, 2025.

### The Temporary Injunction Hearing and Evidence of Harm

For the temporary-injunction hearing, the parties stipulated to the Challenged Rules' first imminent reporting deadlines and the admissibility of 23 exhibits, including 9 sets of comments on the proposed rules and 10 declarations by attorneys and administrators in Appellees' offices. (CR383–85). Appellees also presented two live witnesses at the evidentiary hearing. (2RR35–160). The Attorney General presented no evidence and offered no objections.[3]

Appellees presented abundant evidence regarding the impact of the Challenged Rules. For example, Appellees presented evidence that the Challenged Rules divert Appellees' resources from their core prosecutorial functions. (*See, e.g.*, 3RRP-14 at ¶ 13; P-20 at 2) (explaining how prosecutor-

---

[3] The Attorney General comments that several other prosecutors have submitted initial reports to the Attorney General, "with nary a suggestion that the prosecutions in those jurisdictions have reached a standstill." (Appellants' Br. at 32–33). But these referenced reports are not in the record and not before this Court.

attorney time is required for compliance). They also presented evidence that the rules would deprive Appellees of the ability to protect confidential information in their judicial-department roles while requiring that the confidential information be given to an executive entity without the protections afforded by existing statutes, especially for individuals reporting crimes and participating in prosecutions. (*See, e.g.*, 3RRP-4 at 4–7; P-14 at ¶ 19; P-23 at ¶ 8). That confidential information includes grand jury information, informant identities, and child sexual-abuse records, just to name a few confidential items subject to the Challenged Rules. (*E.g.*, 3RRP-4 at 4; P-9 at 3–4, 5–6; P-15 at 5; P-18 at 6). For each disclosure mandated by the Challenged Rules, prosecutors will be forced to "evaluate the risk of noncompliance"—that is, "the threat of a removal action, quo warranto proceeding, or other Attorney General-initiated lawsuit"—and weigh that against "the privacy rights, confidentiality laws, and other statutory and regulatory provisions prohibiting release of certain case information and communications." (3RRP-14 at 4).

Appellees also demonstrated that, to comply, they would incur significant economic costs and divert staff away from their core, constitutional prosecutorial duties. For example, Joshua Reiss—the General Counsel of the Harris County District Attorney's Office—attested that ten full-time employees would be required in new roles. (3RRP-20 at 2). Compliance by this year's earlier deadlines was "impossible" because the District Attorney's office

21

lacked possession and control of some of the data required by the Rules and because of the many hours of attorney review of the office's data that will be necessary to meet the Rules' specifications. (*Id.* at 3–8). Over a 5-year period, the Harris County District Attorney's Office would be required to spend millions of dollars and create a new unit just to comply. (*See generally id.*).

Likewise, Danny Smith of the Travis County Attorney's Office testified that his team has spent "hundreds of hours just in the last two months" preparing to comply. (2RR74:5–22; *see also* CR94). "[B]y focusing on [compliance] we are not focusing on what we can be doing for the actual criminal cases that are filed in our office." (2RR82:24–83:13). Holly Taylor of the Travis County District Attorney's Office added that she "ha[d] dedicated most of [her] working hours to implementing methods for data and document collection and retention to comply with the challenged rules." (3RRP-15 at 2). So has Williamson County District Attorney Shawn Dick. (3RRP-23 at ¶ 14.). Amy Lechuga of the El Paso District Attorney's Office "estimate[d] that accurately completing the initial report will take over 12,000 hours of staff and attorney time," and that the county would "need to hire, at minimum, one software developer, two secretaries, one attorney, and one functional data analyst permanently on staff." (3RRP-17 at 3–4). Marsha Edwards of the Dallas County Criminal District Attorney's Office explained that compliance would "divert staff away from their core roles and responsibilities." (3RRP-18 at 2).

Jamissa Jarmon of the Bexar County District Attorney's Office stated that her office would hire a third-party contractor because its IT department lacks "the capacity, software, or personnel to review and search through such a large volume of emails." (3RRP-19 at 3–4). Williamson County already has hired an outside contractor. (3RRP-23 at § 14).

Appellees further demonstrated that they would also be injured by the forced disclosure of legally protected privileged and confidential information. Holly Taylor specified several categories of confidential information "that [are] commonly found in [case] files" including "victim contact information, statements, and pseudonyms; DNA testing of rape kits; graphic photos; grand jury testimony; identities of confidential informants; criminal history information; mental health and substance abuse treatment records; CPS records; and defense counsel's confidential communications with prosecutors." CR100. Alma Trejo from the El Paso County Attorney's Office provided a very similar list. CR105-06. Joshua Reiss stated "federal agencies will disapprove" of certain required disclosures. CR275. The District Attorney for Williamson County also expressed legal and ethical reservations of turning over materials protected by existing federal and state laws. (3RRP-23 at § 8; P-21 at § 12.).

Finally, Appellees presented evidence that these confidentiality infringements and other burdens created by the Challenged Rules will hinder "prosecutors from fulfilling their duty 'to see that justice is done.'" (3RRP-9

at 10 (quoting TEX. CODE CRIM. PROC. § 2.01)). Specifically, the Challenged Rules will impair the ability of prosecutors—whether constitutionally elected officials or the line prosecutors serving the public—to explore legal theories with their colleagues; have confidential discussions with defense counsel about the theory of the case, circumstances of the defendant, or other sensitive information; staff ongoing investigations with law enforcement; prepare a victim for a difficult and invasive cross examination; and collaborate with child advocacy centers, family violence centers, and other agencies that serve survivors of trafficking or sexual assault. (3RRP-9 at 11–12; *see also, e.g.*, 3RRP-11 at 6; 3RRP-14 at 6; 3RRP-16 at 5).

### The Injunction Order

The trial court granted the relief sought and issued a written temporary injunction order. (CR391). It found that Appellees stated a valid cause of action against the Attorney General, have a probable right to declaratory and permanent injunctive relief, and will suffer probable, imminent, and irreparable injury absent the temporary injunction. (CR392).

The trial court also found that Appellees are likely to prevail on their claims that (1) Texas Government Code Section 41.006 does not confer any rulemaking authority on the Attorney General; (2) the Challenged Rules impermissibly impose burdens outside the scope of the statute; (3) the Challenged Rules are not in substantial compliance with the Administrative

24

Procedure Act; and (4) the Challenged Rules violate the Texas Constitution's Separation-of-Powers Clause because they "permit the Executive Branch (the Attorney General) to interfere with Judicial Branch officers' performance of their prosecutorial duties." (CR392–93).

Further, the trial court found imminent and irreparable harm through (a) the significant expenses and resources to provide the first reports, diverting resources from prosecution of crimes; and (b) the Rules' requiring disclosure of confidential information, which causes irreparable harm both on its own and by discouraging other people from reporting crimes and participating in prosecution, thereby decreasing Appellees' "ability to perform their constitutionally assigned duties and protect their communities from criminal activity." (CR393).

## SUMMARY OF THE ARGUMENT

Appellate courts review temporary injunctions for an abuse of discretion, and do not make final determinations of the merits at this stage. The trial court's discretion is broad, particularly when presented with uncontroverted evidence.

First, Appellees established a probable right to relief. As a matter of law, the Attorney General has no authority to promulgate rules under Texas Government Code Section 41.006, contrary to his claims. That statute does not reference rules or regulatory authority. It does nothing more than relate a duty for county and district attorneys—a duty originally tied to repealed statutes. Further, the Challenged Rules exceed any possible scope of Section 41.006; the Attorney General did not comply with procedural requirements in promulgating the rules; and the Challenged Rules constitute a separation of powers violation.

Second, Appellees established a probable, imminent, and irreparable injury. The Attorney General functionally does not challenge this conclusion. There is no dispute that the likely injury for Appellees is probable and imminent. And it is irreparable for numerous reasons: Appellees would sustain economic harm that cannot be remedied through damages (because Appellees are not entitled to money damages here), they would be forced to disclose

privileged and confidential information to others, and their constitutional prosecutorial role would be impaired.

Third, the trial court properly preserved the status quo and was well within its broad discretion in balancing the equities to do so. Appellees filed suit before they were ever put under any reporting duty by the Challenged Rules and, as this Court has recently held, a preservation of the status quo cannot include the continued preservation of an invalid rule or law. Appellate courts do not reweigh the equities, but the equities also support the trial court's conclusion. The Attorney General claims injury to his ability to enforce the laws, but the logic is circular: given the temporary injunction, there is no violation of any law for him to enforce. And if the Attorney General is ultimately right on the merits, he suffers no more than a delay in obtaining information, something he has been without for almost 150 years—and this mere delay pales in comparison to the harms suffered here by the Appellees and the public from interim reporting should the Challenged Rules be declared invalid. The trial court's balancing of the equities to preserve the status quo was imminently reasonable, therefore, and certainly within its discretion.

Finally, the temporary injunction is not overbroad. The Challenged Rules are likely invalid in their entirety. Generally enjoining their enforcement was appropriate.

## STANDARD OF REVIEW

The decision to grant or deny a temporary injunction is reviewed under an abuse-of-discretion standard. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). Under this standard, an appellate court "defer[s] to the trial court's factual findings if they are supported by the evidence" but "review[s] legal determinations de novo." *State v. Loe*, 692 S.W.3d 215, 226 (Tex. 2024). The Court should "view the evidence in the light most favorable to the trial court's order, indulging every inference in its favor." *Abbott v. Doe*, 691 S.W.3d 55, 87 (Tex. App.—Austin 2024, pet. filed).

The Court should additionally "limit the scope of [its] review to the validity of the order, without reviewing or deciding the underlying merits." *Henry v. Cox*, 520 S.W.3d 28, 33–34 (Tex. 2017). Indeed, the deference to the trial court's factual findings often means (especially for mixed questions of law and fact) that the "trial judge is entitled to reserve difficult questions of law and fact for full development at trial on the merits." *Ctr. for Econ. Justice v. Am. Ins. Ass'n*, 39 S.W.3d 337, 346 (Tex. App.—Austin 2001, no pet.). "Moreover, the court of appeals cannot substitute its judgment for the trial court's reasonable judgment even if it would have reached a contrary conclusion." *Butnaru*, 84 S.W.3d at 211. "The trial court does not abuse its discretion if some evidence reasonably supports its decision, even if the evidence is conflicting." *Abbott*, 691 S.W.3d at 87.

# ARGUMENT

"To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Butnaru*, 84 S.W.3d at 204. A "temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits." *Id.* Here, the trial court correctly found that Appellees met all three elements and are entitled to a temporary injunction.

In his brief, the Attorney General challenges the trial court's finding on the second element, the trial court's weighing of equities, and the scope of the injunction order. Notably, he gives no deference to the trial court's fact findings where appropriate, urging this Court to essentially adopt a de novo review of both the legal and factual questions. Nevertheless, this brief will address each of these challenges (in Sections I, III, and IV below), as well as the trial court's finding on the third element (in Section II), which the Attorney General only nominally challenges in the context of other sections.

In sum, the Attorney General is wrong on all counts, and the trial court was well within its discretion to issue the temporary injunction.

**I.    The trial court did not abuse its discretion in finding that Appellees established a probable right to the relief sought.**

To establish a probable right to relief sought, a temporary-injunction applicant "is not required to establish that it will prevail on final trial." *Id.* at 211 (citing *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex. 1968)). That is, the applicant need submit only "some evidence" that "tends to support its cause of action." *INEOS Grp. Ltd. v. Chevron Phillips Chem. Co.*, 312 S.W.3d 843, 848 (Tex. App.—Hous. [1st Dist.] 2009, no pet.) (citing *Camp v. Shannon*, 348 S.W.2d 517, 518–19 (Tex. 1961)). And, where an applicant has multiple claims for relief, it need establish a probable right to relief on only one of the claims. *See, e.g., Washington v. Associated Builders & Contractors of S. Tex. Inc.*, 621 S.W.3d 305, 319 (Tex. App.—San Antonio 2021, no pet.) (declining to review different claims after holding that a temporary injunction was proper based on one claim).

Here, the trial court did not abuse its discretion in finding that Appellees established a probable right to relief on four separate claims, although it only needed one. Each of the Attorney General's contentions fail.

**A.    The Attorney General lacks statutory authority to promulgate the Challenged Rules.**

The Attorney General appears to agree that neither he nor any other state agency has inherent authority to promulgate an administrative rule. Indeed, an agency may "exercise only powers conferred in *clear* and *express*

statutory language." *In re Oncor Electric Delivery Co.*, 630 S.W.3d 40, 45 (Tex. 2021) (emphasis added). It "can adopt only such rules as are authorized by and consistent with its statutory authority." *R.R. Comm'n of Tex. v. Lone Star Gas Co.*, 844 S.W.2d 679, 685 (Tex. 1992). And a rule is invalid if "the agency had no statutory authority to promulgate it." *Williams v. Tex. St. Bd. of Orthotics & Prosthetics*, 150 S.W.3d 563, 568 (Tex. App.—Austin 2004, no pet.).

Moreover, that statutory authority must generally amount to an express grant of rulemaking power, but an agency may exercise an "implied" power to promulgate an administrative rule for an industry *only* where the agency was first given an "express" grant of authority to regulate the industry. *See Pruett v. Harris Cnty. Bail Bond Bd.*, 249 S.W.3d 447, 453 (Tex. 2008) ("When a statute *expressly authorizes* an agency *to regulate* an industry, it implies the authority to promulgate rules and regulations necessary to accomplish that purpose." (emphasis added)).

Here, the Attorney General contends that Texas Government Code Section 41.006—which is silent on rulemaking—nevertheless grants him both express and implied rulemaking authority. Again, that section provides:

> At the times and in the form that the attorney general directs, the district and county attorneys shall report to the attorney general the information from their districts and counties that the attorney general desires relating to criminal matters and the interests of the state.

31

TEX. GOV'T CODE § 41.006.

In the Attorney General's view, the word "directs" does all the work. He essentially claims that, because some dictionaries define "direct" as "to regulate," the statute must provide "an express grant of authority for the Attorney General to create rules with content regulating the 'forms' and 'times' of the production of information." (Appellants' Br. at 10). He alternatively claims, citing to *Hartzell v. S.O.*, 672 S.W.3d 304, 315 (Tex. 2023), that the statute "is expansive and lacking in detail," so the word must at least imply rulemaking authority. (*Id.* at 11).

In short, the Attorney General's cursory statutory construction fails, and he takes *Hartzell* and other cases out of context. Reality is that the Legislature did not clearly and expressly authorize the Attorney General to adopt the Challenged Rules. It did not do so when it codified the current version of Section 41.006, nor did it when the Legislature originally adopted that statute over 100 years ago. Nor did it grant the Attorney General implied authority.

1. **The Legislature did not expressly grant the Attorney General power to promulgate the Challenged Rules.**

The Attorney General argues—relying exclusively on dictionary definitions of "direct"—that Section 41.006 contains an express grant of rulemaking authority because it states that district and county attorneys "shall report" certain information "[a]t the time and in the form that the attorney

general *directs.*" (Appellants' Br. at 10) (emphasis added). This contention fails for several reasons.

***First***, the plain language of Section 41.006 lacks an explicit grant of rulemaking authority. *See* TEX. GOV'T CODE § 41.006. It does not say that the Attorney General may or shall adopt a "rule" or "rules" or "regulations." *See id.* Nor does it use any other "clear and unmistakable language" granting such authority. *Pub. Util. Comm'n of Tex. (PUC) v. City Pub. Serv. Bd. of S.A.*, 53 S.W.3d 310, 315 (Tex. 2001).

***Second,*** when the Legislature has conferred rulemaking authority to the Attorney General in other statutes, it has consistently included the specific word "rule" or "rules." *See, e.g.,* TEX. GOV'T CODE § 402.0212(f) ("The attorney general may adopt rules as necessary to implement and administer this section."); *id.* § 402.035(f-3) ("The attorney general may adopt rules to administer the submission and collection of information …."); *id.* § 402.0351(b) ("The attorney general by rule shall prescribe …."); *id.* § 402.036(e) ("The attorney general by rule shall establish …." ); *id.* § 420.005(b) ("The attorney general may by rule…."); *id.* § 420.011(a) ("The attorney general may adopt rules …."); *id.* § 420.108 ("The attorney general may adopt rules …."); *id.* § 552.262(a) ("The attorney general shall adopt rules for use by each governmental body…."); *id.* § 552.3031(c) ("The attorney general may adopt rules necessary to implement this section …."); *id.* § 1202.004(e) ("The attorney

general may adopt rules ….”); *id.* § 2107.002 (“the attorney general by rule may establish collection procedures for the agency”); TEX. CODE CRIM. PROC. art. 46B.460(f) (“The attorney general shall adopt rules ….”); *id.* art. 56A.309 (“The attorney general and the department shall each adopt rules as necessary to implement this subchapter.”); *id.* art. 58.052(e) (“The attorney general shall adopt rules to administer the program.”); *id.* art. 2.305(f) (“the attorney general shall adopt rules to administer this article”); TEX. BUS. & COMM. CODE § 102.101(b) (“The attorney general by rule shall prescribe ….”); *id.* § 114.0002 (“The attorney general by rule shall ….”); *id.* § 303.004 (“The attorney general may adopt rules ….”); *id.* § 17.464(d) (“the attorney general may adopt rules”); TEX. TRANSP. CODE § 371.051(g) (“The attorney general by rule shall ….”); TEX. INS. CODE § 848.151 (“the attorney general may adopt reasonable rules”).

The Texas Legislature knows how to confer rulemaking authority on the Attorney General, and it did not do so here. Just as “every word of a statute must be presumed to have been used for a purpose[,] . . . every word excluded from a statute must also be presumed to have been excluded for a purpose.” *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981).

*Third*, the term “directs” is not a replacement for the use of the term “adopt,” “rules,” or “regulate,” either. (Appellants’ Br. at 10). While the word “direct” may suggest some type of authority, it has several meanings, and

34

certainly does not "clearly and unmistakably" confer rulemaking or regulatory authority over an industry. One court explained:

> As for the word 'direct,' while it can imply an exercise of authority, it does not always. 'Direct' can mean 'to manage or guide by advice, helpful information, instruction, etc.'

*Main St. Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542, 556 (2d Cir. 2016) (quoting RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 558 (2d ed. 2001)); *see also United States v. Hernandez-Barajas*, 71 F.4th 1104, 1107 (8th Cir. 2023) ("[D]irection does not *always* require authority."). Another definition for "direct" is simply "to show or point out the way for"—that is, "signs *directing* us to the entrance." *Direct*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/direct (last updated Aug. 17, 2025).

Further, the term "directs" is part of a restrictive clause within a prepositional phrase that starts the statutory sentence, and so it modifies only "times" and "form." *See* Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* 152 (2012) (Nearest-Reasonable-Referent Canon). In other words, under the nearest-reasonable-referent canon, the Attorney General's authority to "direct" reaches no further than prescribing when and in what format information must be reported. It cannot be read as a freestanding grant of power to regulate district and county attorneys, much less the

35

substance of prosecutions or to impose broader regulatory obligations. Doing so would wrench the word from its grammatical function and expand it beyond the plain text.

*Finally*, the Attorney General argues as a last resort that no "magic words" are necessary, citing to *S.C. v. M.B.*, 650 S.W.3d 428, 444 (Tex. 2022). (Appellants' Br. at 11-12) While that may be true for statutory interpretation generally, the context must still "plainly" indicate that the statute does what a party urges, absent express words. The issue in *S.C.* was whether a new property-division remedy created by the Family Code vested exclusive jurisdiction in the original divorce court. The court held that it did not, because—

> [e]lsewhere, the Family Code repeatedly and unambiguously vests 'continuing and exclusive jurisdiction' in family courts over a host of matters. In fact, the Family Code uses the phrase 'exclusive jurisdiction' or some variation over a hundred times in at least fifty-five provisions, not counting the ten instances where it appears in a section's title.

*Id.* at 443. Agreeing with the dissent that "[n]o magic words are necessary … when the context plainly indicates that the statute creates" exclusive jurisdiction, the Texas Supreme Court held that "the context here is a Code in which the legislature repeatedly uses *some* version of 'exclusive jurisdiction' when exclusivity is what it wants." *Id.* at 444 (ellipsis in original). The court continued:

> We would ignore that context if we dismissed the legislature's decision to omit remotely comparable language here. … Something unmistakable must be present to displace the strong presumption of jurisdiction. The Family Code generally achieves that goal with clear and express language of exclusivity, which is lacking here. Nothing else suffices to establish such exclusivity by implication.

*Id.* (alteration in original). Similarly here, the context—the Legislature's repeated uses of some version of "shall adopt" or "may adopt" "rules" when delegating rulemaking authority to the Attorney General—indicates that it did not intend to grant rulemaking authority in Section 41.006.

### 2.  The Attorney General does not have the "implied" power to promulgate the Challenged Rules.

The Attorney General argues that "even if this Court disagrees" with its argument that Section 41.006 expressly confers rulemaking authority, "the language of section 41.006 logically implies rulemaking authority." (Appellants' Br. at 11). In support of its position, the Attorney General quotes *Pruett v. Harris County Bail Bond Board*: "'When a statute *expressly* authorizes an agency to regulate an industry, it *implies* the authority to promulgate rules and regulations necessary to accomplish that purpose.'" (Appellants' Br. at 11) (quoting *Pruett*, 249 S.W.3d at 453 (emphasis added)). But as this quote indicates, there must be an "express" grant of "regulatory authority" to an agency *before* an agency may have the implied authority to promulgate a particular rule. 249 S.W.3d at 452; *see also PUC*, 53 S.W.3d at 315–16; *Amicus*

*Brief of Ron Beal*, July 7, 2025, at 2. Put differently, an agency cannot have an implied power to promulgate a particular rule absent an initial express grant of authority to the agency to regulate a particular industry, subject area, or, in this case, district and county attorneys.

The Supreme Court's analysis in *Pruett* is instructive. *Pruett* concerned the validity of administrative rules adopted by a bail bond board that restricted the solicitation of bail bond customers. *See Pruett*, 249 S.W.3d at 450. Pruett, a bail bondsman, "claim[ed] the Board's adoption of certain rules exceeded the powers the Bail Bond Act at the time expressly enumerated and was thus ultra vires." *Id.* at 452. The Court began its analysis by "turn[ing] to the provisions of the Bail Bond Act," where it observed that the Bail Bond Act *expressly* authorized the board to regulate the bonding business and to adopt rules. *See id.* The Bail Bond Act requires the board to "supervise and *regulate* each phase of the bonding business in the county" and to "adopt and post rules necessary to implement this chapter." *Id.* (quoting Tex. Occ. Code § 1704.101) (emphasis added). Thus, the Court concluded that "the legislature *explicitly* conferred broad *regulatory* powers on the Board." *Id.* at 453 (emphasis added). In the end, the Court ruled on the scope of the statute's rulemaking authority and held that the scope was impliedly broad, even though the regulatory power itself existed explicitly: "[w]hen a statute *expressly* authorizes an agency to

regulate an industry, it implies the authority to promulgate rules and regulations necessary to accomplish that purpose." *Id.* (emphasis added).

The Attorney General also quotes *Hartzell*, attempting to justify his strained reading by claiming Section 41.006 "is expansive and lacking in detail, leaving it to" him "to fill in the gaps." (Appellants' Br. at 11) (quoting *Hartzell*, 672 S.W.3d at 315). But no authority grants him the power to fill in those gaps. Moreover, *Hartzell* also dealt with express authority: a statute granting the University of Texas Board of Regents power to "promulgate and enforce such other rules and regulations for the operation, control, and management of the university system[.]" 672 S.W.3d at 315.

The other two cases cited by the Attorney General, *PUC* and *Lone Star Gas Co.*, also involved challenges to the validity of an agency's rules adopted under statutes that *expressly* authorized the agency to regulate an industry and adopt "rules." *See PUC*, 53 S.W.3d at 312 (quoting TEX. UTIL. CODE § 35.002, which instructs the Public Utility Commission to "adopt rules"); *Lone Star Gas Co.*, 844 S.W.2d at 685–87 (quoting the Texas Natural Resources Code, which authorizes the Texas Railroad Commission to "make" or "adopt" "rules"). The issue in each case was whether the agency had exceeded its statutory authority in adopting the specific rules at issue. *See PUC*, 53 S.W.3d at 312; *Lone Star Gas Co.*, 844 S.W.2d at 682. In each case, as in *Pruett* and *Hartzell*, the Court did not

hold (and was not asked to hold) that an agency may have the implied power to adopt rules despite the absence of any express grant of regulatory authority.

Here, by contrast, there is no express grant of authority to the Attorney General to regulate district and county attorneys, much less an "unambiguously broad" one. Section 41.006 does not authorize the Attorney General to "regulate" district and county attorneys or to "adopt" or "make" "rules." Because there has been no express grant of regulatory authority, there can be no implied rulemaking authority to adopt the Challenged Rules.

\* \* \*

Rulemaking authority may be implied in the first instance only when "necessary to accomplish the express duties that the Legislature gives to" the agency. *Cities of Austin, Dallas, Ft. Worth & Hereford v. Sw. Bell Tel. Co.*, 92 S.W.3d 434, 441 (Tex. 2002). But because Section 41.006 does not expressly grant any duty to the Attorney General, the Challenged Rules cannot be necessary for any such express duty. In any event, the Attorney General has no argument for why the Challenged Rules, or any rules, are "necessary" to effectuate the other authority he claims from Section 41.006.

Indeed, the Attorney General cites not one case where a Texas court has ever held that an agency has the implied power to promulgate an administrative rule absent an express grant of regulatory authority to the agency, because no such case exists. And in its nearly 150 years of its existence, neither

40

Section 41.006 nor its predecessors have served as the basis for adopting administrative rules. This is unsurprising given the context in which Section 41.006 appears—a statute in the Government Code governing prosecuting attorneys and describing *their* powers and duties (not those of the Attorney General or any executive agency).

In the end, the Attorney General's argument that a statute may imply rulemaking authority despite the absence of an express grant of regulatory authority is not simply without precedent; it contradicts the longstanding principle that an agency may "exercise only powers conferred in clear and express statutory language." *In re Oncor Electric Delivery Co.*, 630 S.W.3d at 45. To hold otherwise would turn the law on its head by requiring the Legislature to affirmatively write into a statute that the statute does *not* confer rulemaking authority rather than requiring the body to write that the statute does confer rulemaking authority.

> **3.** **Statutory history confirms that Section 41.006 always focused on local prosecutors and their duties, not on the Attorney General's powers.**

Section 41.006 was first enacted as an auxiliary to a preexisting statutory scheme in 1879 and then recodified multiple times without substantive change before landing at Section 41.006. Far from a broad grant of rulemaking power, the greatest power the scheme ever gave to the Attorney General was limited to gathering certain information that he needed to make statutorily required

41

reports to the Governor. And in 1879, the Legislature required local prosecutors to comply with those limited requests, by enacting the first version of Section 41.006. The statutes have never provided anything like the broad authority that the Attorney General asserts now.

Section 41.006 cannot be fully understood unmoored from its historical context. The Texas Supreme Court looks to the statutory history—"the statutes repealed or amended by the statute under consideration"—to discern legislative intent. *Brown v. City of Houston*, 660 S.W.3d 749, 755 (Tex. 2023) (quoting Scalia & Garner, *Reading Law* 256). This "*statutory* history … form[s] part of the context of the statute, and (unlike legislative history) can properly be presumed to have been before all the members of the Legislature when they voted." Scalia & Garner, *Reading Law* 256 (citation omitted) (emphasis in original). This statutory history is part of the context of the statute "that *is* the law." *Brown*, 660 S.W.3d at 755. Section 41.006's history reveals that it does not grant any power to the Attorney General at all, and the Attorney General was only otherwise granted a limited power by a separate statute (now repealed) to assist his independent reports to the Governor.

The broader statutory scheme first came into being before the advent of the current Constitution in 1846, as part of An Act Defining the Duties of the Attorney-General of the State of Texas. As relevant to what would become Section 41.006, that act provided that the Attorney General shall report to the

Governor certain prosecutorial data and that the Attorney General "shall require the several district attorneys to communicate to him … all the information necessary for his compliance" with his reports to the Governor. Paschal's Digest Art. 201-02 (Act of 11 May 1846).

This provision was recodified under our current constitution, with minor modifications, in the 1879 Code of Criminal Procedure. Again, the scheme's second part (Article 30) granted the Attorney General the power to request specific information from district and county attorneys:

> He may require the several district and county attorneys, clerks of the district and county courts in the state, to communicate to him at such times as he may designate, and in such form as he may prescribe, all the information necessary for his compliance with the requirements of the preceding article [which describes Attorney General reports to the Governor].

TEX. CODE CRIM. PROC. title. 1, ch. 2, sec. I, art. 30 (1879). At the same time, the Legislature added a companion provision (now codified as Section 41.006) directed at local prosecutors and requiring them to provide the information that the above article authorized the Attorney General to request. Article 40 read:

> District and county attorneys shall, when required by the attorney-general, report to him at such times, and in accordance with such forms as he may direct, such information as he may desire in relation to criminal matters and the interests of the state, in their districts and counties.

TEX. CODE CRIM. PROC. title. 1, ch. 2, sec. II, art. 40 (1879); *see* 3RRDX-5. A similar article in the 1879 Code also directed clerks to provide the same type of information to the Attorney General. TEX. CODE CRIM. PROC., title 1, ch. 2, sec. VI, art. 58.

From the 1879 Code's language, it is clear that Article 40, along with Article 58, were merely auxiliary to Article 30, which empowered the Attorney General to "require" specific information. For example, the new provisions stated that the local prosecutors and clerks should respond at the "times" and in the "forms" that the Attorney General requires, which directly parallels the grant of authority in Article 30. That Code contained no other grant of authority to which Articles 40 and 58 could be related. The statute did not give the Attorney General authority to make rules setting out types of information to be provided. Instead, the categories of information were limited by Article 30 to those identified in Article 29—i.e., data to be reported to the Governor. The only other article in the section setting out the Attorney General's general powers makes no mention of any report or communication. *See* TEX. CODE CRIM. PROC. title. 1, ch. 2, sec. I, art. 28 (1879) (requiring the Attorney General to represent the State in criminal appeals except when conflicted).

Placed in proper context, then, it becomes clear why Section 41.006 was written as an instruction to local prosecutors rather than as a grant of power to the Attorney General. It was not an accident or oversight—that Section was

added to facilitate or effectuate the exercise of a preexisting obligation, not to create any new power.

Section 41.006 can hardly be expected to create the significant rulemaking authority that the Attorney General now claims, given the circumstances under which it came into existence. It was added as part of a recodification, as an auxiliary to preexisting provisions establishing the relevant duty and power and phrased only as an instruction for local prosecutors to cooperate. If the Legislature meant to grant the Attorney General the power to establish detailed new reporting requirements by administrative rules with the force of law and enforceable by removal from office, it is hard to imagine a more egregious case of hiding an elephant in a mousehole. *See Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 468 (2001) (Scalia, J.) ("Congress, we have held, does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes."); *Hogan v. Zoanni,* 627 S.W.3d 163, 174 (Tex. 2021) ("[T]he Legislature does not hide elephants in mouseholes ….").

\* \* \*

Then, some 45 years later and as a part of the 1925 recodification of Texas's statutes, the provision requiring the Attorney General to make reports to the Governor and the companion provision directed to county and district

attorneys were both moved into the Revised Civil Statutes. TEX. REV. CIV. STAT. title 70, ch. 4, art. 4413 (1925), *id.* title 15, sec. 3, art. 333. When moved, the statute kept the exact same wording used in its prior codification. *See id.* At the same time, however, the provision empowering the Attorney General to require reports was dropped entirely. COMPLETE TEX. STATS. at 1387 (Vernon's 1928) (Table Showing Corresponding Articles in 1879 and 1925 Codes of Criminal Procedure).

The 1925 recodification expressly repealed all statutes not included in the new Codes, and so the recodification repealed the grant of authority to the Attorney General to require reports under this scheme. *See* TEX. REV. CIV. STAT. at 2419, sec. 2 (1925) (repealing civil and general statutes "not included herein"); TEX. CODE CRIM. PROC. at 181, sec. 3, art. 1 (1925) (repealing penal laws "that are not embraced in this Act and that have not been enacted during the present session"). Such repeal does not transform an auxiliary provision into a grant of authority, however, as the Attorney General suggests (Appellants' Br. at 14). Instead, the statute must be read as it always was: that local prosecutors should cooperate whenever the Attorney General directs reporting consistent with his statutory powers established elsewhere. When viewing statutory history, a "change in the *language* of a prior statute presumably connotes a change in meaning." *Am. Pearl Grp., L.L.C. v. Nat'l Payment Sys., L.L.C.*, 715 S.W.3d 383, 388 (Tex. 2025) (quoting Scalia & Garner, *Reading*

46

*Law* 256) (emphasis added). But there was no change in the language here. Regardless, "new language does not amend prior enactments unless it does so clearly." Scalia & Garner, *Reading Law* 257. The simple elimination of a companion grant of authority is not the equivalent to new language clearly expanding the Attorney General's authority.

If there has been any substantive change in the text, it would be the 1985 recodification's deletion of the phrase "when required by the Attorney General." *Compare* TEX. CODE CRIM. PROC. title. 1, ch. 2, sec. II, art. 40 (1879), *and* TEX. REV. CIV. STAT. title 15, sec. 3, art. 333 (1925), *with* Act of May 17, 1985, 69th Leg., R.S., ch. 480, § 1, 1985 Tex. Gen. Laws 1720, 1919 (codified as TEX. GOV'T CODE § 41.006).[4] Such deliberate removal of language that suggests the Attorney General may "require" information cannot be read to imply virtually unlimited rule-making authority but instead can only be read to minimize any assumption of authority that the Attorney General might have.

Section 41.006 always described the mere duties for local prosecutors—it did not independently grant authority to the Attorney General. So too now.

---

[4]  In the unlikely event this Court sees an ambiguity, 1985's legislative history further confirms there is no rulemaking authority. *See* Senate Judiciary Comm., Bill Analysis, Tex. S.B. 1228, 69th Leg., R.S. (1985) ("[T]his bill does not delegate rulemaking authority to any state officer, agency, department, or institution."); *cf. Ojo v. Farmers Grp., Inc.*, 356 S.W.3d 421, 442 (Tex. 2011) (Willett, J., concurring in part) ("The springboard for diving into legislative history is ambiguity.").

**B.    The Challenged Rules are invalid because they exceed the scope of Texas Government Code Section 41.006.**

A rule is also invalid if it "runs counter to the general objectives of the statute" or "imposes additional burdens, conditions, or restrictions in excess of or inconsistent with the relevant statutory provisions." *Tex. St. Bd. of Exam'rs of Marriage & Fam. Therapists*, 511 S.W.3d 28, 33 (Tex. 2017); *Tex. Ass'n of Acupuncture & Oriental Med. v. Tex. Bd. of Chiropractic Exam'rs*, 524 S.W.3d 734, 739 (Tex. App.—Austin 2017, no pet.). The Attorney General argues ipse dixit that Section 41.006 provides a "capacious grant" of authority and that the Challenged Rules actually "narrow and clarify the scope of Plaintiffs' reporting obligations." (Appellants' Br. at 16). Not so.

To begin, if the Attorney General's supposed rulemaking authority derives from the word "directs," as explained above, that word modifies only "the times" and "the form" of information reports, not their substance. Tex. Gov't Code § 41.006.[5] In other words, if the Attorney General relies on that word for authority, the corresponding scope of authority must rise and fall with that word. In context, the word "directs" does not authorize the Attorney General to enact a complete regulatory scheme like in *Hartzell*, where the statue

---

[5]    When the Legislature authorizes rulemaking about the *substance* of information, rather than just the *form* of reporting, it does so plainly. *See, e.g.*, Tex. Health & Safety Code § 142.0104 ("The executive commissioner by rule shall … specify the information provided … that a license holder shall report.").

granted explicit regulatory authority over the entire "operation, control, and management of the university system." 672 S.W.3d at 315. Certainly, it makes no sense to view this use of "direct" as giving the Attorney General authority to promulgate rules defining and expanding types of information to be provided (including privileged and confidential materials), especially given the statutory history and Section 41.006's limited original meaning.

Moreover, even if Section 41.006 is construed to grant more authority over county and district attorneys, the Challenged Rules both exceed the general objectives of the state and impose additional burdens.

*First*, the Challenged Rules run contrary to the general objective of Section 41.006. The general objective of the statute is to aid the gathering of "information," as made apparent from its statutory history discussed above. However, the Challenged Rules attempt to regulate the primary function of county and district attorneys. For example, in the Preamble, the Challenged Rules state that they "help[] ensure that county and district attorneys are consistently complying with statutory duties." 50 Tex. Reg. 2173, 2174. Section 41.006 says nothing about policing district and county attorneys' compliance with the law. The Attorney General essentially brushes aside the import of the Challenged Rules' oversight committee, but it confirms his attempt to regulate the judicial department rather than just gather information therefrom. Given that the Challenged Rules are an attempt by the Executive

49

Department to regulate the Judicial Department, *see supra* Section I.D, Section 41.006 must be read narrowly, not as a limitless authorization for Attorney General oversight over prosecutors. *See In re Bay Area Citizens Against Lawsuit Abuse*, 982 S.W.2d 371, 380 (Tex. 1998) ("We should, if possible, interpret the statute in a manner that avoids constitutional infirmities.").

*Second*, the Challenged Rules exceed the scope of any alleged authority implied in Section 41.006 by allowing the Attorney General to treat any violation of the Rules, "without limitation," as grounds for removal from office—an extreme remedy for noncompliance found nowhere in Section 41.006. *See* 1 TEX. ADMIN. CODE § 56.8(1) (authorizing the Attorney General to "construe the violation to constitute 'official misconduct' under Local Government Code § 87.911"); *see also id.* § 56.8(2) (authorizing the Attorney General to seek removal by filing a petition for quo warranto). To be clear, Appellees do not complain about the Attorney General's independent power to institute quo warranto actions against county and district attorneys (to the extent it exists),[6] but instead about the Challenged Rules' choice to elevate the quo warranto procedure to a specific and draconian enforcement mechanism for mere administrative reporting rules (because otherwise, why else would the

---

[6] The case cited by the Attorney General suggesting that his quo warranto power "flows directly from the Constitution" is only about the constitutional quo warranto authority to seek "charter revocation" from private corporations. *See Paxton v. Annunciation House, Inc.*, __ S.W.3d __, No. 24-0573, 2025 WL 15362224, at *12 (Tex. May 30, 2025).

Attorney General promulgate Section 56.8?). When paired with the fact that the Challenged Rules also single out district and county attorneys in "major counties" with populations over 400,000—and the Attorney General's public statements about using the Rules to "rein in" "rogue prosecutors" (3RRP-13)—it is evident that the Challenged Rules were designed to intrusively monitor the operations of certain district and county attorneys, not to collect statewide prosecution statistics. Because the Challenged Rules' burdensome and invasive reporting obligations far exceed the information collection that might be even arguably authorized by the statute, they are invalid.

*Finally*, the Challenged Rules exceed the scope of the statute by demanding much more than "information." According to Webster's Dictionary, "information" means "**knowledge** obtained from investigation, study, or instruction." *Information*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/information (last visited August 15, 2025) (emphasis added). The Challenged Rules do not simply establish the timing ("the times") and format ("the form") of "information" district and county attorneys shall "report" to the Attorney General. Instead, they demand entire "case files" (including core work product and evidence regarding prospective and ongoing prosecutions), correspondence files, internal policies and operating procedures, and accounting for uses of certain funds received and further directs the offices to implement new document

51

retention policies. 1 TEX. ADMIN. CODE §§ 56.3, 56.4, 56.6. The Attorney General suggests this is a "form" contemplated by Section 41.006, but the context of the statute suggests otherwise: it implies that the Attorney General may direct the "shape and structure" or "orderly method of arrangement" of the "sets of required information"—nothing more. *City of Houston v. James Const. Grp., LLC*, No. 14-21-00322-CV, 2023 WL 3301739, at *7 & n.3 (Tex. App.—Houston [14th Dist.] May 8, 2023, no pet.) (construing the noun "forms"). The Challenged Rules go well beyond collecting prosecution statistics and instead give the Attorney General near-unlimited access to district and county attorneys' emails, attorney work product, privileged information, and case files—all untethered to any statutory responsibility of the Attorney General to collect such information. And the burdens are excessive, as discussed throughout this brief. (*See also* 3RRP-4 to P-12; 3RRP-14 to P-23). As a result, the Challenged Rules are invalid because they conflict with the design of Section 41.006 and impose burdens and conditions in excess of that contemplated by the statute—and the Attorney General made no attempt below to dispute the evidence on this topic.

C. **The Attorney General did not comply with the procedural requirements of the Texas Administrative Procedure Act.**

"When an agency promulgates a rule without complying with the proper rule-making procedures, the rule is invalid." *El Paso Hosp. Dist. v. Tex. Health*

*& Hum. Servs. Comm'n,* 247 S.W.3d 709, 715 (Tex. 2008). These procedures are not mere technicalities; they instead are meant to "provide for public participation in the rulemaking process." TEX. GOV'T CODE § 2001.001(2). In requiring a reasoned justification for rules and a detailed cost estimate, for example, "the APA assures that the public and affected persons are heard on matters that affect them and receive notice of new rules." *Rodriguez v. Serv. Lloyds Ins. Co.,* 997 S.W.2d 248, 255 (Tex. 1999). Here, the Attorney General failed to follow the proper procedures in at least two ways.

1. **The Challenged Rules were not adopted in substantial compliance with the reasoned justification requirement.**

Under the Texas Administrative Procedure Act (APA), a state agency order adopting a rule must include a "reasoned justification for the rule as adopted." The "reasoned justification" must include:

(A) a summary of comments received from parties interested in the rule that shows the names of interested groups or associations offering comment on the rule and whether they were for or against its adoption;

(B) a summary of the factual basis for the rule as adopted which demonstrates a rational connection between the factual basis for the rule and the rule as adopted; and

(C) the reasons why the agency disagrees with party submissions and proposals[.]

TEX. GOV'T CODE § 2001.033(a)(1). The "agency's reasoned justification" must demonstrate in a "clear and logical fashion that the rule is a reasonable means to a legitimate objective." *Id.* § 2001.035(c). An agency rule is invalid if it is not adopted in substantial compliance with APA Section 2001.033(a)'s reasoned justification requirement. *Id.* § 2001.035. The Attorney General did not substantially comply with this requirement.

*First*, the final notice of the Challenged Rules does not provide "a summary of comments received from parties interested in the rule that shows the names of interested groups or associations offering comment on the rule and whether they were for or against its adoption." *Id.* § 2001.033(a)(1)(a). The Attorney General does not dispute this fact.

*Second*, the Attorney General's "reasoned justification" does not demonstrate in a "clear and logical fashion that the rule is a reasonable means to a legitimate objective." *Id.* § 2001.035(c). In his "Explanation and Justification Rules," the Attorney General states that the Challenged Rules "help[] ensure that county and district attorneys are *consistently* complying with statutory duties." 50 Tex. Reg. 2173 (emphasis added). But the Challenged Rules are not a reasonable means to achieve that objective because they ignore district and county attorneys in jurisdictions with fewer than 400,000 attorneys—that is, prosecutors in 241 of the 254 counties in Texas, a geographically diverse state that cannot be properly represented through such

exclusion. As such, the Challenged Rules cannot produce information that informs the Attorney General whether county and district attorneys are acting "consistently" throughout the State. The promulgating order states that the "population requirement … allows the Attorney General to review data from the largest counties in the state which will indicate trends for all counties in the state." 50 Tex. Reg. 2177. But the Attorney General did not explain how this limited subset of prosecutors' production of entire "case files" and "correspondence" will indicate "trends." Moreover, as quoted above, the Attorney General acknowledged in a Press Release on its website that the true purpose of the Rules is to "rein in" so-called "rogue district attorneys" in "major counties" and "to enable citizens to hold rogue DA's accountable." (3RRP-13). In other words, the Attorney General has conceded that the Challenged Rules are targeted at particular major counties, not intended to serve as a statewide proxy. As a result, the Attorney General's goal of seeking the removal of duly elected county officials is not a "legitimate objective," "logical fashion," or a "rationale connection." And, to be clear, this is not a matter of whether Appellees "disagree" with the explanations (*see* Appellants' Br. at 27), but simply taking the Attorney General at his word.

*Finally*, the Attorney General did not provide "reasons why the agency disagrees with party submissions and proposals." TEX. GOV'T CODE § 2001.033(a)(1)(C). Appellees submitted timely letters after the publication of

55

the proposed rules wherein they detailed the massive financial costs and other burdens that must be incurred in order to comply with the Challenged Rules. (3RRP-4 to P-12). The Attorney General failed to meaningfully engage with or respond to Appellees' concerns, instead asserting without factual basis or analysis: that he "completed a fiscal impact analysis of the rule and concludes that the costs should be minimal as complying with the rules could be absorbed into the reporting entities' ongoing operations." 50 Tex. Reg. 2176.

2. **The Challenged Rules were not adopted in substantial compliance with Section 2001.024.**

Section 2001.024 requires the Attorney General to provide in its notice of the proposed rule "the estimated loss or increase in revenue to the state or to local governments as a result of enforcing or administering the rule." TEX. GOV'T CODE § 2001.024(a)(4)(C). Similarly, Section 2001.024(a)(5) requires the Attorney General to provide a statement of probable economic costs for the first five years of implementation. *Id.*

The Attorney General failed to consider and address the loss of revenue county governments will suffer because of the sweeping new compliance burdens, including extensive collection, review, and submission of case files. Instead, the notice blanketly asserted that "there may be minimal costs to local governments for gathering and submitting quarterly and annual reports" and that the Attorney General "cannot predict the cost amounts." 50 Tex. Reg. at

2174. Section 2001.024(a)(4)(C), however, commands the Attorney General to estimate what the loss or increase in revenue to the state and local governments would be. Moreover, the Attorney General's notice fails to consider at all the costs for gathering and submitting the "initial report," which requires the production of information, case files, and correspondence going back to 2021. The notice addresses the costs for gathering and submitting only the "quarterly and annual reports."

It does not matter if Section 2001.024 only applies to *proposed* rules, as the Attorney General argues. (Appellants' Br. at 28). The proposed rules here, leading up to the Challenged Rules, still did not meet the cost-benefit analysis requirement.

The APA's cost-benefit requirements ensure transparency and accountability in rulemaking. By failing to conduct and disclose a meaningful cost analysis, the Attorney General deprived affected parties—including Appellees and taxpayers—of the opportunity to fully understand the proposed rule's consequences and to offer informed objections. *See Unified Loans, Inc. v. Pettijohn*, 955 S.W.2d 649, 651 (Tex. App.—Austin 1997, no writ).

### D. The Challenged Rules violate the Texas Constitution's separation of powers.

Finally, Appellees established a probable right to relief because the Challenged Rules violate the separation of powers articulated in the Texas

Constitution. Our Constitution enshrines a clear separation of powers. After expressly dividing the powers into three departments, it states: "no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted." TEX. CONST. art. II, § 1. A constitutional violation occurs when one department tries to usurp or interfere with the core function of another. *See In re Turner*, 627 S.W.3d 654, 660 (Tex. 2021). "Exceptions to the constitutionally mandated separation of powers are never to be implied in the least; they must be 'expressly permitted' by the Constitution itself." *Fin. Comm'n of Tex. v. Norwood*, 418 S.W.3d 566, 570 (Tex. 2013) (quoting TEX. CONST., art. II, § 1).

The separation of powers can be violated in two ways. "First, it is violated when one branch of government assumes, or is delegated, to whatever degree, a power that is more 'properly attached' to another branch." *Martinez v. State*, 503 S.W.3d 728, 733 (Tex. App.—El Paso 2016, pet. ref'd) (quoting *Armadillo Bail Bonds v. State*, 802 S.W.3d 237, 239 (Tex. Crim. App. 1990) (superseded by statute on other grounds)). The second type of violation occurs "when one branch unduly interferes with another branch so that the other branch cannot effectively exercise its constitutionally assigned powers." *Id.* (quoting *Martinez v. State*, 323 S.W.3d 493, 501 (Tex. Crim. App. 2010)). Both grounds justify relief here.

As background, the Attorney General and his office are constitutionally part of the Executive Department, whereas the district and the county attorneys are part of the Judicial Department. *Compare* TEX. CONST., art. V, § 21, *with* TEX. CONST., art. IV, § 22.[7] The Attorney General's primary duties "are to render legal advice in opinions to various political agencies and to represent the State in civil litigation." *Webster v. Comm'n for Law. Discipline*, 704 S.W.3d 478, 494 (Tex. 2024) (quoting *Perry v. Del Rio*, 67 S.W.3d 85, 91 (Tex. 2001)). The Attorney General also has the "visitorial" right to "inquire" into private corporations. *See In re Off. of the Att'y Gen.*, No. 15-24-00091-CV, 2025 WL 2204075, at *2 (Tex. App.—15th Dist. Aug. 4, 2025, orig. proceeding) (citing TEX. CONST., art. IV, § 22). In contrast, our Constitution charges county and district attorneys with the function to "prosecute the pleas of the state in criminal cases." *State v. Stephens*, 663 S.W.3d 45, 50 (Tex. Crim. App. 2021) (quoting *Meshell v. State*, 739 S.W.2d 246, 254 (Tex. Crim. App. 1987) and citing TEX. CONST., art. V, § 21).

The Challenged Rules necessarily would assume (or at least unduly interfere with) the Judicial Department's assigned prosecutorial functions and

---

[7] In fact, district attorneys have been part of the judicial branch in Texas constitutions going back to 1836. *See* TEX. CONST. of 1836, art. IV, § 5. The Attorney General was also part of the judicial branch prior to the Reconstruction Constitution (TEX. CONST. of 1866, art. IV, § 13), but the office was part of the executive branch in the two constitutions since then. *See* TEX. CONST., art. IV, sec. 22; TEX. CONST. of 1869, art. IV, § 23.

authority by attempting to *regulate* the county and district attorneys and their prosecutorial decisions. As the Attorney General admits, the promulgation of rules is a means of regulating another (such as "regulat[ing] an industry"). (Appellants' Br. at 10–11). And the Challenged Rules were promulgated with regulatory purpose: to "ensure that county and district attorneys are consistently complying with statutory duties, including seeking justice for citizens who have been harmed by a criminal act, appropriately administering funds, and appropriately prosecuting crimes." 50 Tex. Reg. 2173. That is, the Challenged Rules are a means of the Attorney General supervising county and district attorneys "prosecuting crimes," which is an improper assumption of, or intrusion upon, their primary constitutional role. The Constitution precludes the Attorney General from independent authority to prosecute crimes, *Stephens*, 663 SW3d at 57, and so necessarily must preclude his claiming authority to supervise and oversee the elected officials assigned that role.

At minimum, the Challenged Rules unduly interfere with the Judicial Department's prosecutorial roles. Even when the department exerting authority does not "arrogate power to itself, … the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties." *In re Tex. House of Representatives*, 702 S.W.3d 330, 344 (Tex. 2024) (quoting *Loving v. United States*, 517 U.S. 748, 757 (1996)) (alteration in original). Thus, "interference by one branch of government with

the *effectual* function of another raises concerns of separation of powers." *Id.* (emphasis in original) (quoting *In re Turner*, 627 S.W.3d at 660). Nor does such interference require that the intrusion "destroy" Appellees' ability to perform their constitutional duties, as Appellants imply. *See Stephens*, 663 S.W.3d at 54 ("The standard for whether this is a violation of the separation of powers is not whether a legislative grant of authority to the attorney general would 'destroy' the county or district attorney's office."). "Where certain duties are imposed or specific powers are conferred upon a designated officer, the Legislature cannot withdraw them … nor confer them upon others nor abridge them or interfere with the officer's right to exercise them unless the Constitution expressly so provides." *Meshell*, 739 S.W.2d at 254 (quoting *Hill County v. Sheppard*, 142 Tex. 358, 178 S.W.2d 261, 264 (1944)) (alteration in original) (emphasis removed).

The trial court considered abundant and unrebutted evidence about how the Challenged Rules create that interference, and the trial court's conclusions on the facts of interference are accorded deference at this stage, when a definitive declaration of the merits should not yet be made. That includes not only the trial court's finding of interference through resource diversions but also the finding that forced disclosure of confidential information "will discourage people from reporting crimes, investigating crimes, and/or participating in the prosecution of crimes, thereby decreasing the Plaintiffs' ability to perform their constitutionally assigned duties and protect their

communities from criminal activity." (CR393; *see also, e.g.,* 3RRP-9 at 11–12; P-11 at 6; P-14 at 6; P-16 at 5). The Attorney General questions the effect of the resource diversions (Appellants' Br. at 31-33), but "*any* attempt by one department of government to interfere with the powers of another is null and void," regardless of the magnitude of that attempt, unless that attempt is "authorized by an express provision of the constitution." *Stephens*, 663 S.W.3d at 50 (quoting *Meshell*, 739 S.W.2d at 252) (emphasis added). Appellees therefore established a probable right to relief on their constitutional claims, despite the Attorney General's assertions here about the weight of that uncontroverted evidence.

The Attorney General also maintains that his "exercise of legislatively delegated authority to obtain information from the judicial branch" somehow overrides Appellees' constitutional duties. (Appellants' Br. at 30). But it is clear that the Attorney General is not merely attempting to exercise fact-finding authority but attempting to "ensure" specific conduct by county and district attorneys. 50 Tex. Reg. 2173. Next, if there is a constitutional impairment such that this balancing is required, the "probable right to relief" standard is already satisfied since the "probable right" standard is not a final determination of the merits. At any rate, the Attorney General wrongly describes his authority here. As discussed above, Section 41.006 itself does not expressly delegate such authority, and so the Attorney General's exercise of legislative authority is also

a constitutional violation. *See Perry*, 67 S.W.3d at 93 ("As a member of the executive branch, the Attorney General may not perform legislative functions unless expressly authorized to do so.").[8] To the extent Section 41.006 could be read otherwise, this would be a different violation not only of the traditional separation of powers but also of the nondelegation doctrine, an interpretation that should not be engrafted onto the statute. *Cf. Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 466 (Tex. 1997) (explaining the "power to pass laws rests with the Legislature, and that power cannot be delegated to some commission or other tribunal" (quoting *Brown v. Humble Oil & Refin. Co.*, 83 S.W.2d 935, 941 (Tex. 1935)).

When the Legislature properly delegates any of its inquiry power to the Attorney General, in relation to local prosecutors, it specifies the information to be collected and then designates the Attorney General as the executive officer to administer that collection. *See, e.g.*, TEX. CODE CRIM. PROC. art. 2A.205 (detailing annual reports on human-trafficking investigations); *id.* art. 2A.213 (concerning information needed for the federal habeas review by

---

8   The Texas Constitution does not otherwise give the Attorney General such a broad power of inquiry. His inquiry power is explicitly granted only as to private corporations, and even that power is limited. *See* TEX. CONST., art. IV, § 22; *see also In re Off. of the Att'y Gen.*, 2025 WL 2204075, at *3 ("We decline the OAG's invitation to be the first Texas state court to hold that state law grants that department an across-the-board right to demand pre-suit depositions."); *id.* at *5 (Brister, C.J., dissenting) (agreeing that there is no grant so broad).

the Attorney General); *id*. art. 59.06 (detailing auditing procedures related to proceeds from forfeited property); TEX. NAT. RES. CODE § 11.071 (detailing reports concerning persons who have taken mineral or other property from public lands). Those statutes, as opposed to the Attorney General's broad exertion of power here, show a proper delegation of authority that respects the Texas Constitution's "vertical separation of powers between the Attorney General and the district attorneys in matters of criminal prosecution." *See Stephens*, 663 S.W.3d at 50 (quoting TEX. CONST., art. V, § 21, *and Saldano v. State*, 70 S.W.3d 873, 877 (Tex. Crim. App. 2002)). The way the Attorney General overreads Section 41.006 and seizes authority through the Challenged Rules, however, is a grab of power that our State's Constitution and statutes do not give him.

## II. The trial court did not abuse its discretion by finding that Appellees established a probable, imminent, and irreparable injury.

The trial court made the following factual findings to support its conclusion that Appellees established a probable, imminent, and irreparable injury:

> 1. [Appellees] will need to expend a significant amount of resources, personnel time, and taxpayer funds to provide the first quarterly report and initial report … . Compliance with the Challenged Rules has already diverted and will continue to divert resources and personnel time from performing necessary tasks related to the investigation and prosecution of criminal activity.

64

2. The Challenged Rules require disclosure of case files, explicitly including confidential work product and privileged communications, as well as [other sensitive information].

3. Plaintiffs will be forced to disclose confidential information about previous and ongoing criminal prosecutions and law enforcement investigations, including records and information that are specifically protected from unauthorized disclosure by Plaintiffs under other state and/or federal laws that contain both civil and criminal penalties.

4. Plaintiffs will be forced to disclose the private and confidential information provided to the district and county attorneys in connection with the performance of their prosecutorial duties and such disclosure of confidential and private information containing highly sensitive and personal matters to Defendants will discourage people from reporting crimes, investigating crimes, and/or participating in the prosecution of crimes, thereby decreasing the Plaintiffs' ability to perform their constitutionally assigned duties and protect their communities from criminal activity.

(CR393). The Attorney General does not specifically challenge any of these findings on appeal and presented no controverting evidence nor objections to Appellees' proffered evidence. Instead, he argues that the "equitable balancing" of harms favors the Attorney General. (Appellants' Br. at 34). Nevertheless, the trial court's conclusion and uncontroverted evidence supporting it merit affirmance.

**A.    The Attorney General has waived any challenge to the trial court's injury findings or conclusions.**

By not specifically challenging any of the factual findings that underpin the trial court's legal conclusion that Appellees established a probable, imminent, and irreparable injury, the Attorney General waived any argument to the contrary. *See* TEX. R. APP. P. 38.1(i); *Talisman Energy USA, Inc. v. Matrix Petrol., LLC,* No. 04-15-00791-CV, 2016 WL 7379254, at *5 (Tex. App.—San Antonio Dec. 21, 2016, no pet.) (affirming the temporary injunction "[b]ecause [appellant] did not attack all of the trial court's irreparable injury or equivalent findings in its original brief"). The Attorney General also does not challenge the legal conclusion itself but instead argues for a *different* weighing of equities. But whether Appellees themselves were in danger of a probable, imminent, and irreparable injury is a separate question from the balancing of the harms or equities. By challenging imminent and irreparable harm solely by arguing about the balance of equities, therefore, the Attorney General has not actually challenged whether Appellees meet this temporary-injunction element.

**B.    Nevertheless, the trial court did not abuse its discretion in holding that Appellees established this element.**

The trial court did not abuse its discretion in finding that Appellees would suffer a probable, imminent, and irreparable injury absent a temporary injunction.

*First*, the parties stipulated that the First Quarterly Report was due June 30, 2025, the "Initial Report" was due July 1, 2025, and the First Annual Report and the Second Quarterly Report were due September 30, 2025. (CR384). They also stipulated that the Attorney General intended to enforce those reporting deadlines. (CR384). The probability and imminence elements of the test were accordingly established by stipulation.

*Second*, Appellees presented abundant evidence below that they would be irreparably injured. "An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard." *Butnaru*, 84 S.W.3d at 204. Appellees cannot be compensated in damages here. *See State v. Hollins*, 620 S.W.3d 400, 410 (Tex. 2020) ("Money damages are not available in an *ultra vires* action."). Here, the trial court found that Appellees' compliance with the Challenged Rules will cause Appellees to suffer significant fiscal costs, as supported by the record. (*See* 3RRP-4 to P-12; 3RRP-14 to P-23). That is enough. *See City of El Paso v. Heinrich*, 284 S.W.3d 366, 368–69 (Tex. 2009) ("We conclude that while governmental immunity generally bars suits for retrospective monetary relief, it does not preclude prospective injunctive remedies in official-capacity suits against government actors who violate statutory or constitutional provisions.").

*Third*, because the Challenged Rules explicitly call for the disclosure of privileged and confidential information, *see* 1 TEX. ADMIN. CODE § 56.2(1), Appellees (as well as members of the public) suffer another irreparable injury. For example, "[t]he supreme court has made it clear that forced disclosure of privileged material subjects the party disclosing to irreparable harm" for which there is no adequate legal remedy through an appeal or otherwise. *Cupples Prods. Co., Div. of H.H. Robertson Co. v. Marshall,* 690 S.W.2d 623, 625 (Tex. App.—Dallas 1985, no writ) (citing *Md. Am. Gen. Ins. Co. v. Blackmon,* 639 S.W.2d 455, 456 (Tex. 1982)). This makes sense especially in the attorney context, because the entire purpose of the privilege is "to promote the unrestrained communications" of an attorney in their communications with their client or in their work product. *Blackmon,* 639 S.W.2d at 458. The risk of disclosure of confidential and privileged materials to the Attorney General— particularly core attorney work product disclosing the prosecutor's thoughts, impressions, opinions, and legal strategies in prospective and ongoing cases— will suppress and discourage full and open communications and strategy. (*See, e.g.,* 2RR86–87; 3RRP-8 at 2, P-9 at 1–2, P-14 at 4–5). Appellees have identified a plethora of confidentiality laws that would be violated by their compliance with the Challenged Rules. (CR31, 74, 150, 314–18; 3RRP-4 at 4–7, P-5 at 6–

7, P-9 at 3–7, P-11 at 6–7, P-16 at 3–4).[9] Damages do not adequately remedy this harm. Once the information is disclosed, it cannot be *undisclosed.*

*Fourth*, the trial court found that compliance with the Challenged Rules would cause the Appellees to divert significant resources away from their core responsibilities of prosecuting criminal cases. The Attorney General argues that diversion would be minimal (*e.g.*, Appellants' Br. at 32 ("It blinks reality to suggest that the Rules will grind prosecutions in Harris County to a halt.")). The Attorney General's jury-type argument is wrong and without evidentiary support.  Also, the size of the injury does not matter. *See, e.g., Gatlin v. GXG, Inc.*, No. 05-93-01852-CV, 1994 WL 137233, at *6 (Tex. App.—Dallas Apr. 19, 1994, no writ) ("It is not so much the magnitude of the harm suffered, but its irreparability that matters for purposes of a temporary injunction."). At any rate, the diversion of limited resources is a significant injury that cannot be redressed by damages.

*Finally*, the trial court found that compliance with the Challenged Rules would result in the constitutional deprivation of the separation of powers, which is an irreparable injury in and of itself. As part of the Judicial

---

[9]   As ipse dixit, the Attorney General claims he is subject to the same confidentiality laws as local prosecutors, but that would not absolve Appellees of any unauthorized disclosure *to* the Attorney General. And there is no evidence of any law or other authority that would protect confidentiality once these materials are with the Attorney General, despite the question being asked of a witness at the hearing. (2RR65:15–22).

Department, the Appellee county and district attorneys have the exclusive constitutional right that "no person, or collection of persons" from another department of the State—including the Attorney General—"shall exercise any power" that violates the separation of powers between one branch and another. TEX. CONST. art. II, § 1. This unique constitutional injury independently satisfies the requisites for a temporary injunction, as well. *E.g.*, *Op. Rescue-National v. Planned Parenthood of Hous.*, 937 S.W.2d 60, 77 (Tex. App.—Houston [14th Dist.] 1996) ("[A] violation of a constitutionally guaranteed right inflicts irreparable injury warranting injunctive relief.") (internal citations omitted), *aff'd as mod.*, 975 S.W.2d 546 (Tex. 1998).

## III. The trial court did not abuse its discretion in preserving the status quo or otherwise weighing the equities.

Temporary injunctions are meant to preserve the status quo pending litigation. So when Texas courts refer to an "abuse of discretion" for temporary injunctions, that discretion is especially bound in the decision to preserve the status quo and the balancing of equities the trial court conducts before issuing its equitable decision. This Court should defer to the trial court's discretion on these remaining issues beyond the essential elements of a temporary injunction.

### A. The temporary injunction preserves the status quo.

Any consideration of equities beyond the required elements for a temporary injunction necessarily refers to the maintenance of the status quo.

70

*E.g.*, *Ctr. for Econ. Justice v. Am. Ins. Ass'n*, 39 S.W.3d at 343 ("A temporary injunction is a remedial writ through which the court exercises its equity jurisdiction in order to maintain the status quo."). The status quo is the "last, actual, peaceable, non-contested status which preceded the pending controversy." *State v. City of San Marcos*, 714 S.W.3d 224, 243 (Tex. App.—15th Dist. 2025, pet. filed).

Section 41.006 has existed for well over a century and yet no county and district attorney has **ever** been subject to **any** regulatory reporting deadline under the statute; preventing that from happening now maintains the status quo. The analysis does not change because Appellees filed suit after the Challenged Rules came into effect, either, especially since the Challenged Rules were invalid to begin with. Such "continuation of illegal conduct," as this Court has explained, "cannot be justified as preservation of the status quo." *Id.* at 245 (quoting *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004)). And since "the acts sought to be enjoined constitute violation of the law … the status quo to be preserved cannot be a continuation of those acts." *Id.*

## B.     This Court should not reweigh the equities.

Beyond the simple "status quo" alone, a reminder of the standard of review is important here. The abuse-of-discretion standard applied to temporary injunctions is appropriate for reviewing all sorts of decisions by a trial court sitting in equity. *See Wagner & Brown, Ltd. v. Sheppard*, 427–29 &

71

n.54 (Tex. 2008) (discussing several equitable actions). Critically, the "court of appeals cannot substitute its judgment for the trial court's reasonable judgment even if it would have reached a contrary conclusion." *Butnaru*, 84 S.W.3d at 211. That is, a balancing of the equities is not even part of this Court's review. Certainly, an appellate court may not *rebalance* the equities and impose its own view of them.

Trial courts have frequently issued temporary injunctions in APA cases challenging the validity or application of the administrative rule, and appellate courts have affirmed these orders without any reference to the balancing of the equities. *See generally, e.g., Tex. Health & Hum. Servs. v. Advocates for Patient Access, Inc.*, 399 S.W.3d 615 (Tex. App.—Austin 2013, no pet.); *Tex. Alcoholic Beverage Comm'n v. Amusement & Music Operators of Tex., Inc.*, 997 S.W.2d 651 (Tex. App.—Austin 1999, pet. dism'd w.o.j.); *see also Muth v. Voe*, 691 S.W.3d 93 (Tex. App.—Austin 2024, pet. filed); *Doe*, 691 S.W.3d 55; *Combs v. Ent. Publ'ns, Inc.*, 292 S.W.3d 712, 724–25 (Tex. App.—Austin 2009, no pet.). For example, in *Advocates for Patient Access*, the court affirmed the trial court's issuance of a temporary injunction in a declaratory-judgment action challenging a regulatory rule after noting that "the only question before the trial court is whether the applicant is entitled to preservation of the status quo pending trial on the merits." 399 S.W.3d at 629.

Even when a party has raised the equities, courts of appeals have unsurprisingly affirmed temporary injunctions even if there is a valid argument for the equities weighing in the other direction. *See, e.g., Burkholder v. Wilkins,* 504 S.W.3d 485, 493 (Tex. App.—Corpus Christi–Edinburg 2016, no pet.) ("Given that some record evidence reasonably supports the trial court's assessment of the balance of equities, we cannot conclude that the trial court abused its discretion."); *Daniels v. Balcones Woods Club, Inc.,* No. 03-02-00353-CV, 2002 WL 31426294, at *3 (Tex. App.—Austin Oct. 31, 2002, no pet.) ("Although equities may exist on both sides, we cannot say that the district court abused its discretion in finding that the equities balance in favor of the Association."). This Court should affirm for the same reasons, too.

## C. To the extent it is relevant, the Attorney General overestimates his own harm.

Even though it is irrelevant to the essential elements of a temporary injunction and was never raised in the trial court, the Attorney General relies on his own harm in arguing that this Court should reverse. Citing no evidence in the record, the Attorney General relies heavily on the State's intrinsic right to enforce its own laws, noting that *ultra vires* conduct "automatically results in harm to the sovereign as a matter of law." (Appellants' Br. at 34–35) (citing *In re State,* 711 S.W.3d 641, 647 (Tex. 2024)). This theory has multiple logical

problems; on closer inspection, the Attorney General has no significant harm at all.

First and foremost, the State's intrinsic right to enforce its own laws can only apply when there is a preexisting law to enforce, not in a case involving a legal challenge to the validity of a brand-new, never-enforced regulation. After all, **Appellees** are the government officials bringing an *ultra vires* action—not the Attorney General—and Appellees have shown a probable right to relief, as discussed above and as the district court found. Allowing the Attorney General to invoke this doctrine in defending **against** an *ultra vires* claim would shield the Attorney General from *ultra vires* actions, which is not what Texas Supreme Court precedent permits. That Court has explained that "*ultra vires* suits do not attempt to exert control over the state—they attempt to reassert the control of the state." *Heinrich*, 284 S.W.3d at 372. "Stated another way, these suits do not seek to alter government policy but rather to enforce existing policy." *Id.* Yet the *ultra vires* tool would be useless—and Texas Supreme Court precedent null and void—if state officials could impose *ultra vires* regulations upon local officials, then turn around and claim that an injunction should not issue because the local officials' desire not to abide by the invalid regulations is itself *ultra vires*. Under this theory, a Court could never temporarily enjoin **any** rule, even if it is blatantly unconstitutional or plainly violates the APA. Yet that is what

the Attorney General asks, despite no on-point authority to support his argument.

Additionally, the injunction is not a "violation of duly enacted state law by government officials," as the Attorney General suggests. (Appellants' Br. at 35). For one, the Challenged Rules were not duly enacted, as this brief illustrates. Two, the injunction does not create a violation of the Challenged Rules, in any event. The entire purpose of the injunction is to preserve the status quo and protect Appellees from irreparable harm; that is, it is meant to *preclude* any violations by Appellees that would subject them to irreparable harm. Critically, enjoining the enforcement of the Challenged Rules necessarily enjoined the effect of the Challenged Rules' deadlines, so Appellees cannot violate the Challenged Rules while the injunction is in effect. In this sense, even if the Challenged Rules are valid, there is therefore no current violation of the law for the Attorney General to enforce.

To the extent he can claim any remaining harm, the Attorney General ignores the fact that his own potential success in this lawsuit means he could still achieve the object of his statutory "desire": the report of information specified by the Challenged Rules. At most, the Attorney General only faces a mere delay. That is not a harm that changes the status quo, which the temporary injunction preserves.

## D.    The equities favor preserving the status quo.

At bottom, the trial court did not abuse its broad discretion in preserving the status quo and, in fact, was correct in its view of the equities. Simply stated, the burden of delayed enforcement of a brand-new administrative rule, for which Appellees present a serious challenge, counts for little against the thousands of personnel hours, millions of dollars, and confidential information which the Appellees are poised to lose, not to mention the constitutional violation of the separation of powers.

Even if the public suffers some indirect alleged harm through the Attorney General merging with the public, as he suggests (Appellants' Br. at 35), the record shows evidence of the public being harmed only by compliance with the Challenged Rules, not an injunction against their enforcement. It is uncontroverted that Appellees' ability to prosecute crimes for the benefit of the public will be harmed by the enforcement of the Challenged Rules. Such harm is far from "implausible," as the Attorney General exclaims without evidence (Appellants' Br. at 36), but illuminated by competent and uncontroverted testimony. For example, the Assistant Director of the Family Violence Division for Travis County Attorney Delia Garza testified live about the harms that would ensue, and how the Challenged Rules would likely cause lost trust with crime victims:

Q. And what potential effect on community safety do you think this will have when the public becomes aware of what you're required to turn over in terms of confidential information?

A. Well, I mean, my concern is obviously that -- and I'll use my current example as -- my current experience as the prime example. Family violence cases are intrinsically difficult sometimes to get victims to cooperate, for whatever reason, because of the cycle of violence someone is involved in, because of fear for their future safety, because of fear for their family safety, things of that nature. It's already hard enough to get people to cooperate and prosecute family violence assaults.

If a family violence victim is aware that then we're going to turn over all of their confidential information, including if they've elected to be in a pseudonym what their real name is, where they live, their medical and substance abuse history, if any, to an agency that they have no idea who's going to be looking at it, they -- I build relationships with victims on cases that I prosecute, and I get them to trust me. And it is a very different situation for me to say, Trust this nameless, faceless agency at the Attorney General because they said they won't disclose it.

(2RR86–87). And, of course, there is the diversion of resources (already discussed) from live prosecutions. Between the limited resources and the lost-trust dynamic of the confidential-information disclosures, the public interest weighs more heavily in favor of the injunction than against it.

The Attorney General also accuses Appellees of "slumber[ing] on their rights" (Appellants' Br. at 35), but that is false. The record demonstrates that Appellees spent hundreds of hours trying to comply with the Challenged Rules

before filing suit (*e.g.*, 2RR74) and even asked the Attorney General's counsel for an agreement not to require production during the pendency of the litigation (to which counsel said "no"). (2RR148).

All in all, the equities favor the trial court's relief. At minimum, the trial court was within its broad discretion to balance the equities in order to preserve the status quo. The temporary injunction thus could not have been an abuse of discretion.

## IV. The temporary-injunction order is not overbroad.

Lastly, the Attorney General asserts that the temporary injunction was "broader than necessary to provide complete relief to each plaintiff with standing to sue" (Appellants' Br. at 37), but he does not explain how the injunction is actually so broad. If a statute or regulation is unconstitutional or invalid, it "must be declared invalid in its entirety." *Smith v. Craddick*, 471 S.W.2d 375, 378 (Tex. 1971); *cf. City of San Marcos*, 714 S.W.3d at 243 (justifying a full injunction against enforcement based on the plaintiff's demonstration of a probable right on preemption). After all, courts must "give effect to the language of the constitution without regard to the consequences." *Craddick*, 471 S.W.2d at 378.

Likewise, the Challenged Rules' severability provision does not matter when there is a probable right to success on claims that the rules are either completely invalid (due to lack of authority) or contain so many invalid

provisions that severance is not functionally possible. When a law is invalid and all the provisions are "connected in subject-matter," "dependent on each other," and "operating together for the same purpose," a trial court is within its discretion not to sever invalid provisions in a temporary injunction. *Washington*, 621 S.W.3d at 322 (quoting *Rose v. Doctors Hosp.*, 801 S.W.2d 841, 844 (Tex. 1990)).

## PRAYER

Appellees respectfully request that this Court affirm the trial court's temporary injunction order.

Respectfully submitted,

[Signatures on following pages]

/s/ Leslie W. Dippel

Leslie W. Dippel
State Bar No. 00796472
Leslie.Dippel@traviscountytx.gov
Todd A. Clark
State Bar No. 04298850
Todd.Clark@traviscountytx.gov
Cynthia W. Veidt
State Bar No. 24028092
Cynthia.Veidt@traviscountytx.gov
Travis County Attorneys
**DELIA GARZA**
**TRAVIS COUNTY ATTORNEY**
P.O. Box 1748
Austin, TX 78767
Tel.: (512) 854-9513
Fax: (512) 854-4808

*Counsel for Appellees Delia Garza, in her Official Capacity as Travis County Attorney, José P. Garza, in his Official Capacity as Travis County District Attorney, and Travis County*

/s/ Michael Satin

Alexandria Oberman
State Bar No. 24131555
aoberman@milchev.com
Michael J. Statin, *pro hac vice*
msatin@milchev.com
**MILLER & CHEVALIER CHARTERED**
900 16th Street, NW
Washington, DC 20006
Tel.: (202) 626-5800
Fax: (202) 626-5801

*Counsel for Appellees Criminal District Attorney John Creuzot; Dallas County; Criminal District Attorney Joe Gonzales; and Bexar County*

/s/ Bradley W. Snead

Jonathan G.C. Fombonne
Deputy County Attorney & First Assistant
State Bar No. 24102702
Jonathan.Fombonne@harriscountytx.gov
Tiffany S. Bingham
Managing Counsel
Affirmative & Special Litigation Division
State Bar No. 24012287
Tiffany.Bingham@harriscountytx.gov
Christopher Garza
Deputy Division Director
Affirmative & Special Litigation Division
State Bar No. 24078543
Christopher.Garza@harriscountytx.gov
Office of the Harris County Attorney
**CHRISTIAN D. MENEFEE**
**HARRIS COUNTY ATTORNEY**
1019 Congress Plaza, 15th Floor
Houston, TX 77002
Tel.: (713) 274-5101
Fax: (713) 755-8924

Bradley W. Snead
State Bar No. 24032706
snead@wrightclosebarger.com
Michael Adams-Hurta
State Bar No. 24097860
hurta@wrightclosebarger.com
**WRIGHT CLOSE & BARGER, LLP**
One Riverway, Suite 2200
Houston, Texas 77056
Tel.: (713) 572-4321
Fax: (713) 572-4320

*Counsel for Appellees District Attorney Sean Teare and Harris County*

/s/ Bernardo Cruz
Christina Sanchez
El Paso County Attorney
State Bar No. 24062984
Ch.sanchez@epcountytx.gov
Bernardo Rafael Cruz
Assistant County Attorney
State Bar No. 24109774
b.cruz@epcountytx.gov
**CHRISTINA SANCHEZ**
**EL PASO COUNTY ATTORNEY**
320 S. Campbell St., Suite 200
El Paso, TX 79901
Tel.: (915) 273-3247

*Counsel for Appellees El Paso County District Attorney James Montoya, El Paso County Attorney Christina Sanchez, and El Paso County*

/s/ Randy T. Leavitt
C. Robert Heath
State Bar No. 09347500
bheath@bickerstaff.com
**BICKERSTAFF HEATH DELGADO ACOSTA**
1601 S. Mopac Expy., Suite 400
Austin, TX 78746
Tel.: (512) 404-7821

Randy T. Leavitt
State Bar No. 12098300
randy@randyleavitt.com
**LAW OFFICE OF RANDY T. LEAVITT**
1301 Rio Grande St.
Austin, TX 78701
Tel.: (512) 476-4475

*Attorneys for Appellee Shawn W. Dick in his Official Capacity as Williamson County District Attorney (26th Judicial District)*

**CERTIFICATE OF COMPLIANCE**

This document complies with the typeface requirements of Texas Rule of Appellate Procedure 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes. This document also complies with the word-count limitations of Texas Rule of Appellate Procedure 9.4(i), if applicable, because it contains 14,995 words, excluding any parts exempted by Rule 9.4(i)(1).

/s/ *Michael Adams-Hurta*
Michael Adams-Hurta

## Appendix

Tab A:   50 Tex. Reg. 2173–82 (2025) (Adopted Rules) (*also available at* 3RRP-1)

Tab B:   TEX. GOV'T CODE § 41.006

Tab C:   Paschal's Digest Art. 198-213 (Act of 11 May 1846)

Tab D:   Excerpts from the 1879 Texas Code of Criminal Procedure (*also available at* 3RRDX-5)

Tab E:   Excerpts from the 1925 Texas Revised Civil Statutes

Tab F:   COMPLETE TEX. STATUTES at 1387 (Vernon's 1928) (Table Showing Corresponding Articles in 1879 and 1925 Codes of Criminal Procedure)

Tab G:   Excerpts from Act of May 17, 1985, 69th Leg., R.S., ch. 480, § 1, 1985 Tex. Gen. Laws 1720, 1919 (codified as TEX. GOV'T CODE § 41.006)

# APPENDIX TAB A

50 TEX. REG. 2173–82 (2025) (Adopted Rules)
(*also available at* 3RRP-1).



# ADOPTED RULES

Adopted rules include new rules, amendments to existing rules, and repeals of existing rules. A rule adopted by a state agency takes effect 20 days after the date on which it is filed with the Secretary of State unless a later date is required by statute or specified in the rule (Government Code, §2001.036). If a rule is adopted without change to the text of the proposed rule, then the *Texas Register* does not republish the rule text here. If a rule is adopted with change to the text of the proposed rule, then the final rule text is included here. The final rule text will appear in the Texas Administrative Code on the effective date.

# TITLE 1. ADMINISTRATION

# PART 3. OFFICE OF THE ATTORNEY GENERAL

## CHAPTER 56. DISTRICT AND COUNTY ATTORNEY REPORTING REQUIREMENTS

### 1 TAC §§56.1 - 56.10

The Office of the Attorney General (OAG) adopts new chapter 56 in Title 1 of the Texas Administrative Code (TAC), relating to reporting requirements for district attorneys and county attorneys presiding in a district or county with a population of 400,000 or more persons. Adopted new chapter 56 consists of §§56.1 - 56.10. New chapter 56 is necessary to implement Government Code §41.006 and is in the public's interest. These new rules are adopted with changes to the proposed text as published in the September 13, 2024, issue of the *Texas Register* (49 TexReg 7139). The new rules will be republished. The changes are in response to public comments.

EXPLANATION OF AND JUSTIFICATION RULES

Texas Government Code §41.006 states that "[a]t the times and in the form that the attorney general directs, the district and county attorneys shall report to the attorney general the information from their districts and counties that the attorney general desires relating to criminal matters and the interests of the state." Adopted new chapter 56 helps ensure that county and district attorneys are consistently complying with statutory duties, including seeking justice for citizens who have been harmed by a criminal act, appropriately administering funds, and appropriately prosecuting crimes. Whether a public official and office whose purpose is to fairly prosecute crimes and keep communities safe is enforcing criminal prosecution laws is a criminal matter and within the interest of the state.

Section 41.006 also states that the information must be submitted to the OAG at the times and in the form the OAG directs. New chapter 56 is necessary to implement §41.006. The adopted chapter prescribes the time, form, and content of reports the OAG requires from certain district and county attorneys' offices.

SECTION-BY-SECTION SUMMARY

Adopted new §56.1 specifies that district attorneys and county attorneys presiding in a district or county with a population of 400,000 or more are required to submit initial, quarterly, and annual reports relating to criminal matters and the interests of the state to the OAG in a manner prescribed by the OAG.

Adopted new §56.2(1) defines the term "case file" as all documents, notes, memoranda, and correspondence, in any format such as handwritten, typed, electronic, or otherwise, including drafts and final copies, that were produced within or received by the reporting entity's office, including work product and otherwise privileged and confidential matters. A "case file" does not include a reporting entity employee's correspondence that is purely personal in nature and has no connection with the transaction of official business.

Adopted new §56.2(2) defines the term "correspondence" as any email, letter, memorandum, instant message, text message, or direct message, received or issued by an employee of the reporting entity. "Correspondence" does not include a reporting entity employee's correspondence that is purely personal in nature and has no connection with the transaction of official business.

Adopted new §56.2(3) defines the term "electronic copies" as a digital version of a record that can be stored on a computer device.

Adopted new §56.2(4) defines the term "reporting year" as the period of September 1 through August 31.

Adopted new §56.2(5) defines the term "report" as all information submitted to the OAG by a reporting entity under this chapter.

Adopted new §56.2(6) defines the term "reporting entity" as the office of a District Attorney or County Attorney serving a population of 400,000 or more persons.

Adopted new §56.2(7) defines the term "violent crime" to include capital murder, murder, other felony homicides, aggravated assault, sexual assault of an adult, indecency with a child, sexual assault of a child, family violence assault, aggravated robbery, robbery, burglary, theft, automobile theft, riot, any crime listed in Code of Criminal Procedure §17.50(3), and any attempt to commit such crimes.

Adopted new §56.3(a) specifies the content of the reports that must be electronically submitted to the OAG on a quarterly basis each reporting year.

Adopted new §56.3(b) specifies that reporting entities must submit an initial report containing the contents of the reports described in adopted new §56.3(a) for reporting events that occurred between January 1, 2021, and the effective date of this rule. This section provides exceptions to the initial report requirement.

Adopted new §56.4 specifies the content of the reports that must be electronically submitted to the OAG on an annual basis.

Adopted new §56.5(a) sets forth the deadlines for reporting entities to electronically submit each type of report. Quarterly reports must be submitted within 30 days of the beginning of each new reporting quarter. Annual reports must be submitted at the end of each reporting year and not later than September 30. The initial reports must be submitted within 90 days of the effective date of this rule. Adopted new §56.5(a) also provides that the OAG's

Exhibit
P-1

Oversight Committee may grant exceptions to the deadlines on a case-by-case basis if the reporting entity can establish good cause for not meeting the reporting deadlines.

Adopted new §56.5(b) establishes that a reporting entity must submit all reports under this chapter electronically. Information on how to submit reports electronically will be found on the OAG's website.

Adopted new §56.6 establishes that reporting entities must implement document retention policies reasonably designed to preserve all documents which are, or may be, subject to the requirements in this chapter. The retention policies must preserve documents for at least two years after the dates when they are due to be reported.

Adopted new §56.7 establishes that if an entity fails to comply with this chapter, the OAG may send notice to the reporting entity identifying the reporting entity of its failure to comply. A reporting entity must remedy the identified reporting failure within 30 days after receipt of notice. Any reporting entity that fails to timely comply with this chapter's reporting requirements may be identified on the OAG's website as being out of compliance with both this chapter as well as Texas Government Code §41.006.

Adopted new §56.8 establishes that if a district attorney or county attorney violates adopted new chapter 56, without limitation, the Attorney General may (1) construe the violation to constitute "official misconduct" under Local Government Code §87.011; (2) file a petition for quo warranto under Civil Practice and Remedies Code 66.002; or (3) file a petition for an injunction in a civil proceeding ordering the District Attorney or County Attorney to comply.

Adopted new §56.9 specifies the makeup and responsibilities of the Oversight Advisory Committee as it relates to adopted new chapter 56. The Oversight Advisory Committee is an internal OAG committee composed of OAG employees who will review, collect, and advise on the reports submitted under new adopted chapter 56. Adopted new §56.9 also states that the Oversight Advisory Committee may request entire case files from reporting entities based on submitted reports or any other information that the Oversight Advisory Committee desires relating to criminal matters and the interests of the state on a case-by-case basis, as consistent with Texas Government Code §41.006.

Adopted new §56.10 specifies that all provisions of new adopted chapter 56 are severable.

FISCAL IMPACT ON STATE AND LOCAL GOVERNMENT

Josh Reno, the Deputy Attorney General for Criminal Justice, has determined that for the first five-year period the adopted rules are in effect, enforcing or administering the rules does not have foreseeable implications relating to cost or revenues of state government.

Mr. Reno has determined that there may be minimal costs to local governments for gathering and submitting quarterly and annual reports to OAG. Because the content of the reports will differ between reporting entities, the OAG cannot predict the cost amounts but expects the cost to be minimal and likely absorbed into reporting entities' ongoing operations with minimal, if any, fiscal impact.

According to Texas SmartBuy, the cooperative purchasing program provided by the Texas Comptroller of Public Accounts, scanners range from $50 to $10,000, and the price will depend on the scanner's quality, speed, and if it is a portable or self-loading model. However, it is likely that reporting entities already maintain a scanner in their respective offices. Because the reporting entities are required to submit the information electronically, there will be no postage or printing cost to do so.

The OAG acknowledges it will take some time for county employees to compile the required reporting data. However, the OAG estimates such time will be minimal as the reporting entity should maintain standard law enforcement record keeping practices. The OAG estimates individual employee compensation for an administrative assistant to be $21.29 an hour, and the OAG estimates one to ten hours of work to scan and electronically submit documents to the OAG. This wage is based on the national median hourly wage for each classification as reported in the May 2023 National Industry Specific Occupational Employment and Wage Estimates. Bureau of Labor Statistics, Occupational Employment Statistics, United States Dep't of Labor (August 8, 2024 2:38 p.m.), www.bls.gov/oes/current/oes436014.htm.

PUBLIC BENEFIT AND COST NOTE

Mr. Reno has determined that for the first five-year period the adopted rules are in effect, the public will benefit because the rule will help ensure that county and district attorneys are consistently complying with statutory duties, appropriately administering funds, appropriately prosecuting crimes, and seeking justice for citizens who have been harmed by a criminal act.

Mr. Reno has also determined that for each year of the first five-year period the adopted rules are in effect, there are minimal anticipated costs to the county and district attorneys that are required to comply with the adopted rules. The costs detailed below are the same costs detailed in the Public Benefit and Cost Note section of this adoption order.

Because the content of the reports will differ between reporting entities, the OAG cannot predict the cost amounts but expects the cost to be minimal and likely absorbed into reporting entities' ongoing operations with minimal, if any, fiscal impact.

According to Texas SmartBuy, the cooperative purchasing program provided by the Texas Comptroller of Public Accounts, scanners range from $50 to $10,000, and the price will depend on the scanner's quality, speed, and if it is a portable or self-loading model. However, it is likely that reporting entities already maintain a scanner in their respective offices. Because the reporting entities are required to submit the information electronically, there will be no postage or printing cost to do so.

The OAG acknowledges it will take some time for county employees to compile the required reporting data. However, the OAG estimates such time will be minimal as the reporting entity should maintain standard law enforcement record keeping practices. The OAG estimates individual employee compensation for an administrative assistant to be $21.29 an hour, and the OAG estimates one to ten hours of work to scan and electronically submit documents to the OAG. This wage is based on the national median hourly wage for each classification as reported in the May 2023 National Industry Specific Occupational Employment and Wage Estimates. Bureau of Labor Statistics, Occupational Employment Statistics, United States Dep't of Labor (August 8, 2024 2:38 p.m.), www.bls.gov/oes/current/oes436014.htm.

IMPACT ON LOCAL EMPLOYMENT OR ECONOMY

Mr. Reno has determined that the adopted rules do not have an impact on local employment or economies because the adopted rules only impact governmental bodies. Therefore, no local em-

Exhibit
P-1

ployment or economy impact statement is required under Texas Government Code §2001.022.

ECONOMIC IMPACT STATEMENT AND REGULATORY FLEXIBILITY ANALYSIS FOR SMALL BUSINESSES, MICROBUSINESSES, AND RURAL COMMUNITIES

Mr. Reno has determined that for each year of the first five-year period the adopted rules are in effect, there will be no foreseeable adverse fiscal impact on small business, micro-businesses, or rural communities as a result of the adopted rules.

Since the adopted rules will have no adverse economic effect on small businesses, micro-businesses, or rural communities, preparation of an Economic Impact Statement and a Regulatory Flexibility Analysis, as detailed under Texas Government Code §2006.002, is not required.

TAKINGS IMPACT ASSESSMENT

The OAG has determined that no private real property interests are affected by the adopted rules, and the adopted rules do not restrict, limit, or impose a burden on an owner's rights to the owner's private real property that would otherwise exist in the absence of government action. As a result, the adopted rules do not constitute a taking or require a takings impact assessment under Texas Government Code §2007.043.

GOVERNMENT GROWTH IMPACT STATEMENT

In compliance with Texas Government Code §2001.0221, the agency has prepared a government growth impact statement. During the first five years the adopted rules are in effect, the adopted rules:

- will not create a government program;

- will not require the creation or elimination of employee positions;

- will not require an increase or decrease in future legislative appropriations to the agency;

- will not lead to an increase or decrease in fees paid to a state agency;

- will create a new regulation;

- will not repeal an existing regulation;

- will not result in a decrease in the number of individuals subject to the rule; and

- will not positively or adversely affect the state's economy.

PUBLIC COMMENTS

The OAG held a public hearing on November 18, 2024, and received verbal and written comments on the proposed rule from several county attorneys, district attorneys, organizations and individuals.

**Comments regarding the OAG's authority**

Commenters commented that the OAG lacks authority to adopt this rule. Commenters state that the Texas Legislature did not delegate express or implied authority to the OAG to adopt rules under Government Code §41.006.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as the OAG has authority to implement Government Code §41.006.

Commenters also commented that the rule violates the nondelegation doctrine in Article 3, Section 56(2) of the Texas Constitution. Commenters state Government Code §41.006 is so broad and lacking in reasonable standards that it is an impermissible exercise of legislative authority.

**OAG Response**

The OAG considered the comment and declines to make changes to the rule as Article 3, Section 56(2) of the Texas Constitution does not apply to the rulemaking authority of the OAG, but instead it imposes requirements and limitations on the Legislature.

Commenters also commented that Government Code §41.006 does not authorize the OAG to remove duly elected district attorneys and county attorneys from office. Commenters stated Texas law already delineates a specific set of criteria for removing prosecuting attorneys from office under Local Government Code Chapter 87 and the definition of "official misconduct" that can result in removal from office does not include failure to make a report to the Office of the Attorney General.

**OAG Response**

The OAG reviewed the comments and declines to make changes to the rule as the OAG does not purport to have authority to remove district or county attorneys under Local Government Code Chapter 87. Under Local Government Code 87.012, only a district judge may remove a district or county attorney from office. The rule states the OAG may construe the violation to constitute "official misconduct." Section 87.015 sets forth procedures for petitioning a district court for the removal of an attorney. It does not state the OAG may remove a district or county attorney from office.

Commenters also commented that the OAG does not have original jurisdiction to prosecute state criminal offenses and has no legitimate law enforcement purpose in receiving or reviewing this information.

**OAG Response**

The OAG considered the comment and declines to make changes to the rule as the rule does not state the OAG has original jurisdiction to prosecute criminal offenses nor is there a "legitimate law enforcement purpose" requirement for receiving information under Government Code §41.006.

**Comments regarding Separation of Powers**

Commenters commented that the rule violates the separation of powers provision of the Texas Constitution because the respective duties of district and county attorneys shall be regulated by the Texas Legislature.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as the OAG determined the requirements in the rule do not violate the separation of powers provision in the Texas Constitution. The rule implements Government Code §41.006 as it prescribes the time, form, and content of reports the OAG requires from certain district and county attorneys' offices.

Commenters further commented that the rule implies that the OAG has original jurisdiction over the criminal matters in the State of Texas.

**OAG Response:**

Exhibit
P-1

The OAG considered the comments and declines to make changes to the rule because the rule does not imply that the OAG has original jurisdiction over the criminal matters in the State of Texas. The rule implements Government Code §41.006 as it prescribes the time, form, and content of reports the OAG requires from certain district and county attorneys' offices.

Commenters also commented that the OAG misrepresents the primary duty of prosecuting attorneys under the Texas Constitution.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as the rule does not make any representation of the primary duty of prosecuting attorneys. The rule implements Government Code §41.006 as it prescribes the time, form, and content of reports the OAG requires from certain district and county attorneys' offices.

**Comments regarding fiscal impact, cost, and burden**

Commenters commented that the rule is an unfunded mandate that imposes significant financial and operational burdens on reporting entities.

Commenters commented that compliance with the rule would require the diversion of significant resources from the essential functions of reporting entities and divert critical resources from the reporting entity's central purpose.

Commenters also commented that the rule is likely to cost counties and taxpayers millions of dollars in additional staff time and by acquiring new staff to comply with the initial and annual reporting requirements in the rule. Commenters commented that the rule's financial impact analysis underestimates operational, technology, and labor costs and fails to consider and specify cumulative costs.

Commenters further commented that compiling the initial report will require making case-by-case determinations in each case file as to whether the circumstances of a particular case fall within the parameters of the required reports, which would require enormous resources and could effectively bring everyday operations to a halt.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as the OAG completed a fiscal impact analysis of the rule and concluded that costs should be minimal as complying with the rule could be absorbed into the reporting entities' ongoing operations. Because the content of the reports will differ between reporting entities, the OAG could not predict the exact cost amounts for each reporting entity but expects the cost to be minimal and likely absorbed into reporting entities' ongoing operations with minimal, if any, fiscal impact. Additionally, the OAG acknowledges it will take some time for employees to compile the required reporting data. However, the OAG estimates such time will be minimal as the reporting entity should maintain standard law enforcement record keeping practices.

**Comments regarding the purpose of the rules**

Commenters commented that the purpose of this rule is purely political and designed to allow the OAG to influence arrests, indictments, and prosecutions. Commenters also commented that the purpose of the rule is to target specific groups and organizations that the OAG disagrees with and to protect certain groups and organizations that the OAG agrees with. Commenters stated the purpose of the rule is for the OAG to determine who should or should not be prosecuted.

Commenters also commented that the purpose of the rule is to provide a method to remove elected district and county attorneys over failures to comply with the rule or scrutinize or remove district and county attorneys if the attorney general disagrees with a district or county attorneys' approach on a particular case.

Commenters also commented that the purpose of the rule is to gain information pertaining to elections because the Attorney General has not been successful in prosecuting election related crimes due to lack of information. Commenters stated that review of case files pertaining to elections serves to intimidate election workers around the state.

**OAG Response**

The OAG considered the comments and declines to make changes to the rule as the purpose of the rule is to prescribe the time, form, and content of reports the OAG requires from certain district and county attorneys' offices under Government Code §41.006.

**Comments regarding confidential, sensitive, and privileged information**

Commenters commented that the proposed rules, and broad definition of "case file," would require reporting entities to disclose to the OAG confidential information that they are not legally permitted to disclose. Commenters stated that reporting entities are not permitted to disclose specific information, including, but not limited to: Grand jury information, healthcare records, juvenile justice information, criminal history information, information pertaining to victims and child victims, and DNA information.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as the OAG has not identified any instances in which a reporting entity would be prohibited from sharing information with the OAG. Reporting entities currently routinely submit their entire case files, including all of the types of information specified in the comments, to the OAG in various manners and in compliance with other statutes that only generally require disclosure of information to the OAG. The rule implements Government Code §41.006, which specifically states the district and county attorneys shall report to the attorney general the information the attorney general desires. The OAG is required to comply with the same confidentiality statutes for which the reporting entities are required to comply. Any confidential information provided to the OAG pursuant to the rule and §41.006 maintains its confidentiality under the respective confidentiality laws.

Commenters also commented that the rule may require reporting entities to submit information to the OAG that is subject to the work product or attorney-client privileges. Commenters state that once the privileged material has been knowingly and voluntarily disclosed to a third party, even in response to a governmental reporting requirement, the privilege as to that information is waived.

**OAG Response:**

The OAG has reviewed the comments and declines to make changes to the rule as submitting information to the OAG under the rule and Government Code §41.006 will not waive the work product or attorney-client privileges.

Exhibit
P-1

Commenters also commented that there is no provision in the rule to ensure the privacy of sensitive case information, including crime victim and witness information. Because of this, commenters state the rule will have a chilling effect on crime victims and witnesses from coming forward to report crimes, which could result in increased crime. Commenters stated that should these rules go into effect, victims will no longer be assured of how sensitive case information will be accessed, shared, or utilized.

**OAG Response:**

The OAG has reviewed the comments and declines to make changes to the rule as the law requires the OAG to comply with the same confidentiality statutes for which the reporting entities are required to comply.

Commenters commented that the rules violate Article 1. §30 of the Texas Constitution; Rights of Crime Victims.

**OAG Response:**

The OAG reviewed the comments and declines to make changes to the rule because the rule does not violate the Texas Constitution.

**Comments regarding data storage:**

Commenters commented that the rule does not indicate where and how the OAG will store the information received from reporting entities. Commenters commented that the rule does not provide assurances as to the security of the data it receives from reporting entities.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule because the OAG has a legal duty to, and does secure, safeguard, and properly maintain data.

Commenters further commented that it may not be possible for reporting entities to transmit electronically the volume of data required to be reported under the rule.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as reporting entities currently routinely submit electronically their entire case files to the OAG in various manners and in compliance with other statutes.

**Comments regarding the population requirement for compliance with the rule**

Several commenters commented that the fact that the reporting requirements are only for district attorneys and county attorneys presiding in a district or county with a population of 400,000 or more persons is arbitrary and lacks a statutory basis.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule. The population requirement for compliance with the rule allows the OAG to review data from the largest counties in the state which will indicate trends for all counties in the state.

**Comments regarding the rule's definition of "violent crime"**

Commenters commented that the fact that the definition of "violent crime" in §56.2(7) includes crimes the commenters described as nonviolent, such as theft, and any attempt to commit such crimes, is a misleading and overly broad re-categorization of the term violent crime. Commenters state this will generate statistical reports which might incorrectly imply to the public that there has been a significant increase in actual violent crimes. Commenters further state that defining "violent crime" is a legislative issue.

**OAG Response:**

The OAG reviewed the comments and declines to make changes to the rule because the definition of "violent crime" in §56.2(7) is only applicable to the reporting requirements in the rule. The rule does not purport to amend the definition of "violent crime" in any other context. Further, the rule does not speak to generation of statistical reports. The rule implements Government Code §41.006 as it prescribes the time, form, and content of reports the OAG requires from certain district and county attorneys' offices.

**Comments regarding the Oversight Advisory Committee**

Commenters commented that the work of the Oversight Advisory Committee has no scope at all in the rule.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as 1 TAC §56.9 specifies the makeup and responsibilities of the Oversight Advisory Committee.

**Comments regarding Quarterly Reports**

Commenters asked whether the quarterly reports should repeat information each quarter if the status of the cases has not changed. Commenters also asked whether cases that are declined initially but refiled upon further investigation should be included in the quarterly reports.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as the rule does not require clarification. The quarterly reports must include a running list of the required reporting information, including cases that were declined initially but refiled upon further investigation.

Commenters commented that the quarterly reports are not "reports" but instead are quarterly demands by the OAG for any case file it wants.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as reporting requirements are only for information that relates to criminal matters and the interests of the state, which is consistent with Texas Government Code §41.006. The term "report" is defined in 1 TAC §56.2(5) as all information submitted to the OAG by a reporting entity under this chapter.

**Comments regarding Annual Reports:**

Commenters commented that §56.4(a)(2) is unclear and ask what state and federal ordinances would be responsive to the section.

**OAG Response:**

The OAG considered the comment and declines to make changes to the rule as the rule clearly identifies the information the OAG is requesting. The term ordinance is part of an inclusive list of actions that refers not just to actions of state and federal entities, but also to local and county entities who may pass ordinances.

Exhibit
P-1

Commenter commented §56.4(a)(4) and (5) are very unclear and asks if the requirement includes ARPA funds, government grants, or general fund disbursements.

**OAG Response:**

The OAG considered the comment and declines to make changes to the rule as §56.4(a)(4) and (5) specify the requested information relates to funds accepted by the commissioners court of their county pursuant to Texas Government Code §41.108. Section 41.108 states "the commissioners court of the county or counties composing a district may accept gifts and grants from any foundation or association for the purpose of financing adequate and effective prosecution programs in the county or district."

**Comments regarding 1 TAC §56.3(a)(1)**

Commenters asked whether the reporting requirement for indictment of police officers includes cases in which officers are indicted for personal conduct.

**OAG Response:**

The OAG considered the comment and included clarifying language in §56.3(a)(1) to indicate that the reporting requirement is only for indictment of a peace officer for conduct that occurred while the peace officer was conducting official duties.

Commenters commented that the rule creates a deterrent to the indictment of peace officers which will result in a risk of increased violence to Texans from law enforcement.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as the rule does not regulate the indictment of peace officers. The rule implements Government Code §41.006 as it prescribes the time, form, and content of reports the OAG requires from certain district and county attorneys' offices.

**Comments regarding 1 TAC §56.3(a)(2)**

Commenters commented that the reporting requirement in §56.3(a)(2) regarding a decision to indict a poll watcher presents a conflict of interest for the OAG and a safety risk to voters.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as the reporting requirement does not present a conflict of interest to the OAG nor a safety risk to individuals. The rule implements Government Code §41.006 as it prescribes the time, form, and content of reports the OAG requires from certain district and county attorneys' offices.

Commenters also commented that §56.3(a)(2) contains a typographical error as "Teas" is not a word.

**OAG Response:**

The OAG considered the comment and corrected the error to read "Texas" in §56.3.

**Comments Regarding 1 TAC §56.3(a)(3)**

Commenters commented that §56.3(a)(3) is unclear because it does not define how a defendant "raises a justification under Chapter 9 of the Penal Code."

OAG Response:

The OAG considered the comments and revised §56.3(a)(3) to clarify that the request is for the number of prosecutions involving a defendant's discharge of a firearm where any prosecutorial decision was based on Title 9 of the Penal Code.

**Comments regarding 1 TAC §56.3(a)(4)**

Commenters requested clarification as to what party recommends to a judicial body that a person subject to a final judgment of conviction be released from prison before the expiration of their sentence; resentenced to a lesser sentence; or granted a new trial based on a confession of error.

**OAG Response:**

The OAG considered the comment and included clarifying language in §56.3(a)(4) that the recommendation to a judicial body that a person subject to a final judgment of conviction be released from prison before the expiration of their sentence; resentenced to a lesser sentence; or granted a new trial based on a confession of error is a recommendation made by the reporting entity.

**Comments regarding 1 TAC §56.3(a)(6)**

Commenters commented that the language in §56.3(a)(6) regarding cases where "substantial doubt" for probable cause is extremely broad.

**OAG Response:**

The OAG considered the comment and declines to make changes as substantial doubt is at the discretion of the OAG's Oversight Advisory Committee.

**Comments Regarding 1 TAC §56.3(a)(7)**

Commenters commented that the requirement is unclear as to whether the section only refers to a violent crime or if it includes any case that was resolved by deferred prosecution or any case where all charges were dropped for cases that do not fall under the definition of violent crime.

**OAG Response:**

The OAG considered the comment and declines to make changes to the rule. The reporting requirement in 1 TAC §56.3(a)(7) only applies to arrests for violent crime as defined in the rule.

**Comments Regarding 1 TAC §56.3(a)(11)**

Commenters commented that 1 TAC §56.3(a)(11) is broad and unclear. Commenters ask whether the required communication include communications with the Children's Advocacy Center, local crisis shelters, and other community partners.

**OAG Response**

The OAG considered the comment and included clarifying language in 1 TAC §56.3(a)(11) that the reporting requirement is for correspondence with any non-profit organization, not for profit organization, and non-governmental organization regarding a decision to indict an individual. The requirement includes communications with the Children's Advocacy Center, local crisis shelters, and other community partners that are a non-profit organization, not for profit organization, and/or a non-governmental organization.

**Comments regarding 1 TAC §56.3(a)(12)**

Commenters commented that §56.3(a)(12) is unclear and does not define the term "complaint."

Exhibit
P-1

**OAG Response:**

The OAG considered the comments and revised §56.3(a)(12) to clarify that the information the OAG is requesting is all correspondence written at any time by an assistant district attorney or assistant county attorney regarding the attorney's resignation under a formal or informal complaint process. This section does not include communications regarding salary negotiations or retirement policies.

**Comments regarding retention**

Commenters commented that the reporting requirements for the initial report are impractical and legally dubious, as many reporting entities either do not maintain certain categories of information or have already disposed of records in accordance with lawful document retention policies.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as §56.3(b)(1) provides exceptions to the initial reporting requirement in §56.3(a). The exceptions include the option for reporting entities to provide a sworn affidavit that states the information cannot be produced because it was destroyed or otherwise discarded pursuant to a *bona fide* document retention policy that existed prior to the effective date of this rule and that is described in detail and transmitted to the Oversight Advisory Committee.

Commenters also commented that the rules seek information that reporting entities may not possess or have no existing obligation to track. Commenters further commented that the rule creates numerous new data and case information reporting requirements for prosecutor offices and require the collection, storage, documentation, and dissemination of records that are not ordinarily retained as part of a criminal case file.

**OAG Response:**

The OAG considered the comments and declines to make changes to the rule as §56.6 establishes that reporting entities must implement document retention policies reasonably designed to preserve all documents which are, or may be, subject to the requirements in this Chapter. The retention policies must preserve documents for at least two years after the dates when they are due to be reported.

Commenters also commented that §56.6 requires retention of any documents required by this report but provides no exception for expunged matters which could cause a conflict with the penal violations for maintaining records which have been expunged. Additionally, the OAG's office will need to be included in future expunctions for any cases related to these reports.

**OAG Response:**

The OAG has considered the comment and declines to make changes to the rule as laws regarding expunged matters take precedence over administrative rules. Additionally, the OAG will implement a process to be included in future expunctions for any cases related to reports submitted to the OAG under the rule.

**Comments Regarding Procedure**

Commenters commented that providing only a seven-day notice of comment and hearing is insufficient and does not allow for the interests of our communities to be adequately represented.

**OAG Response:**

The OAG considered the comment and declines to make changes as the proposal was published on September 13, 2024, and provided for a 30-day public comment period.

Commenters also comment that the *Texas Register* notice fails to ensure that stakeholders understand the implications of this rule and that stakeholders won't understand that highly personal and confidential information from case files could be transmitted to the attorney general likely without notice or consent given the points in the process when this must occur, under a range of circumstances.

**OAG Response:**

The OAG reviewed the comment and declines to make changes to the rule as the proposal complies with the notice requirements in Government Code Chapter 2001.

**Additional Comments**

Commenters commented that if the OAG makes recommendations on charges in cases obtained under this rule and the county fails to obtain convictions in the resulting proceedings, the government would be exposed to greater financial and legal liabilities.

**OAG Response:**

The OAG has considered the comments and declines to make changes to the rule as the rule does not contemplate OAG recommendations on cases. The rule implements Government Code §41.006 as it prescribes the time, form, and content of reports the OAG requires from certain district and county attorneys' offices.

Commenters commented that the data collection in the rule focuses on "arrests" and very often an arrest is made that is not adequately supported by probable cause. A number of "arrests" should never be used as a measure of criminality because Americans are not guilty at the point of arrest. Commenters further stated that district attorneys have a responsibility to the Texas taxpayer to pursue only those indictments where probable cause clearly exists.

**OAG Response:**

The OAG has considered the comments and declines to make changes to the rule as the rule does not contemplate the measure of criminality or pursuit of indictments. The rule implements Government Code §41.006 as it prescribes the time, form, and content of reports the OAG requires from certain district and county attorneys' offices.

Commenters commented that the information required to be reported under the rule is too specific and at the same time so broad such that it will reveal very little about the actual performance of a district attorney's office.

**OAG Response:**

The OAG considered the comment and declines to make changes to rule as the rule implements Government Code §41.006 as it prescribes the time, form, and content of reports the OAG requires from certain district and county attorneys' offices. Government Code §41.006 authorizes the attorney general to direct districts and counties attorneys' offices to report the information that the attorney general desires.

Commenters also commented that the rule interferes with the professional responsibilities and discretion of local prosecutors.

**OAG Response:**

Exhibit
P-1

The OAG considered the comments and declines to make changes to the rule as the rule does not speak to how a local prosecutor executes their duties. The rule implements Government Code § 41.006 as it prescribes the time, form, and content of reports the OAG requires from certain district and county attorneys' offices.

**Other changes**

The OAG corrected identified, non-substantive typographical errors.

STATUTORY AUTHORITY

New 1 TAC Chapter 56 is adopted pursuant to Texas Government Code §41.006.

CROSS-REFERENCE TO STATUTE

This regulation clarifies Texas Government Code §41.006. No other rule, regulation, or law is affected by this proposed rule.

*§56.1.   General Reporting Requirements.*

District Attorneys and County Attorneys presiding in a district or county with a population of 400,000 or more persons must submit an initial, and quarterly and annual reports relating to criminal matters, and the interest of the state, to the Office of the Attorney (OAG) in a manner prescribed by the OAG and as set forth in this chapter.

*§56.2.   Definitions.*

The following words and terms, when used in this subchapter, have the following meanings:

(1)    "Case file" means all documents, notes, memoranda, and correspondence, in any format such as handwritten, typed, electronic, or otherwise, including drafts and final copies, that were produced within or received by the reporting entity's office, including work product and otherwise privileged and confidential matters. A "case file" does not include a reporting entity employee's correspondence that is purely personal in nature and has no connection with the transaction of official business.

(2)    "Correspondence" means any email, letter, memorandum, instant message, text message, or direct message, received or issued by an employee of the reporting entity. "Correspondence" does not include a reporting entity employee's correspondence that is purely personal in nature and has no connection with the transaction of official business.

(3)    "Electronic copies" means a digital version of a record that can be stored on a computer device.

(4)    "Reporting year" means the period of September 1 through August 31.

(5)    "Report" means all information submitted to the OAG by a reporting entity under this chapter.

(6)    "Reporting entity" means the office of a District Attorney or County Attorney serving a population of 400,000 or more persons.

(7)    "Violent crime" includes capital murder, murder, other felony homicides, aggravated assault, sexual assault of an adult, indecency with a child, sexual assault of a child, family violence assault, aggravated robbery, robbery, burglary, theft, automobile theft, riot, any crime listed in Code of Criminal Procedure §17.50(3), and any attempt to commit such crimes.

*§56.3.   Quarterly and Initial Reporting Requirements.*

(a)    Content of reports. Reporting entities must submit electronic copies of the following information to the OAG quarterly in accordance with this chapter.

(1)    The number of instances that the Reporting Entity indicted a peace officer for the peace officer's conduct during official duties;

(2)    The number of instances that the reporting entity indicted an individual for a criminal violation under the Texas Election Code.

(3)    The number of prosecutions involving a defendant's discharge of a firearm resulting in any prosecutorial decision based on Title 9 of the Penal Code;

(4)    The case file for instances a recommendation made by the Reporting Entity is made to a judicial body that a person subject to a final judgment of conviction be released from prison before the expiration of their sentence; resentenced to a lesser sentence; or granted a new trial based on a confession of error;

(5)    The case file for prosecutions for which the Texas Governor has announced that The Office of the Texas Governor is considering a pardon;

(6)    Any case file for prosecutions relating to criminal matters and the interests of the state, as requested by the Attorney General through the Oversight Advisory Committee, including cases where there are substantial doubts by the Oversight Advisory Committee whether probable cause exists to support a prosecution;

(7)    The number of instances that an arrest was made for a violent crime but no indictment was issued, the case was resolved by deferred prosecution or a similar program, or all charges were dropped;

(8)    All correspondence requested by OAG's Oversight Advisory Committee for a matter listed in response to paragraph (7) of this subsection on a prior quarterly report;

(9)    All correspondence and other documentation describing and analyzing a reporting entity's policy not to indict a category or sub-category of criminal offenses;

(10)    All correspondence with any employee of a federal agency regarding a decision whether to indict an individual;

(11)    All correspondence with any non-profit organization regarding a decision whether to indict an individual; and

(12)    All correspondence written at any time by an assistant district attorney or assistant county attorney regarding the attorney's resignation under a formal or informal complaint process. This section does not include communications regarding salary negotiations or retirement policies.

(b)    Initial Report. A reporting entity must submit an electronic copy of the information outlined in this section for which a reporting event occurred between January 1, 2021, and the effective date of this rule, unless:

(1)    The reporting entity obtains a written exception, in whole or in part, from the OAG;

(2)    The reporting entity provides a sworn affidavit that states the information:

(A)    was the exclusive product of a previous District or County Attorney; and

(B)    is not reflective of the reporting entity's current operations due to a formal change in the office's policies, and the formal

**Exhibit
P-1**

change is described in detail and transmitted to the Oversight Advisory Committee; or

(3) The reporting entity provides a sworn affidavit that states the information cannot be produced because it was destroyed or otherwise discarded pursuant to a *bona fide* document retention policy that existed prior to the effective date of this rule and that is described in detail and transmitted to the Oversight Advisory Committee.

### §56.4. *Annual Reports.*

Reporting entities must submit electronic copies of the following information for the prior reporting year in accordance with this chapter.

(1) All policies, rules, and orders, including internal operating procedures and public policy documents, that were modified during the prior 12 months;

(2) A list of all local, county, state, and federal ordinances, statutes, laws, and rules for which the reporting entity files reports, whether that requirement is regular or arises upon the occurrence of an event;

(3) A list of individual expenditures and purchases made based on funds or assets received through civil asset forfeiture;

(4) All information regarding funds accepted by the commissioners court of their county pursuant to Texas Government Code §41.108 that were passed on to the reporting entity. The reporting entity must detail how much of the funds were passed on to the reporting entity and provide a detailed accounting of how the reporting entity disposed of any funds received; and

(5) All information regarding funds accepted by the commissioners court of their county pursuant to Texas Government Code §41.108 that were not passed on to the reporting entity, but were used to benefit the reporting entity, its personnel, or its operations. The report must include any correspondence regarding accepted funds, as well as a detailed account of how the funds were used to benefit the reporting entity, its personnel, or its operations.

### §56.5. *Report Submission Deadlines and Requirements*

(a) Deadlines.

(1) The quarterly report under §56.3 of this chapter (relating to Quarterly and Initial Reporting Requirements) is due within 30 days of the beginning of each new reporting quarter for all reporting events that occurred in the prior reporting quarter.

(2) The reporting quarters are as follows:

(A) Quarter one: September through November;

(B) Quarter two: December through February;

(C) Quarter three: March through May; and

(D) Quarter four; June through August.

(3) The annual report under §56.4 of this chapter (relating to Annual Reports) is due at the end of each reporting year and no later than September 30.

(4) The initial report under this section is due within 90 days of the effective date of this rule.

(5) The Oversight Advisory Committee may grant an extension on a case-by-case basis if the reporting entity can establish good cause for not meeting the reporting deadlines.

(b) Electronic Submissions. A reporting entity submit all reports under this chapter electronically. Information on how to submit reports electronically can be found on the OAG's website.

### §56.6. *Document Retention.*

Reporting entities must implement document retention policies reasonably designed to preserve all documents which are, or may be, subject to the requirements in this chapter. The retention policies must preserve documents for at least two years after the dates when they are due to be reported.

### §56.7. *Overdue reports.*

If an entity fails to comply with this chapter, in whole or in part, the OAG may send notice to the reporting entity identifying the reporting entity of its failure to comply. A reporting entity must remedy the identified reporting failure within 30 days after receipt of notice. Any reporting entity that fails to timely comply with this chapter's reporting requirements may be identified on the OAG's website as being out of compliance with both this chapter as well as Texas Government Code §41.006.

### §56.8. *Compliance.*

If a reporting entity violates this chapter, without limitation:

(1) The OAG may construe the violation to constitute "official misconduct" under Local Government Code §87.011;

(2) The OAG may file a petition for quo warranto under Civil Practice and Remedies Code §66.002 for the performance of an act that by law causes the forfeiture of the County or District Attorney's office; or

(3) The OAG may initiate a civil proceeding seeking to order the County or District Attorney to comply with this chapter.

### §56.9. *Oversight Advisory Committee.*

(a) The Attorney General will establish an Oversight Advisory Committee composed of three members of the Office of the Attorney General designated by the Attorney General.

(b) The Oversight Advisory Committee may issue notifications of overdue reports under §56.7 of this chapter (relating to Overdue reports).

(c) The Oversight Advisory Committee may request entire case files based on submitted reports or any other information that the Oversight Advisory Committee desires relating to criminal matters and the interests of the state on a case-by-case basis,

(d) The Oversight Advisory Committee may waive any provision of this chapter if a reporting entity demonstrates that compliance would impose an undue hardship.

### §56.10. *Severability.*

(a) All provisions of this chapter are severable.

(b) If any application of any provision of this rule is held to be invalid for any reason, all valid provisions are severable from the invalid provisions and remain in effect. If any section or portion of a section is held to be invalid in one or more of its applications, in all valid applications the provisions remain in effect and are severable from the invalid applications.

The agency certifies that legal counsel has reviewed the adoption and found it to be a valid exercise of the agency's legal authority.

Filed with the Office of the Secretary of State on March 13, 2025.

TRD-202500891

Exhibit
P-1

Justin Gordon
General Counsel
Office of the Attorney General
Effective date: April 2, 2025
Proposal publication date: September 13, 2024
For further information, please call: (512) 475-4291

◆　　◆　　◆

# PART 15.　TEXAS HEALTH AND HUMAN SERVICES COMMISSION

## CHAPTER 353.　MEDICAID MANAGED CARE
## SUBCHAPTER O.　DELIVERY SYSTEM AND PROVIDER PAYMENT INITIATIVES

### 1 TAC §353.1306

The executive commissioner of the Texas Health and Human Services Commission (HHSC) adopts amendments to §353.1306, concerning Comprehensive Hospital Increase Reimbursement Program for Program Periods on or after September 1, 2021.

Section 353.1306 is adopted with changes to the proposed text as published in the September 13, 2024, issue of the *Texas Register* (49 TexReg 7143). This rule will be republished.

BACKGROUND AND JUSTIFICATION

HHSC has been working since September 2022 to evaluate the future of the Medicaid hospital financing system in a post-public health emergency environment. With the combination of new Medicaid fee-for-service and managed care rules at the federal level, the unwinding of the Medicaid caseload coverage from the public health emergency, and the interplay between directed payment programs and new supplemental payment programs (e.g., the private graduate medical education (GME) and Hospital Augmented Reimbursement program (HARP)), hospital financing in Medicaid and for the uninsured has been challenging to forecast. With the support of hospitals and their representatives, Medicaid managed care organizations and their representatives, and industry subject matter experts, HHSC made final decisions regarding the program design for CHIRP that will be implemented, beginning in state fiscal year (SFY) 2026.

Comprehensive Hospital Increase Reimbursement Program

Beginning in SFY 2025, CHIRP is composed of three components: Uniform Hospital Rate Increase Payment (UHRIP), Average Commercial Incentive Award (ACIA), and Alternate Participating Hospital Reimbursement for Improving Quality Award (APHRIQA). The amendment to §353.1306 updates the ACIA component calculation beginning in SFY 2026 to calculate the Average Commercial Reimbursement (ACR) gap on an aggregated, per-class basis. The amendment to §353.1306 also allocates available ACIA funds across hospital classes based on the proportion of the combined ACR gap of each hospital class within a Service Delivery Area (SDA) to the total ACR gap of all hospitals within the SDA. Lastly, the rule amendment to §353.1306 updates the maximum ACR Upper Payment Limit (UPL) percentage to 95 percent beginning in SFY 2027 and to 100 percent beginning in SFY 2028.

COMMENTS

The 31-day comment period ended October 15, 2024.

During this period, HHSC received comments regarding the proposed rule from three commenters: the Texas Association of Behavioral Health Systems, the Children's Hospital Association of Texas, and the Texas Hospital Association. A summary of comments relating to §353.1306 and HHSC's responses follow.

Comment: Multiple commenters requested that HHSC withdraw the CHIRP rule amendment due to new Federal reporting requirements and recent Centers for Medicare & Medicaid Services (CMS) guidance on the CHIRP program. Commenters believe that the CHIRP rule should be withdrawn and that HHSC should draft an alternative amendment to include greater details and clarity on CMS requirements for the program.

Response: HHSC appreciates the comment and understands the desire for greater clarity and transparency. The rule amendment, as proposed, describes the CHIRP Program as is; HHSC is continuing to work with CMS on requirements for future years. Depending on the outcomes of these discussions, additional rule amendments may be made in future years. No revision to the rule text was made in response to this comment.

Comment: Multiple commenters requested that HHSC provide greater clarity and transparency for program definitions and descriptions including class definitions and separation by managed care programs in alignment with new CMS requirements for the CHIRP program.

Response: HHSC appreciates the comment and understands the desire for greater clarity and transparency. HHSC is continuing to work with CMS on requirements for future years. Depending on the outcomes of these discussions, additional rule amendments may be made in future years. No revision to the rule text was made in response to this comment.

Comment: A commenter stated that, in light of recent CMS requirements for the CHIRP program for SFY 2025, it is important to ensure that all CHIRP payments are capped at 100 percent of the average commercial rate for all program components.

Response: HHSC appreciates this comment. In the rule text, language is included to increase the percentage of ACR UPL to 100 percent by the program period beginning on or after September 1, 2027. No revision to the rule text was made in response to this comment.

Comment: A commenter requested clarifications to the language of the ACIA allocation of available funds to take into consideration UHRIP payments because the ACIA distribution occurs after the UHRIP distribution.

Response: HHSC appreciates the comment and has updated subsection (g)(3)(A) to clarify that the allocation of available funds across hospital classes will be proportional to the combined ACR gap less UHRIP payments of each hospital class within an SDA to the total ACR gap of all hospital classes within the SDA. In addition, (g)(3)(D) is updated to clarify that the ACIA payment example is for program periods beginning on or before September 1, 2024.

Comment: A commenter requested that HHSC oppose CMS's requirement to limit the Medicare UPL gap to ACR gap limits.

Response: This comment is outside the scope of the rule amendment. No revision to the rule text was made in response to this comment.

Comment: A commenter stated that they believed that the new federal rule does not explicitly limit CHIRP payments at the aggregate ACR rate for inpatient behavioral health services in an

**Exhibit**

**P-1**

# APPENDIX TAB B

TEX. GOV'T. CODE § 41.006.

Vernon's Texas Statutes and Codes Annotated
    Government Code (Refs & Annos)
        Title 2. Judicial Branch (Refs & Annos)
            Subtitle C. Prosecuting Attorneys
                Chapter 41. General Provisions
                    Subchapter A. Office of Prosecuting Attorney

V.T.C.A., Government Code § 41.006

§ 41.006. Report to Attorney General

[Currentness](#)

At the times and in the form that the attorney general directs, the district and county attorneys shall report to the attorney general the information from their districts and counties that the attorney general desires relating to criminal matters and the interests of the state.

**Credits**

Acts 1985, 69th Leg., ch. 480, § 1, eff. Sept. 1, 1985.

V. T. C. A., Government Code § 41.006, TX GOVT § 41.006
Current through legislation effective July 1, 2025, of the 2025 Regular Session of the 89th Legislature. Some statute sections may be more current, but not necessarily complete through the whole Session. See credits for details.

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# APPENDIX TAB C

Paschal's Digest Art. 198-213 (Act of 11 May 1846).



THE LIBRARY
OF
THE UNIVERSITY
OF TEXAS

THE LAW LIBRARY

Presented by
Joe Moore

*KFT*
*1238*
*P3*
*1875*
*V. 1*

able by law into the treasury of the state, and shall, at the same time, pay such money into the treasury, retaining the commissions thereon allowed by law.

ART. 190. (624) [10] That each district attorney shall also file a like account, verified in like manner, in the office of the county treasurer of each county in his district, of all money received by him in such county by virtue of his office during the preceding year, and payable by law into the treasury of the state. *To account to county treasurer*

ART. 191. (625) [11] That should any person who may have been elected district attorney fail, on or before the first day of the first term of the first district court in his district, to enter into bond, as required by this act, it shall be the duty of the judge of the district court of said district, to appoint some other competent person to discharge, *pro tempore*, the duties assigned by this act to said officer : Provided, however, that such appointment shall in no instance extend beyond the term of the said district court in any one county. *Attorney pro tempore. [State v. Manlove, 33 Tex. 800; Keenan v. Perry, 24 Tex. 253.]*

ART. 192. (626) [12] That no district attorney shall act as attorney or counsel for any party to an action wherein such party is charged with a crime, with a misdemeanor, or a breach of a penal statute, nor where the interest of such party is adverse to that of the state. *District attorney not to defend offenders. [Controlling. State v Allen, 32 Tex. 275.]*

ART. 193. (627) [13] That no admission made by the district attorney in any suit or action in which the state is a party, shall operate to prejudice the interests of the state. *Admission not to prejudice. Art. 210.*

ART. 194. (628) [14] That each district attorney shall keep, in proper books, to be procured for that purpose at the expense of the state, a register of all his official acts and reports, and of all actions and demands prosecuted or defended by him, of all proceedings had in relation thereto ; and shall deliver the same over to his successor in office. *Shall keep a register.*

ART. 195. (629) [15] That all laws and parts of laws contrary to or in conflict with this act, are hereby repealed. *Repealing clause.*

### AN ACT TO REGULATE THE SALARIES OF DISTRICT ATTORNEYS.

ART. 196. (630) [1] That the several district attorneys of this state shall receive an annual salary of five hundred dollars, to be paid quarterly. *Act of 24 Jan. 1848; took effect from 18 April, 1848. Vol. 11, p. 13. Salary.*

### AN ACT TO REQUIRE DISTRICT ATTORNEYS TO REPORT TO THE COMPTROLLER'S OFFICE IN CERTAIN CASES.

ART. 197. [1] That the comptroller shall furnish to the several district attorneys respective statements of defalcations to the state in their districts, specifying names of defaulters and amounts due, which claims shall have been placed in the charge of said attorneys for collection ; and thereupon said attorneys, respectively, shall make complete returns to the comptroller twice a year, at the expiration of the regular circuits of the courts of the districts, showing the exact condition of any suits that shall have been instituted for such collections, and the precise situation of the collections that shall have been made, either with or without suits; and in any case where such attorney shall have failed to make such return, the salary of such delinquent shall not be paid, until the proper return shall have been received at the comptroller's office. *Act of 4 Dec. 1863; took effect from passage. Vol. 20, part 1, p. 11. Comptroller to furnish list of defaulters. District attorneys to report when. Art. 184.*

# Attorney-General.

Act of 11 May, 1846; took effect from passage. Vol. 10, p. 206. Duties. Note 118.

### AN ACT DEFINING THE DUTIES OF THE ATTORNEY-GENERAL OF THE STATE OF TEXAS.

ART. 198. (65) [1] It shall be the duty of the attorney-general to prosecute and defend all actions in the supreme court of the state, in which the state may be interested ; and also to perform such other duties as may be prescribed by the constitution and laws of the state.

ART. 199. (66) [2] If any attorney-general shall fail, from any cause, to

# ATTORNEY-GENERAL.

**Failure to attend court—penalty.** attend said court at any of its sessions, his salary shall be liable to such deduction as may be prescribed by law.

**To advise district attorneys.** ART. 200. (67) [3] The attorney-general shall counsel and advise the several district attorneys in the state, in the prosecution and defence of all actions in the district courts, wherein the state is interested, whenever requested by them so to do; and it shall be the duty of the attorney-general to appear and defend the interests of the state, in any suits now pending, or which may be hereafter instituted, in the district court, by empressarios for the settlement of their claims.

**Report annually to governor. Art. 182.** ART. 201. (68) [4] It shall be the duty of the attorney-general to report to the governor on the first Monday of December, annually, and at such other times as he may require, the number of indictments which have been found by grand juries in this state for the preceding year; the offences charged therein; the number of arraignments, convictions, and acquittals, for each offence; the number of indictments which have been disposed of without the intervention of a petit jury, with the cause and manner of such disposition; and also a summary of the judgments rendered on conviction, specifying the offence, the nature and amount of penalties imposed, and the amount of fines collected.

**Shall require reports from district attorneys. Arts. 182, 201.** ART. 202. (69) [5] He shall require the several district attorneys to communicate to him, semi-annually, at the close of the courts of their respective districts, in such form as he may prescribe, all the information necessary for his compliance with the requisitions of the fourth section.

**Transmit instructions to district attorney.** ART. 203. (70) [6] He shall transmit to the proper district attorneys, with such instructions as he may deem necessary, all certified accounts, bonds, or other demands, which may have been delivered to him, by the comptroller of public accounts, for prosecution and suit.

**Shall require reports of district attorneys of suits for pub. money.** ART. 204. (71) [7] He shall require the several district attorneys to report to him semi-annually, at the close of the courts of their respective districts, in such form as he may prescribe, precise information of the situation of all suits instituted by them for the collection of public money.

**Report to comptroller.** ART. 205. (72) [8] He shall report to the comptroller of public accounts annually, on the last day of October, and at such other times as the comptroller may require, a full and correct statement of the situation of all suits instituted for the collection of public money.

**Give opinion in writing to public officers.** ART. 206. (73) [9] The attorney-general shall, at the request of the governor, secretary of state, comptroller of public accounts, state treasurer, assessor or collector of taxes, or treasurer of any county, give an opinion in writing, in all cases touching the public interest, or concerning the revenue or expenses of the state.

**Prepare forms of contracts.** ART. 207. (74) [10] He shall, whenever requested by the comptroller of public accounts, prepare proper forms for contracts, obligations, and other instruments, which may be wanted for the use of the state.

**Pay money into treasury.** ART. 208. (75) [11] All money received by the attorney-general, for debts due or penalties forfeited to the state, shall be paid by him into the treasury, immediately after the receipt thereof.

**Keep books and register of opinions and acts.** ART. 209. (76) [12] The attorney-general shall keep in proper books, to be provided for that purpose at the expense of the state, a register of all his official acts and opinions; of all actions and demands, prosecuted or defended by him or any district attorney, in which any portion of the revenue of the state is involved, and of all proceedings had in relation thereto; and shall deliver the same to his successor in office.

**Institute suits against colony contractors. Art. 859. Note 215.** ART. 210. (77) [13] It shall be the duty of the attorney-general of this state to file the petition or information, and institute legal proceedings against all colony contractors who have entered into contracts with any president of the republic of Texas; which proceedings may be commenced in any district court for any county, where the whole or any portion of territory embraced in any colony may be situate.

**Rights of state shall not be prejudiced. Art. 193.** ART. 211. (78) [14] No admission, agreement, or waiver, made by the attorney-general, in any action or suit in which the republic of Texas or the state is a party, shall prejudice the rights of the state.

**Reside and keep office at the seat of government.** ART. 212. (79) [15] The attorney-general shall reside at, and keep his office at the seat of government.

**Repealing clause.** ART. 213. (80) [16] That all laws and parts of laws, contrary to or in conflict with this act, are hereby repealed.

**AN ACT TO AUTHORIZE THE GOVERNOR TO EMPLOY COUNSEL TO REPRESENT THE STATE IN CERTAIN CASES.**

ART. 214. (81) [1] Whenever a vacancy may occur in the office of attorney-general by death, resignation, or otherwise, it shall be the duty of the governor, whenever the interest of the state may require it, to appoint counsel to represent the state ; which counsel, so appointed, shall hold his appointment until an attorney-general can be elected and qualified, and no longer ; and shall be entitled to receive, as compensation for his services, at the same rate as is by law allowed to the attorney-general.

*Margin notes: Act of 15 Jan. 1850; took effect from passage. Vol. 13, p. 3. Governor to appoint state counsel, when. For how long. Compensation.*

# Bankruptcy.

**AN ACT TO REPEAL "AN ACT CREATING A SYSTEM OF BANKRUPTCY AND REGULATING THE COLLECTION OF FOREIGN DEBTS."**

ART. 215. [1] That " An act creating a system of bankruptcy, and regulating the collection of foreign debts," approved January 19th, 1841, be, and the same is hereby repealed.

*Margin notes: Act of 2 Jan. 1860; took effect 13 April, 1860. Vol. 18, p. 18. Hart. 1591. O & W. 78.*

278. It is the opinion of the EDITOR that the bankrupt act (vol. 5, p. 38) was superseded by the state constitution ; or, that, if not actually superseded, its practical operation was suspended, because the proceedings were to be had in the county court ; and by the 15th section of the 4th article of the state constitution, the jurisdiction of the chief justice is limited to the estates of deceased persons. The 2d sec. of the act of 16th March, 1848, "to organize county courts," limits their jurisdiction to estates of deceased persons, and to police matters in counties: therefore, said courts had no jurisdiction to hear and determine proceedings in bankruptcy, which necessarily involve many legal and equitable issues. It is also believed that the homestead, and other exemptions, are in conflict with the reservations. The act is therefore not published as a repealed law, on which rights depend. The decisions which have incidentally turned upon the act, were cases in which the question of jurisdiction was never raised. Doubts expressed. Van Hook v. Walton, 28 Tex. 60.

The assignment transfers the whole estate of the debtor, whether described in tne deed or not. Smith v. Talbot, 18 Tex. 774. This proceeding in bankruptcy was had before the adoption of the state constitution. Chief Justice Hemphill suggested that the act was in contravention of the constitution of the republic. He also held that the whole property passed to the trustees ; and that they, for the benefit of the creditors, could recover property not assigned or fraudulently withheld, and therefore it was their duty to present their claims. Id. 781. If there was fraud in obtaining the certificate of bankruptcy, the suit should have been brought on the notes, at the latest within four years after the assignment in bankruptcy. Id. The discharge under the bankrupt act of the United States, of 1841, is also a complete bar to all suits against the debtor ; but it is expressly made subject to impeachment for fraud, or wilful concealment by the debtor, of his property or rights of property. (Vol. 5, Stat. at Large, 444.) Id. 781. The record and decree of discharge in bankruptcy, under that law, were evidence of discharge without the production of the certificate required by the act. Tompkins v. Bennett, 3 Tex. 43. The party having surrendered his real estate in Galveston in his schedule, it could not be urged as fraud that it did not pass, Texas then being a republic. Id. The discharge could not be attacked on the ground of fraud, except in the manner provided by the 4th section of the statute ; that is, "on prior reasonable notice, specifying in writing such fraud or concealment." Id. A decree in bankruptcy, passed in 1843, by the district court of the United States for the eastern district of Louisiana, did not pass to the assignee the title to a house and lot in the city of Galveston and state of Texas, which house and lot were the property of the bankrupt. Texas was then a foreign state, and whatever difference of opinion there may be with respect to the extra-territorial operation of a bankrupt law upon personal property, there is none as to its operation upon real estate. This court concurs with Sir William Grant, in 14 Vesey, 537, that the validity of every disposition of real estate, must depend upon the law of the country in which that estate is situated. Oakey v. Bennett, 11 How. 83. The points decided in Oakey v. Bennett, and the reasoning of the judge, were quoted and approved in Barnett v. Pool, 23 Tex. 519. It is the well-settled doctrine of the common law, that real property is exclusively subject to the laws of the government within whose territory it is situate. Id. The law of estoppel did not apply. Id. That the original certificate of bankruptcy required to be recorded, under the 5th rule of the law of the republic, was in another county, is no excuse for using a copy of the record of registration. Wade v. Work, 18 Tex. 488.

*Margin notes: Note 185. Vol. 11, p. 181. Hart. 309. Note 198. See JUDGMENTS. Limitation. Fraud. Law of United States of 1841. Not collaterally. Lex loci. Notes 420 to 425. Hart. 96.*

# Bill of Exceptions.

ART. 216. (754) [100] After the charge of the judge, either party, or his attorney, may present in writing, but without argument, such charges or instructions as he desires to be given to the jury, which the judge shall deliver to the jury in whole or in part, or refuse to deliver the same, as he may think proper ; but where the charge asked, or any part thereof, is refused to be given, the judge shall write down distinctly what portions of the same he refuses, and what portion he gives, and also subscribe his name thereto, all of which shall be filed by the clerk, and constitute a part of the records of the case, subject to revision for error by the supreme court, in the same manner as if a regular bill of exceptions had been signed.

*Margin notes: Act of 13 May, 1846. For caption, see art. 1. Special instructions asked stand as exceptions. Art. 1464. Note 562.*

279. As to the instructions submitted by the parties in writing, there is no necessity of a bill of exceptions from either party. Jones v. Thurmond, 5 Tex. 323. Exceptions to the general charge may be taken before verdict, and reduced to writing at any time during the term. Id. At as early a day as practicable. Id. Art. 1464.

*Margin notes: See COURTS, DISTRICT, sec. 92. Art. 1464.*

# APPENDIX TAB D

Excerpts from 1879 Texas Code of Criminal Procedure (*also available at* 3RRDX-5).

# Texas Historical Statutes Project

1879
## Code of Criminal Procedure
of the
State of Texas

EXHIBIT
**D - 5**



This project was made possible by the
**Texas State Law Library**
and a grant from the
**Litigation Section of the State Bar of Texas**

# THE

# CODE OF CRIMINAL PROCEDURE

OF THE

# STATE OF TEXAS

PASSED BY THE

## SIXTEENTH LEGISLATURE,

FFBRUARY 21, 1879,

TOOK EFFECT JULY 24, 1879.



AUSTIN:
STATE PRINTING-OFFICE.
1887.

*Section 2. BE IT FURTHER ENACTED, That the following articles shall hereafter constitute the CODE OF CRIMINAL PROCEDURE of the State of Texas, to wit:*

# THE CODE

OF

# CRIMINAL PROCEDURE.

## TITLE I.

### Introductory.

## CHAPTER ONE.

### CONTAINING GENERAL PROVISIONS.

| | Article |
|---|---|
| Objects of this Code........................ | 1 |
| The same....................................... | 2 |
| Trial by due course of law secured............ | 3 |
| Rights of accused persons..................... | 4 |
| Protection against searches and seizures..... | 5 |
| Prisoners entitled to bail, except in certain cases........................................ | 6 |
| Writ of *habeas corpus* shall never be suspended...................................... | 7 |
| Excessive bail, fines, etc., forbidden—open courts........................................ | 8 |
| No person shall be twice put in jeopardy for same offense................................. | 9 |
| Trial by jury shall remain inviolate.......... | 10 |
| Liberty of speech and of the press........... | 11 |
| Person shall not be disqualified as a witness for religious opinion, or want of religious belief....................................... | 12 |
| Outlawry and transportation prohibited.... | 13 |

| | Article |
|---|---|
| Conviction shall not work corruption of blood, etc.................................. | 14 |
| No conviction for treason, except, etc........ | 15 |
| Privilege of senators and representatives.... | 16 |
| Privilege of voters........................... | 17 |
| Change of venue.............................. | 18 |
| Conservators of the peace, style of process, etc.......................................... | 19 |
| In what cases accused may be tried, etc., after conviction................................... | 20 |
| Same subject.................................. | 21 |
| No conviction of felony except by verdict of jury......................................... | 22 |
| Defendant may waive any right, except, etc. | 23 |
| Trials shall be public........................ | 24 |
| Defendant shall be confronted by witnesses, except...................................... | 25 |
| Construction of this Code. ................... | 26 |
| When rules of common law shall govern...... | 27 |

ARTICLE 1. It is hereby declared that this Code is intended to embrace rules applicable to the prevention and prosecution of offenses against the laws of this state, and to make the rules of proceeding in respect to the prevention and punishment of offenses intelligible to the officers who are to act under them, and to all persons whose rights are to be affected by them. It seeks—

Objects of this Code.
(Act Feb. 15, 1858.)
(Act Aug. 26, 1856.)
C.C.P. 1.

1. To adopt measures for preventing the commission of crime.
2. To exclude the offender from all hope of escape.
3. To insure a trial with as little delay as shall be consistent with the ends of justice.
4. To bring to the investigation of each offense, on the trial, all the evidence tending to produce conviction or acquittal.
5. To insure a fair and impartial trial; and,
6. The certain execution of the sentence of the law when declared.

5

**The same.**
**C.C.P. 2.**

ART. 2. In order to collect together, for the convenience of officers and all others charged with the enforcement of the laws, the material provisions of the constitution of this state respecting the prosecution of offenses, the following provisions of said instrument are here inserted:

**Trial by due course of law secured.**
**C.C.P. 3.**

ART. 3. No citizen of this state shall be deprived of life, liberty, property or privileges, outlawed, exiled, or in any manner disfranchised, except by due course of the law of the land. (Bill of Rights, sec. 19.)

**Rights of accused persons.**
**C.C.P. 4.**

ART. 4. In all criminal prosecutions, the accused shall have a speedy public trial by an impartial jury. He shall have the right to demand the nature and cause of the accusation against him, and to have a copy thereof. He shall not be compelled to give evidence against himself. He shall have the right of being heard by himself or counsel, or both; shall be confronted with the witnesses against him and shall have compulsory process for obtaining witnesses in his favor. And no person shall be held to answer for a criminal offense, unless on indictment of a grand jury, except in cases in which the punishment is by fine, or imprisonment otherwise than in the penitentiary; in cases of impeachment and in cases arising in the army and navy, or in the militia, when in actual service in time of war or public danger. (Bill of Rights, sec. 10.)

**Protection against searches and seizures.**
**C.C.P. 5.**

ART. 5. The people shall be secure in their persons, houses, papers and possessions from all unreasonable seizures or searches; and no warrant to search any place, or to seize any person or thing, shall issue without describing them as near as may be, nor without probable cause supported by oath or affirmation. (Bill of Rights, sec. 9.)

**Prisoners entitled to bail, except in certain cases.**
**C.C.P. 6.**

ART. 6. All prisoners shall be bailable by sufficient sureties, unless for capital offenses, where the proof is evident; but this provision shall not be so construed as to prevent bail after indictment found, upon examination of the evidence in such manner as may be prescribed by law. (Bill of Rights, sec. 11.)

**Writ of *habeas corpus* shall never be suspended.**
**C.C.P. 7.**

ART. 7. The writ of *habeas corpus* is a writ of right, and shall never be suspended. (Bill of Rights, sec. 12.)

**Excessive bail, fines, etc., forbid.**
**Open courts.**
**C.C.P. 8.**

ART. 8. Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted. All courts shall be open, and every person, for an injury done him in his lands, goods, person or reputation, shall have remedy by due course of law. (Bill of Rights, sec. 13.)

**No person shall be twice put in jeopardy for same offense, etc.**
**C.C.P. 9.**

ART. 9. No person for the same offense shall be twice put in jeopardy of life or liberty; nor shall a person be again put upon trial for the same offense after a verdict of not guilty in a court of competent jurisdiction. (Bill of Rights, sec. 14.)

**Trial by jury shall remain inviolate.**
**C.C.P. 9.**

ART. 10. The right of trial by jury shall remain inviolate. (Bill of Rights, sec. 15.)

**Liberty of speech and of the press.**
**C.C.P. 10.**

ART. 11. Every person shall be at liberty to speak, write or publish his opinion on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press. In prosecutions for the publication of papers investigating the conduct of officers or men in public capacity, or when the matter published is proper for public information, the truth thereof may be given in evidence. And in all indictments for libels the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases. (Bill of Rights, sec. 8.)

**Person shall not be disqualified as a witness for religious opinion, or want of religious belief.**

ART. 12. No person shall be disqualified to give evidence in any of the courts of this state on account of his religious opinions, or for the want of any religious belief; but all oaths or affirmations shall be administered in the mode most binding upon the conscience, and shall be taken subject to the pains and penalties of perjury. (Bill of Rights, sec. 5.)

ART. 13. No citizen shall be outlawed; nor shall any person be transported out of the state for any offense committed within the same. (Bill of Rights, sec. 20.)

*Outlawry and transportation prohibited.*

ART. 14. No conviction shall work corruption of blood or forfeiture of estate. (Bill of Rights, sec, 21.)

*Conviction shall not work corruption of blood, etc.*

ART. 15. No person shall be convicted of treason, except on the testimony of two witnessess to the same overt act, or on confession in open court. (Bill of Rights, sec. 22.)

*No conviction for treason, except, etc.*

ART. 16. Senators and representatives shall, except in cases of treason, felony or breach of the peace, be privileged from arrest during the session of the legislature, and in going to and returning from the same, allowing one day for every twenty miles such member may reside from the place at which the legislature is convened. (State Constitution, art. 3, sec. 14.)

*Privileg ; of senators and representatives. C.C.P. 12.*

ART. 17. Voters shall, in all cases except treason, felony or breach of the peace, be privileged from arrest during their attendance at elections, and in going to and returning therefrom. (State Constitution, art. 6, sec. 5.)

*Privilege of voters. C.C.P. 13.*

ART. 18. The power to change the venue in civil and criminal cases shall be vested in the courts, to be exercised in such manner as shall be provided by law. (State Constitution, art. 3, sec. 45.)

*Change of venue.*

ART. 19. All judges of the supreme court, court of appeals and district courts shall, by virtue of their offices, be conservators of the peace throughout the state. The style of all writs and process shall be "The State of Texas." All prosecutions shall be carried on in the name and by the authority of "The State of Texas," and conclude, "against the peace and dignity of the state." (State Constitution, art. 5, sec. 12.)

*Conservators of the peace*

*Style of process, etc.*

ART. 20. By the provisions of the constitution, no person shall be exempt from a second trial for the same offense, who has been convicted upon an illegal indictment or information, and the judgment thereupon arrested; nor where a new trial has been granted to the defendant, nor where a jury has been discharged without rendering a verdict, nor for any cause other than that of a legal conviction.

*In what cases accused may be tried, etc., after conviction. C.C.P. 19.*

ART. 21. By the provisions of the constitution, an acquittal of the defendant exempts him from a second trial or a second prosecution for the same offense, however irregular the proceedings may have been; but if the defendant shall have been acquitted upon trial in a court having no jurisdiction of the offense, he may, nevertheless, be prosecuted again in a court having jurisdiction.

*Same subject. C.C.P. 20.*

ART. 22. No person can be convicted of a felony except upon the verdict of a jury duly rendered and recorded.

*No conviction of felony except by verdict of jury. C.C.P. 22.*

ART. 23. The defendant to a criminal prosecution for any offense may waive any right secured to him by law, except the right of trial by jury in a felony case.

*Defendant may waive any right, except, etc. C.C.P. 26.*

ART. 24. The proceedings and trials in all courts shall be public.

*Trials shall be public. C.C.P. 23.*

ART. 25. The defendant upon a trial shall be confronted with the witnesses, except in certain cases provided for in this Code, where depositions have been taken.

*Defendant shall be confronted by witnesses, except. C.C.P. 24.*

ART. 26. The provisions of this Code shall be liberally construed, so as to attain the objects intended by the legislature, the prevention, suppression and punishment of crime.

*Construction of this Code. C.C.P. 25.*

ART. 27. Whenever it is found that this Code fails to provide a rule of procedure in any particular state of case which may arise, the rules of the common law shall be applied and govern.

*When rules of common law shall govern. (Act Feb. 15, 1858.) C.C.P. 27.*

# CHAPTER TWO.

## THE GENERAL DUTIES OF OFFICERS CHARGED WITH THE ENFORCEMENT OF THE CRIMINAL LAWS.

Article

### 1.  The Attorney-General.
Attorney-general shall represent the state...  28
Shall report to governor annually..........  29
May require certain officers to report to him.  30

### 2.  District and County Attorneys.
Duties of district attorneys.................  31
Same subject.  ..............................  32
Duties of county attorneys........ ... ......  33
Duty to present officer for neglect of duty, etc.......................................  34
Shall hear complaints, and what the same shall contain. .. ........ ..... ........  35
Special duty to file complaints for violations of "local option law "................35—Note
Duty when complaint has been made........  36
May administer oaths......................  37
Shall not dismiss case, unless, etc ..........  38
Attorney pro tem. may be appointed.........  39
Shall report to attorney-general when required....... ........... ..... ..........  40
Shall not be of counsel adverse to the state..  41

### 3.  Magistrates.
Who are magistrates.... ............... ......  42
Duty of magistrates.......................  43

Article

### 4.  Peace Officers.
Who are peace officers.....................  44
Certain military officers and privates are peace officers.......................44—Note
Duties and powers of peace officers.........  45
May summon aid when resisted.............  46
Person refusing to obey liable to prosecution  47
Officer neglecting to execute process may be fined for contempt................. .........  48

### 5.  Sheriffs.
Shall be a conservator of the peace, and arrest offenders, etc...................... ...  49
Keeper of jail.............................  50
Shall place in jail every person committed by lawful authority.........................  51
Sheriff shall notify district or county attorney of prisoners, etc.........................  52
May appoint a jailer, who shall be responsible  53
May rent room and employ guard, when.....  54
Deputy may perform duties of sheriff........  55

### 6.  Clerks of the District and County Courts.
Shall file all papers, issue process, etc........  56
Power of deputy clerks.... ...............  57
Shall report to attorney-general when required..... . ................... .........  58

### I. THE ATTORNEY-GENERAL.

<div style="float:left">Attorney-general shall represent the state, etc.<br>C.C.P. 28.</div>

ARTICLE 28.  It is the duty of the attorney-general to represent the state in all criminal cases in the court of appeals, except in cases where he may have been employed adversely to the state, previously to his election; and he shall not appear as counsel against the state in any court.

<div style="float:left">Shall report to governor annually.<br>P.D. 201.</div>

ART. 29.  He shall report to the governor on the first Monday of December, annually, and at such other times as the governor may require, the number of indictments which have been found by grand juries in this state for the preceding year; the number of informations filed in this state for the preceding year; the offenses charged in such indictments or informations; the number of arraignments, convictions and acquittals for each offense; the number of indictments and informations which have been disposed of without the intervention of a petit jury, with the cause and manner of such disposition; and also a summary of the judgments rendered on conviction, specifying the offense, the nature and amount of penalties imposed, and the amount of fines collected.

<div style="float:left">May require certain officers to report to him.<br>P.D. 202.<br>C.C.P. 944.</div>

ART. 30.  He may require the several district and county attorneys, clerks of the district and county courts in the state, to communicate to him at such times as he may designate, and in such form as he may prescribe, all the information necessary for his compliance with the requirements of the preceding article.

### II. DISTRICT AND COUNTY ATTORNEYS.

<div style="float:left">Duties of district attorneys.<br>C.C.P. 30.</div>

ART. 31.  It is the duty of each district attorney to represent the state in all criminal cases in the district courts of his district, except in cases where he has been, before his election, employed adversely, and he shall not appeal as counsel against the state, in any court, and he shall not, after the expiration of his term of office, appear as counsel against the state in any case in which he may have appeared as counsel for the state.

<div style="float:left">Same subject.<br>C.C.P. 31.</div>

ART. 32.  When any criminal proceeding is had before an examining court in his district, or before a judge upon *habeas corpus*, and he is notified of the same, and is at the time within the county where such proceeding is had, he shall represent the state therein, unless prevented by other official duties.

ART. 33.   It shall be the duty of the county attorney to attend the *Duties of coun-ty attorneys.* terms of the county and inferior courts of his county, and to represent *(Act Aug. 21,* the state in all criminal cases under examination or prosecution in said *1876, p. 283.) (Act Aug. 7,* courts.   He shall attend all criminal prosecutions before justices of the *1876, p. 85.)* peace in his county, when notified of the pendency of such prosecutions, *(Const., art. 5, §21.)* and when not prevented by other official duties.   He shall conduct all prosecutions for crimes and offenses cognizable in such county and inferior courts of his county, and shall prosecute and defend all other actions in such courts in which the state or the county is interested.   He shall also attend the terms of the district court in his county, and if there be a district attorney of the district including such county, and such district attorney be in attendance upon such court, the county attorney shall aid him when so requested, and when there is no such district attorney, or when he is absent, the county attorney shall represent the state in such court and perform the duties required by law of district attorneys.

ART. 34.   It shall be the duty of the district or county attorney to pre- *Duty to present officer for neg-* sent to the court having jurisdiction, any officer, by information, for the *lect of duty,* neglect or failure of any duty enjoined upon such officer, when such neglect *etc. (Act Aug. 7,* or failure can be presented by information, whenever it shall come to the *1876, p. 83.)* knowledge of said attorney that there has been a neglect or failure of duty upon the part of said officer; and it shall be his duty to bring to the notice of the grand jury all acts of violation of law, or neglect or failure of duty upon the part of any officer, when such violation, neglect or failure are not presented by information, and whenever the same may come to his knowledge.

ART. 35.   Upon complaint being made before a district or county attor- *Shall hear com-plaints, and* ney that an offense has been committed in his district or county, he shall *what the same* reduce the complaint to writing, and cause the same to be signed and *shall contain.* sworn to by the complainant, and it shall be duly attested by said attor- *(Act Aug. 7, 1876, p. 87, §13.)* ney.   Said complaint shall state the name of the accused, if his name is known, and if his name is not known it shall describe him as fully as possible, and the offense with which he is charged shall be stated in plain and intelligible words, and it must appear that the offense was committed in the county where the complaint is filed, and within a time not barred by limitation.

NOTE.—Chapter 42, acts 1879, makes it the special duty of the county attorney to *Special duty to* file or have filed complaints against all keepers of houses where liquor is sold for *file complaints* violations of the " local option " law.—L. *for violations of "local op-tion" law.*

ART. 36.   If the offense be a misdemeanor, the attorney shall forthwith *Duty when* prepare an information, and file the same, together with the complaint, in *complaint has been made.* the court having jurisdiction of the offense.   If the offense charged be a *(Act Aug. 7,* felony, he shall forthwith file the complaint with a magistrate of the *1876, p. 87, §15.)* county, and cause the necessary process to be issued for the arrest of the accused.

ART. 37.   For the purposes mentioned in the two preceding articles, *May adminis-ter oaths.* district and county attorneys are authorized to administer oaths. *(Act Aug. 7, 1876, p. 87, §14.)*

ART. 38.   The district or county attorney shall not dismiss a case unless *Shall not dis-* he shall file a written statement with the papers in the case, setting out *miss case, un-less, etc.* his reasons for such dismissal, which reasons shall be incorporated in the *(Act Aug. 7,* judgment of dismissal, and no case shall be dismissed without the per- *1876, p. 88, §20.)* mission of the presiding judge, who shall be satisfied that the reasons so stated are good and sufficient to authorize such dismissal.

ART. 39.   Whenever any district or county attorney shall fail to attend *Attorney pro* any term of the district, county or justice's court, the judge of said court, *tem. may be* or such justice, may appoint some competent attorney to perform the *appointed. (Act Aug. 7,* duties of such district or county attorney, who shall be allowed the same *1876, p. 87, §12.)* compensation for his services as are allowed the district or county attor-

ney. Said appointment shall not extend beyond the term of the court at which it is made, and shall be vacated upon the appearance of the district or county attorney.

**Shall report to attorney-general when required.** ART. 40. District and county attorneys shall, when required by the attorney-general, report to him at such times, and in accordance with such forms as he may direct, such information as he may desire in relation to criminal matters and the interests of the state, in their districts and counties.

**Shall not be of counsel adverse to the state.** **C.C.P. 30.** ART. 41. District and county attorneys shall not be of counsel adversely to the state in any case, in any court, nor shall they, after they cease to be such officers, be of counsel adversely to the state in any case in which they have been of counsel for the state.

### III. MAGISTRATES.

**Who are magistrates.** **C.C.P. 52.** ART. 42. Either of the following officers is a " magistrate " within the meaning of this Code: the judges of the supreme court, the judges of the court of appeals, the judges of the district court, the county judge of the county, either of the county commissioners, the justices of the peace, the mayor or recorder of an incorporated city or town.

**Duty of magistrates.** **C.C.P. 32.** ART. 43. It is the duty of every magistrate to preserve the peace within his jurisdiction by the use of all lawful means; to issue all process intended to aid in preventing and suppressing crime; to cause the arrest of offenders, by the use of lawful means, in order that they may be brought to punishment.

### IV. PEACE OFFICERS.

**Who are peace officers** **C.C.P. 53.** ART. 44. The following are " peace officers ": the sheriff and his deputies, constable, the marshal, constable or policeman of an incorporated town or city, and any private person specially appointed to execute criminal process.

**Certain military officers and privates are peace officers.** NOTE.—Section 6, chapter 123, acts 1879, clothes the officers, non-commissioned officers and privates of a military company, organized under the act, with the powers of peace officers, and requires them to aid the civil authorities in the execution of the law. They have authority to make arrests, but are to be governed in such cases by the law regulating sheriffs in the discharge of similar duty, and are to take an oath to discharge such duty faithfully and in accordance with law.—L.

**Duties and powers of peace officers.** **C.C.P.34** ART. 45. It is the duty of every peace officer to preserve the peace within his jurisdiction. To effect this purpose he shall use all lawful means. He shall, in every case where he is authorized by the provisions of this Code, interfere without warrant to prevent or suppress crime. He shall execute all lawful process issued to him by any magistrate or court. He shall give notice to some magistrate of all offenses committed within his jurisdiction, where he has good reason to believe there has been a violation of the penal law. He shall arrest offenders without warrant in every case where he is authorized by law, in order that they may be taken before the proper magistrate or court and be brought to punishment.

**May summon aid when resisted.** **C.C.P. 44.** ART. 46. Whenever a peace officer meets with resistance in discharging any duty imposed upon him by law, he shall summon a sufficient number of citizens of his county to overcome the resistance, and all persons summoned are bound to obey, and if they refuse are guilty of the offense prescribed in article 229 of the Penal Code.

**Person refusing to obey, liable to prosecution.** **C.C.P. 45.** ART. 47. The peace officer who has summoned any person to assist him in performing any duty, shall report such person if he refuse to obey, to the district or county attorney of the proper district or county, in order that he may be prosecuted for the offense.

**Officer neglecting to execute process may be fined for contempt.** **(Act Feb. 11, 1860.)** ART. 48. If any sheriff or other officer shall willfully refuse or fail from neglect, to execute any summons, subpœna or attachment for a witness, or any other legal process, which it is made his duty by law to execute, he shall be liable to a fine for contempt not less than ten nor more than two hundred dollars, at the discretion of the court having cognizance

# APPENDIX TAB E

Excerpts from the 1925 Texas Revised Civil Statutes.

# Texas Historical Statutes Project

1925
CONSTITUTION
OF THE
UNITED STATES AND TEXAS



This project was made possible by the
**Texas State Law Library**
and a grant from the
**Litigation Section of the State Bar of Texas**

This project was made possible by the
**Texas State Law Library**
and a grant from the
**Litigation Section of the State Bar of Texas**

## 3.   GENERAL PROVISIONS.

|                                          | Article |                                           | Article |
|------------------------------------------|---------|-------------------------------------------|---------|
| Qualifications                           | 332     | Collection reports                        | 337     |
| Report to Attorney General               | 333     | Register                                  | 338     |
| Shall advise officers                    | 334     | To prosecute officers                     | 339     |
| Collections and fees                     | 335     | Admissions                                | 340     |
| Accepting reward                         | 336     | Population determined                     | 341     |

Art. 332.   [352] [354] [355]   **Qualifications.**—No person who is not a duly licensed attorney at law shall be eligible to the office of district or county attorney.   District and county attorneys shall reside in the district and county, respectively, for which they were elected; and they shall, as soon as practicable after their election and qualification, notify the Attorney General and Comptroller of their post-office address.   [Acts 1876, p. 85.]

Art. 333.   **To report to Attorney General.**—District and County Attorneys shall, when required by the Attorney General, report to him at such times and in such form as he may direct, such information as he may desire in relation to criminal matters and the interests of the State, in their districts and counties.

Art. 334.   [356] [290] [253]   **Shall advise officers.**—The district and county attorneys, upon request, shall give an opinion or advice in writing to any county or precinct officer of their district or county, touching their official duties.   [Acts 1913, p. 48.]

Art. 335.   [363] [297] [257]   **Collection and fees.**—Whenever a district or county attorney has collected money for the State or for any county, he shall within thirty days after receiving the same, pay it into the treasury of the State or of the county in which it belongs, after deducting therefrom and retaining the commissions allowed him thereon by law.   Such district or county attorney shall be entitled to ten per cent commissions on the first thousand dollars collected by him in any one case for the State or county from any individual or company, and five per cent on all sums over one thousand dollars, to be retained out of the money when collected, and he shall also be entitled to retain the same commissions on all collections made for the State or for any county.   This article shall also apply to money realized for the State under the escheat law.   [Acts 1876, p. 86; G. L. Vol. 8, p. 922.]

Art. 336.   [365] [299] [259]   **Accepting reward.**—No district or county attorney shall take any fee, article of value, compensation, reward or gift or any promise thereof, from any person whomsoever, to prosecute any case which he is required by law to prosecute, or consideration of or as a testimonial for his services in any case which he is required by law to prosecute, either before or after such case has been tried and finally determined.   [Id.]

Art. 337.   [361] [362]   **Collection reports.**—On or before the last day of August of each year, each district or county attorney shall file in the office of the Comptroller or of the county treasurer, as the case may be, a sworn account of all money received by him by virtue of his office during the preceding year, payable into the State or county treasury.   [Id.]

Art. 4410. **Escheats.**—The Attorney General shall institute and prosecute, or cause to be instituted and prosecuted, all suits and proceedings necessary to recover for and on behalf of the State all properties, real, personal or mixed, that have escheated or may escheat to the State under the laws of the State. [Acts 1917, p. 376.]

Art. 4411. [4429] [2902] [2807] **No admission to prejudice.**—No admission, agreement or waiver, made by the Attorney General, in any action or suit in which the State is a party, shall prejudice the rights of the State. [Acts 1846, p. 206; P. D. 211; G. L. Vol. 2, p. 1148.]

Art. 4412. [4431] **First office assistant.**—In case of the absence or inability of the Attorney General to act, the first office assistant of the Attorney General shall discharge the duties which devolve by law upon the Attorney General. [Act 1903, p. 117.]

Art. 4413. **Biennial report.**—The Attorney General shall report to the Governor biennially on the first Monday in December next preceding the expiration of his official term the number of indictments which have been found by grand juries in this State for the two preceding years; the offenses charged, the number of trials, convictions and acquittals for each offense; the number of dismissals and also a summary of the judgments rendered on conviction, the nature and amount of penalties imposed and the amount of fines collected. This report shall also give a general summary of all the business, civil and criminal, disposed of by the Supreme Court and Court of Criminal Appeals, so far as the State may be a party, and all civil causes to which the State is a party prosecuted or defended by him in any other courts, State or Federal. [Acts 1885, p. 61; G. L. Vol. 9, p. 681.]

# APPENDIX TAB F

COMPLETE TEX. STATUTES at 1387 (Vernon's 1928) (Table Showing Corresponding Articles in 1879 and 1925 Codes of Criminal Procedure).

# ARTICLES OF THE
## 1879 CODE OF CRIMINAL PROCEDURE

SHOWING CORRESPONDING ARTICLES IN

## 1925 VERNON'S ANNOTATED REVISED CRIMINAL AND CIVIL STATUTES

AND

## 1928 COMPLETE TEXAS STATUTES

---

This table of corresponding articles is intended to show those articles of the 1879 Code of Criminal Procedure which have been carried into Vernon's Annotated Revised Criminal and Civil Statutes 1925 and the 1928 Complete Texas Statutes.

---

| C.C.P. 1879 Art. | C.C.P. 1925 and 1928 Art. | C.C.P. 1879 Art. | C.C.P. 1925 and 1928 Art. | C.C.P. 1879 Art. | C.C.P. 1925 and 1928 Art. | C.C.P. 1879 Art. | C.C.P. 1925 and 1928 Art. |
|---|---|---|---|---|---|---|---|
| 1 | 1 | 60 | 48 | 117 | 103 | 173 | 155 |
| 3 | 2 | 61 | 49 | 118 | 104 | 174 | 156 |
| 4 | 3 | 62 | 50 | 119 | 105 | 175 | 157 |
| 5 | 4 | 63 | 35 | 120 | 106 | 176 | 158 |
| 6 | 5 | 64 | 51 | 121 | 107 | 177 | 159 |
| 7 | 6 | 68 | 54 | 122 | 108 | 178 | 160 |
| 8 | 7 | 69 | 55 | 123 | 109 | 179 | 161 |
| 9 | 8 | 70 | 54 | 125 | 110 | 180 | 162 |
| 10 | 10 | 71 | 117 | 126 | 111 | 181 | 163 |
| 11 | 13 | 72 | 52—88, 56 | 128 | 112 | 182 | 164 |
| 12 | 14 | 73 | 52—89, 59 | 129 | 89 | 183 | 165 |
| 13 | 15 | 74 | 52—90, 117 | 130 | 113 | 184 | 166 |
| 14 | 16 | 75 | 52—91, 57 | 131 | 113 | 185 | 167 |
| 15 | 17 | 75a | 52—157, 58; Civ. 2455 | 132 | 114 | 186 | 168 |
| 16 | 18 | 76 | 60 | 133 | 115 | 187 | 169 |
| 17 | 19 | 77 | 61 | 134 | 116 | 188 | 170 |
| 19 | 20 | 79 | 63 | 135 | 117 | 189 | 171 |
| 21 | 9 | 80 | 65 | 136 | 118 | 191 | 172 |
| 22 | 12 | 81 | 66 | 137 | 119 | 192 | 173 |
| 23 | 11 | 82 | 67 | 138 | 120 | 193 | 174 |
| 24 | 21 | 83 | 68 | 139 | 121 | 194 | 175 |
| 25 | 22 | 84 | 69 | 140 | 122 | 195 | 176 |
| 26 | 23 | 85 | 70 | 141 | 123 | 196 | 177 |
| 27 | 24 | 86 | 71 | 142 | 124 | 197 | 178 |
| 29 | Civ. 4413 | 87 | 72 | 143 | 125 | 198 | 179 |
| 31 | 25 | 88 | 74 | 144 | 126 | 199 | 180 |
| 32 | 25 | 89 | 73 | 145 | 127 | 200 | 181 |
| 33 | 26 | 90 | 75 | 146 | 128 | 201 | 182 |
| 34 | 27 | 91 | 76 | 147 | 129 | 202 | 183 |
| 35 | 28 | 92 | 77 | 148 | 130 | 203 | 184 |
| 36 | 29 | 93 | 78 | 149 | 131 | 204 | 185 |
| 37 | 30 | 94 | 79 | 150 | 132 | 205 | 186 |
| 38 | 577 | 95 | 80 | 151 | 133 | 206 | 187 |
| 39 | 31 | 96 | 81 | 152 | 134 | 207 | 188 |
| 40 | Civ. 333 | 97 | 82 | 153 | 135 | 208 | 189 |
| 41 | 32 | 98 | 83 | 154 | 136 | 209 | 190 |
| 42 | 33 | 99 | 84 | 155 | 137 | 210 | 191 |
| 43 | 34 | 100 | 85 | 156 | 138 | 211 | 192 |
| 44 | 36 | 101 | 86 | 157 | 139 | 212 | 193 |
| 45 | 37 | 102 | 87 | 158 | 140 | 213 | 194 |
| 46 | 38 | 103 | 88 | 159 | 141 | 214 | 195 |
| 47 | 39 | 104 | 90 | 160 | 142 | 215 | 196 |
| 48 | 40 | 105 | 91 | 161 | 143 | 216 | 197 |
| 49 | 41 | 106 | 92 | 162 | 144 | 216a | 199 |
| 50 | Civ. 5116 | 107 | 93, 94 | 163 | 145 | 216b | 200 |
| 51 | 42 | 108 | 94 | 164 | 146 | 217 | 201 |
| 52 | 43 | 109 | 95 | 165 | 147 | 218 | 202 |
| 53 | Civ. 5116 | 110 | 96 | 166 | 148 | 219 | 203 |
| 54 | Civ. 5116 | 111 | 97 | 167 | 149 | 220 | 204 |
| 55 | 44 | 112 | 98 | 168 | 150 | 221 | 205 |
| 56 | 45 | 113 | 99 | 169 | 151 | 222 | 208 |
| 57 | 46 | 114 | 100 | 170 | 152 | 223 | 209 |
| 58 | 47 | 115 | 101 | 171 | 153 | 224 | 210 |
| 59 | 48 | 116 | 102 | 172 | 154 | 225 | 211 |

# APPENDIX TAB G

Excerpts from Act of May 17, 1985, 69th Leg., R.S., ch. 480, § 1, 1985 Tex. Gen. Laws 1720, 1919 (codified as TEX. GOV'T CODE § 41.006).

Passed the Senate on May 2, 1985, by the following vote: Yeas 31, Nays 0; passed the House on May 17, 1985, by a non-record vote.

Approved: June 11, 1985

Effective: September 1, 1985

---

## CHAPTER 480

### S.B. No. 1228

An Act relating to adoption of a nonsubstantive revision of the statutes relating to the judiciary; making conforming amendments and repeals and including penalties.

*Be it enacted by the Legislature of the State of Texas:*

**SECTION 1. ADOPTION OF CODE TITLE.** Title 2, Government Code, is adopted to read as follows:

## GOVERNMENT CODE

TITLE 2. JUDICIAL BRANCH

    Subtitle A. Courts

        Chapter 21. General Provisions

        Chapter 22. Appellate Courts

        Chapter 23. General Provisions for Trial Courts

        Chapter 24. District Courts

        Chapter 25. [reserved for Statutory County Courts]

        Chapter 26. Constitutional County Courts

        Chapter 27. Justice Courts

        Chapter 28. Small Claims Courts

        Chapter 29. Municipal Courts

        Chapter 30. Municipal Courts of Record

    Subtitle B. Judges

        Chapter 31. Additional Compensation of Justices of Courts of Appeals

        Chapter 32. Supplemental Compensation of District Judges for Certain Duties

        Chapter 33. State Commission on Judicial Conduct

        [Chapters 34-40 reserved for expansion]

    Subtitle C. Prosecuting Attorneys

        Chapter 41. General Provisions

        Chapter 42. State Prosecuting Attorney

        Chapter 43. District Attorneys

        Chapter 44. Criminal District Attorneys

        Chapter 45. County Attorneys

        Chapter 46. Professional Prosecutors

        Chapter 47. Prosecutor Council; Discipline of Prosecutors

        [Chapters 48-50 reserved for expansion]

    Subtitle D. Judicial Personnel and Officials

        Chapter 51. Clerks

        Chapter 52. Court Reporters

        Chapter 53. Bailiffs

        Chapter 54. Masters; Magistrates; Referees

        Chapter 55. Other Court Personnel

        [Chapters 56-60 reserved for expansion]

    Subtitle E. Juries

        Chapter 61. General Provisions

        Chapter 62. Petit Juries

        [Chapters 63-70 reserved for expansion]

    Subtitle F. Court Administration

        Chapter 71. Texas Judicial Council

Chapter 72. Office of Court Administration

Chapter 73. Administration of Courts of Appeals

Chapter 74. Administration of District Courts

Chapter 75. Other Court Administration

[Chapters 76-80 reserved for expansion]

Subtitle G. [reserved for State Bar Act, Board of Law Examiners, and statutes relating to licensing of attorneys]

Subtitle H. Information Resources

Chapter 91. State Law Library

# TITLE 2. JUDICIAL BRANCH

## SUBTITLE A. COURTS

### CHAPTER 21. GENERAL PROVISIONS

Sec. 21.001. INHERENT POWER AND DUTY OF COURTS

Sec. 21.002. CONTEMPT OF COURT

Sec. 21.003. OFFICERS NOT TO APPEAR

Sec. 21.004. STATE OF JUDICIARY MESSAGE

### CHAPTER 21. GENERAL PROVISIONS

Sec. 21.001. INHERENT POWER AND DUTY OF COURTS. (a) A court has all powers necessary for the exercise of its jurisdiction and the enforcement of its lawful orders, including authority to issue the writs and orders necessary or proper in aid of its jurisdiction.

(b) A court shall require that proceedings be conducted with dignity and in an orderly and expeditious manner and control the proceedings so that justice is done. (V.A.C.S. Art. 1911a, Sec. 1 (part).)

Sec. 21.002. CONTEMPT OF COURT. (a) A court may punish for contempt.

(b) The punishment for contempt of a court other than a justice court or municipal court is a fine of not more than $500 or confinement in the county jail for not more than six months, or both such a fine and confinement in jail.

(c) The punishment for contempt of a justice court or municipal court is a fine of not more than $100 or confinement in the county or city jail for not more than three days, or both such a fine and confinement in jail.

(d) An officer of a court who is held in contempt by a trial court shall, on proper motion filed in the offended court, be released on his own personal recognizance pending a determination of his guilt or innocence by a judge of a district court that is not the offended court. The presiding judge of the administrative judicial district in which the alleged contempt occurred shall appoint a judge of a district court other than the offended court to determine the guilt or innocence of the officer of the court.

(e) This section does not affect a court's power to confine a contemner to compel him to obey a court order.

(f) Section 5, Article 42.03, Code of Criminal Procedure, 1965, and Section 14.12, Family Code, apply when a person is punished by confinement for contempt of court for disobedience of a court order to make periodic payments for the support of a child. (V.A.C.S. Art. 1911a, Secs. 1 (part), 2, 3, 4.)

Sec. 21.003. OFFICERS NOT TO APPEAR. (a) A judge or clerk of the supreme court, the court of criminal appeals, a court of appeals, or a district court may not appear and plead as an attorney at law in any court of record in this state.

(b) A county judge or county clerk who is licensed to practice law may not appear and practice as an attorney at law in any county or justice court except in cases over which the court in which the judge or clerk serves has neither original nor appellate jurisdiction.

(c) A county clerk who is licensed to practice law may not appear and practice as an attorney at law in the supreme court, the court of criminal appeals, a court of appeals, or a district court unless the court in which the clerk serves has neither original nor appellate jurisdiction. (V.A.C.S. Art. 319 (part).)

Sec. 21.004. STATE OF JUDICIARY MESSAGE. (a) At a convenient time at the commencement of each regular session of the legislature, the chief justice of the supreme court shall deliver a state of the judiciary message evaluating the accessibility of the courts to the citizens of the state and the future directions and needs of the courts of the state.

(2) the deponent's name and residence;

(3) the directions, if any, of the commission or special master; and

(4) a request for an order requiring the person to appear and testify before a designated officer.

(c) On the filing of the petition, the court may order the person to appear and testify. The clerk shall issue a subpoena for the deposition. The person taking the deposition shall take and return it in the manner prescribed by law for depositions in civil actions.

(d) Failure to obey the subpoena or an order connected with the subpoena shall be dealt with as contempt. (V.A.C.S. Art. 5966a, Sec. 9.)

Sec. 33.028. PROCESS AND ORDERS. (a) Process issued in an investigation or formal proceeding under this chapter is valid anywhere in the state.

(b) On request of the commission, a commission member, or an authorized representative of the commission, a sheriff or a constable shall serve any process or execute lawful orders issued by the commission. A commission member, a special master, or a person whom the commission designates may also serve process or execute a lawful order of the commission. (V.A.C.S. Art. 5966a, Secs. 5, 7.)

Sec. 33.029. WITNESSES' EXPENSES. A witness other than an officer or employee of the state or a political subdivision or court of the state is entitled to the same mileage expenses and per diem as a witness before a state grand jury. The commission shall pay these amounts from its appropriated funds. (V.A.C.S. Art. 5966a, Sec. 10.)

Sec. 33.030. ASSISTANCE TO COMMISSION AND SPECIAL MASTER. (a) On request of the commission, the attorney general shall act as its counsel generally or in a particular investigation or proceeding.

(b) A state or local government body or department, an officer or employee of a state or local government body, or an official or agent of a state court shall cooperate with and give reasonable assistance and information to the commission, an authorized representative of the commission, or a special master concerning an investigation or proceeding before the commission or master. (V.A.C.S. Art. 5966a, Secs. 2 (part), 4.)

Sec. 33.031. NO AWARD OF COSTS. The commission, a special master, or a district court may not award costs in a proceeding under this chapter. (V.A.C.S. Art. 5966a, Sec. 11.)

Sec. 33.032. CONFIDENTIALITY OF PAPERS, RECORDS, AND PROCEEDINGS. The papers filed with and proceedings before the commission are confidential prior to the convening of a formal hearing. The formal hearing, and all papers, records, documents, and other evidence introduced during the formal hearing, shall be public. (V.A.C.S. Art. 5966a, Sec. 8A.)

Sec. 33.033. NOTIFICATION TO COMPLAINANT. (a) The commission shall promptly notify a complainant of judicial conduct of the disposition of the complaint.

(b) The communication shall inform the complainant that:

(1) the complaint has no basis and has been dismissed;

(2) appropriate action has been taken, the nature of which will not be disclosed; or

(3) formal proceedings have been instituted.

(c) The communication may not contain the name of a judge unless formal proceedings have been instituted. (V.A.C.S. Art. 5966a, Sec. 15A.)

[Chapters 34-40 reserved for expansion]

## SUBTITLE C. PROSECUTING ATTORNEYS

## CHAPTER 41. GENERAL PROVISIONS

## SUBCHAPTER A. OFFICE OF PROSECUTING ATTORNEY

Sec. 41.001. QUALIFICATIONS

Sec. 41.002. NOTIFICATION OF ADDRESS

Sec. 41.003. ADMISSION BY PROSECUTOR

Sec. 41.004. ACCEPTANCE OF REWARD

Sec. 41.005. COLLECTION OF MONEY

Sec. 41.006. REPORT TO ATTORNEY GENERAL

Sec. 41.007. OPINIONS TO COUNTY AND PRECINCT OFFICIALS

Sec. 41.008. REGISTER

Sec. 41.009. PROSECUTION OF OFFICERS ENTRUSTED WITH PUBLIC FUNDS

Sec. 41.010. APPOINTMENT OF INITIAL DISTRICT OR CRIMINAL DISTRICT AT-
TORNEY

[Sections 41.011-41.100 reserved for expansion]

SUBCHAPTER B. STAFF OF PROSECUTING ATTORNEY

Sec. 41.101. DEFINITION

Sec. 41.102. EMPLOYMENT OF ASSISTANTS AND PERSONNEL

Sec. 41.103. ASSISTANT PROSECUTING ATTORNEYS

Sec. 41.104. BOND

Sec. 41.105. REMOVAL

Sec. 41.106. COMPENSATION

Sec. 41.107. EQUIPMENT AND SUPPLIES

Sec. 41.108. GIFTS AND GRANTS

Sec. 41.109. AUTHORITY OF INVESTIGATOR

[Sections 41.110-41.200 reserved for expansion]

SUBCHAPTER C. APPORTIONMENT OF STATE FUNDS FOR
PROSECUTION IN CERTAIN COUNTIES

Sec. 41.201. ELIGIBLE COUNTIES

Sec. 41.202. TRANSFER BY COMPTROLLER

Sec. 41.203. AMOUNT OF TRANSFER

Sec. 41.204. APPORTIONMENT BY COMMISSIONERS COURT

## CHAPTER 41. GENERAL PROVISIONS

### SUBCHAPTER A. OFFICE OF PROSECUTING ATTORNEY

Sec. 41.001. QUALIFICATIONS. A district or county attorney must be a licensed attorney. (V.A.C.S. Art. 332 (part).)

Sec. 41.002. NOTIFICATION OF ADDRESS. Each district and county attorney shall notify the attorney general and comptroller of his post office address as soon as practicable after his election and qualification. (V.A.C.S. Art. 332 (part).)

Sec. 41.003. ADMISSION BY PROSECUTOR. An admission made by a district or county attorney in a suit or action to which the state is a party does not prejudice the rights of the state. (V.A.C.S. Art. 340.)

Sec. 41.004. ACCEPTANCE OF REWARD. A district or county attorney, either before or after the case is tried and finally determined, may not take from any person a fee, article of value, compensation, reward, or gift, or a promise of any of these, to prosecute a case that he is required by law to prosecute or as consideration or a testimonial for his services in a case that he is required by law to prosecute. (V.A.C.S. Art. 336.)

Sec. 41.005. COLLECTION OF MONEY. (a) Not later than the 30th day after the date on which a district or county attorney receives any money collected for the state or a county, the district or county attorney shall, after deducting the commissions provided by this section, pay the money into the treasury of the state or of the county to which it belongs.

(b) The district or county attorney may retain a commission from money collected for the state or a county. The amount of the commission in any one case is 10 percent of the first $1,000 collected, and five percent of the amount collected over $1,000.

(c) Subsections (a) and (b) of this section also apply to money realized for the state under the laws governing escheat.

(d) Not later than the last day of August of each year, each district and county attorney shall file in the office of the comptroller or of the county treasurer, as the case may be, a sworn account of all money received by him by virtue of his office during the preceding year and payable into the state or county treasury. (V.A.C.S. Arts. 335, 337.)

Sec. 41.006. REPORT TO ATTORNEY GENERAL. At the times and in the form that the attorney general directs, the district and county attorneys shall report to the attorney general the information from their districts and counties that the attorney general desires relating to criminal matters and the interests of the state. (V.A.C.S. Art. 333.)

Sec. 41.007. OPINIONS TO COUNTY AND PRECINCT OFFICIALS. A district or county attorney, on request, shall give to a county or precinct official of his district or county a written opinion or written advice relating to the official duties of that official. (V.A.C.S. Art. 334.)

Sec. 41.008. REGISTER. (a) Each district or county attorney shall keep a register of all his official acts and reports, all actions or demands prosecuted or defended by him as district or county attorney, and all proceedings held in relation to his official acts.

(b) A district or county attorney shall keep the register in proper books obtained by him for that purpose at his own expense.

(c) The register shall be available at all times for inspection by any person appointed to examine it by the governor or by the commissioners court of a county.

(d) Each district and county attorney shall deliver the books that comprise the register to his successor in office. (V.A.C.S. Art. 338.)

Sec. 41.009. PROSECUTION OF OFFICERS ENTRUSTED WITH PUBLIC FUNDS. If a district or county attorney learns that an officer in his district or county who is entrusted with the collection or safekeeping of public funds is neglecting or abusing the trust confided in him or is failing to discharge his duties under the law, the district or county attorney shall institute the proceedings that are necessary to compel the performance of the officer's duties and to preserve and protect the public interest. (V.A.C.S. Art. 339.)

Sec. 41.010. APPOINTMENT OF INITIAL DISTRICT OR CRIMINAL DISTRICT ATTORNEY. If a new office of district attorney or criminal district attorney is created, the governor shall appoint a person to fill the office until the next general election. (V.A.C.S. Art. 199a, Sec. 6.001 (part).)

[Sections 41.011-41.100 reserved for expansion]

## SUBCHAPTER B. STAFF OF PROSECUTING ATTORNEY

Sec. 41.101. DEFINITION. In this subchapter, "prosecuting attorney" means a county attorney, district attorney, or criminal district attorney. (V.A.C.S. Art. 332a, Sec. 1.)

Sec. 41.102. EMPLOYMENT OF ASSISTANTS AND PERSONNEL. A prosecuting attorney may employ the assistant prosecuting attorneys, investigators, secretaries, and other office personnel that in his judgment are required for the proper and efficient operation and administration of the office. (V.A.C.S. Art. 332a, Sec. 2.)

Sec. 41.103. ASSISTANT PROSECUTING ATTORNEYS. (a) An assistant prosecuting attorney must be licensed to practice law in this state and shall take the constitutional oath of office.

(b) An assistant prosecuting attorney may perform all duties imposed by law on the prosecuting attorney. (V.A.C.S. Art. 332a, Sec. 3.)

Sec. 41.104. BOND. A prosecuting attorney may require his assistant prosecuting attorneys, investigators, and secretaries to have a bond in the amount that the prosecuting attorney sets. (V.A.C.S. Art. 332a, Sec. 4 (part).)

Sec. 41.105. REMOVAL. All personnel of a prosecuting attorney's office are subject to removal at the will of the prosecuting attorney. (V.A.C.S. Art. 332a, Sec. 4 (part).)

Sec. 41.106. COMPENSATION. (a) A prosecuting attorney shall fix the salaries of his assistant prosecuting attorneys, investigators, secretaries, and other office personnel, subject to the approval of the commissioners court of the county or counties composing the district.

(b) In addition to their salaries, assistant prosecuting attorneys and investigators may be allowed actual and necessary travel expenses incurred in the discharge of their duties, not to exceed the amount fixed by the prosecuting attorney and approved by the commissioners court of the county or counties composing the district. The county may pay claims for travel expenses from the general fund, the officers' salary fund, or any other available funds of the county. (V.A.C.S. Art. 332a, Secs. 5, 6.)

Sec. 41.107. EQUIPMENT AND SUPPLIES. (a) The commissioners court of the county or counties composing a district may furnish telephone service, typewriters, office furniture, office space, supplies, and the other items and equipment that are necessary to carry out the official duties of the prosecuting attorney's office and may pay the expenses incident to the operation of the office.

(b) The commissioners court of the county or counties composing a district may furnish automobiles for the use of the prosecuting attorney's office in conducting the official duties of the office and may provide for the maintenance of the automobiles. (V.A.C.S. Art. 332a, Sec. 7.)

Sec. 41.108. GIFTS AND GRANTS. The commissioners court of the county or counties composing a district may accept gifts and grants from any foundation or association for the purpose of financing adequate and effective prosecution programs in the county or district. (V.A.C.S. Art. 332a, Sec. 8.)

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Alysa Slocum on behalf of Brad Snead
Bar No. 24049835
slocum@wrightclosebarger.com
Envelope ID: 104532011
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Brief of the Travis County, Harris County, El Paso County, Dallas County, Bexar County, and Williamson County Appellees
Status as of 8/19/2025 7:13 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Christopher Garza | 24078543 | christopher.garza@harriscountytx.gov | 8/18/2025 11:41:55 PM | SENT |
| Cynthia Veidt | 24028092 | cynthia.veidt@traviscountytx.gov | 8/18/2025 11:41:55 PM | SENT |
| Christina Sanchez | 24062984 | christina.sanchez@epcounty.com | 8/18/2025 11:41:55 PM | SENT |
| Jonathan Fombonne | 24102702 | jonathan.fombonne@harriscountytx.gov | 8/18/2025 11:41:55 PM | SENT |
| William FCole | | William.Cole@oag.texas.gov | 8/18/2025 11:41:55 PM | SENT |
| Nicole A.Myette | | nicole.myette@oag.texas.gov | 8/18/2025 11:41:55 PM | SENT |
| Tiffany Bingham | 24012287 | tiffany.bingham@harriscountytx.gov | 8/18/2025 11:41:55 PM | SENT |
| Nancy Villarreal | | nancy.villarreal@oag.texas.gov | 8/18/2025 11:41:55 PM | SENT |
| William Farrell | | biff.farrell@oag.texas.gov | 8/18/2025 11:41:55 PM | SENT |
| Joshua Woods | | woods@wrightclosebarger.com | 8/18/2025 11:41:55 PM | SENT |
| Bradley W.Snead | | snead@wrightclosebarger.com | 8/18/2025 11:41:55 PM | SENT |
| Michael Adams-Hurta | | hurta@wrightclosebarger.com | 8/18/2025 11:41:55 PM | SENT |
| Eric Abels | | Eric.Abels@oag.texas.gov | 8/18/2025 11:41:55 PM | SENT |
| Ben Mendelson | | Ben.Mendelson@oag.texas.gov | 8/18/2025 11:41:55 PM | SENT |
| Cynthia W.Veidt | | cynthia.veidt@traviscountytx.gov | 8/18/2025 11:41:55 PM | SENT |
| Alexandria Oberman | | aoberman@milchev.com | 8/18/2025 11:41:55 PM | SENT |
| Katharine Tafuri | | ktafuri@milchev.com | 8/18/2025 11:41:55 PM | SENT |
| Leslie W. Dippel | | Leslie.Dippel@traviscountytx.gov | 8/18/2025 11:41:55 PM | SENT |
| Todd A. Clark | | Todd.Clark@traviscountytx.gov | 8/18/2025 11:41:55 PM | SENT |
| Jonathan G.C. Fombonne | | Jonathan.Fombonne@harriscountytx.gov | 8/18/2025 11:41:55 PM | SENT |
| Tiffany S. Bingham | | Tiffany.Bingham@harriscountytx.gov | 8/18/2025 11:41:55 PM | SENT |
| Christopher Garza | | Christopher.Garza@harriscountytx.gov | 8/18/2025 11:41:55 PM | SENT |
| Justin C. Pfeiffer | | jpfeiffer@gavrilovlaw.com | 8/18/2025 11:41:55 PM | SENT |
| Christina Sanchez | | Ch.sanchez@epcountytx.gov | 8/18/2025 11:41:55 PM | SENT |

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Alysa Slocum on behalf of Brad Snead
Bar No. 24049835
slocum@wrightclosebarger.com
Envelope ID: 104532011
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Brief of the Travis County, Harris County, El Paso County, Dallas County, Bexar County, and Williamson County Appellees
Status as of 8/19/2025 7:13 AM CST

Case Contacts

| | | | | |
|---|---|---|---|---|
| Christina  Sanchez | | Ch.sanchez@epcountytx.gov | 8/18/2025 11:41:55 PM | SENT |
| Bernardo  Rafael Cruz | | b.cruz@epcountytx.gov | 8/18/2025 11:41:55 PM | SENT |
| C.  RobertHeath | | bheath@bickerstaff.com | 8/18/2025 11:41:55 PM | SENT |
| Randy T. Leavitt | | randy@randyleavitt.com | 8/18/2025 11:41:55 PM | SENT |
| William  H. Farrell | | bill.farrell@oag.texas.gov | 8/18/2025 11:41:55 PM | ERROR |
| Cynthia  W. Veidt | | Cyntia.Vedt@traviscountytx.gov | 8/18/2025 11:41:55 PM | ERROR |
| Alexandria  Oberman | | aoberman@milchev.com | 8/18/2025 11:41:55 PM | SENT |
| Michael  J. Statin | | mstatin@milchev.com | 8/18/2025 11:41:55 PM | ERROR |
| Laura  G. Ferguson | | lferguson@milchev.com | 8/18/2025 11:41:55 PM | SENT |
| Jacob Beach | | Jacob.Beach@oag.texas.gov | 8/18/2025 11:41:55 PM | SENT |
| Michael J.Satin | | msatin@milchev.com | 8/18/2025 11:41:55 PM | SENT |
| Laura G.Ferguson | | lferguson@milchev.com | 8/18/2025 11:41:55 PM | SENT |
| William H. Farrell H.Farrell | | bill.farrell@oag.texas.gov | 8/18/2025 11:41:55 PM | ERROR |
| Leslie W.Dippel | | leslie.dippel@traviscountytx.gov | 8/18/2025 11:41:55 PM | SENT |
| Leslie W.Dippel | | leslie.dippel@traviscountytx.gov | 8/18/2025 11:41:55 PM | SENT |
| Bradely W.Snead | | snead@wrightclosebarger.com | 8/18/2025 11:41:55 PM | SENT |
| Bernardo Cruz | | b.cruz@epcountytx.gov | 8/18/2025 11:41:55 PM | SENT |
| Bernardo Cruz | | b.cruz@epcountytx.gov | 8/18/2025 11:41:55 PM | SENT |
| Bernardo Cruz | | b.cruz@epcountytx.gov | 8/18/2025 11:41:55 PM | SENT |
| Alexandria Oberman Oberman | | aoberman@milchev.com | 8/18/2025 11:41:55 PM | SENT |
| Alexandria Oberman | | aoberman@milchev.com | 8/18/2025 11:41:55 PM | SENT |
| Alexandria Oberman | | aoberman@milchev.com | 8/18/2025 11:41:55 PM | SENT |
| Melissa Contreras | | m.contreras@epountytx.gov | 8/18/2025 11:41:55 PM | SENT |
| Isela Baeza | | i.baeza@epcountytx.gov | 8/18/2025 11:41:55 PM | SENT |
| Isela Jones | | carl.jones@epcountytx.gov | 8/18/2025 11:41:55 PM | SENT |

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Alysa Slocum on behalf of Brad Snead
Bar No. 24049835
slocum@wrightclosebarger.com
Envelope ID: 104532011
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Brief of the Travis County, Harris County, El Paso County, Dallas County, Bexar County, and Williamson County Appellees
Status as of 8/19/2025 7:13 AM CST

Case Contacts

| Isela Jones | | carl.jones@epcountytx.gov | 8/18/2025 11:41:55 PM | SENT |
|---|---|---|---|---|
| Pamela Lopez | | Pam.Lopez@epcountytx.gov | 8/18/2025 11:41:55 PM | SENT |
| Amy Pollock | | amy.pollock@traviscountytx.gov | 8/18/2025 11:41:55 PM | SENT |
| Michael J. Satin | | msatin@milchev.com | 8/18/2025 11:41:55 PM | SENT |
| Andrea Mintzer | | andrea.mintzer@harriscountytx.gov | 8/18/2025 11:41:55 PM | SENT |
| Andrea Mintzer | | andrea.mintzer@harriscountytx.gov | 8/18/2025 11:41:55 PM | SENT |